UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FINANCIAL RESOURCES NETWORK, INC.,
FINANCIAL FAMILY HOLDINGS LLC,
ROSALIND HERMAN and GREGG D. CAPLITZ,
        Plaintiffs,


                    v.                                    CIVIL ACTION NO.
                                                          09-11315-MBB


BROWN & BROWN, INC., BROWN & BROWN OF
CALIFORNIA, INC., AMERICAN GUARANTEE
AND LIABILITY INSURANCE COMPANY, ZURICH
NORTH AMERICA COMPANY and CALSURANCE,
        Defendants.


**MEMORANDUM AND ORDER RE:**
**MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS AMERICAN GUARANTEE**
**AND LIABILITY INSURANCE COMPANY AND ZURICH NORTH AMERICA**
**COMPANY (DOCKET ENTRY # 46); MOTION FOR SUMMARY JUDGMENT**
**BY DEFENDANTS BROWN & BROWN OF CALIFORNIA, INC., BROWN**
**& BROWN, INC., AND CALSURANCE (DOCKET ENTRY # 54);**
**PLAINTIFFS' CROSS MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**
**(DOCKET ENTRY # 59)**

**November 18, 2010**


**BOWLER, U.S.M.J.**

        Pending before this court is a motion for summary judgment

on counts II through IX filed by defendants American Guarantee

and Liability Insurance Company ("American Guarantee") and Zurich

North America Company ("Zurich North").  (Docket Entry # 46).

Adopting the arguments in the American Guarantee and Zurich North

summary judgment motion, defendants Brown & Brown, Inc. ("B&B"),

Brown & Brown of California, Inc. ("BBC") and Calsurance also

move for summary judgment.  (Docket Entry # 54).  Plaintiffs
Financial Resources Network, Inc. ("Financial Resources"),
Financial Family Holdings LLC ("FFH"), Rosalind Herman ("Herman")
and Gregg D. Caplitz ("Caplitz") (collectively "plaintiffs")
filed a cross motion for partial summary judgment seeking a
declaration that "plaintiffs' claims are not time barred" and
that "defendants were obligated to provide coverage to the
plaintiffs" under a Life Insurance Agents Errors & Omissions
Liability Policy ("E&O Policy").  (Docket Entry ## 59 & 60).

The claims subject to the alleged coverage under which
American Guarantee and Zurich North had a duty to defend and
indemnify originate from a November 2004 civil action ("the
Indianapolis action") filed in this district by Indianapolis Life
Insurance Company ("Indianapolis Life") against Herman, Caplitz,
Rudy K. Meiselman, M.D. ("Meiselman") and his wife, Hope E.
Meiselman, ("the Meiselmans") and the Financial Resources Network
Plan and Trust ("FRN Plan").  A final judgment issued in January
2006 on the claims in the complaint as well as those in a
crossclaim filed by Meiselman.  The final judgment ordered inter
alia the rescission of life insurance policies on Meiselman and
his wife and a return of a $650,297.01 commission previously paid
to Caplitz.

Count I in this proceeding sets out claims against B&B, BBC
and Calsurance for breach of a contract "by estoppel."  (Docket

Entry # 28, ¶ 53).  Counts II through V consist of claims against Zurich North and American Guarantee for breach of contract. Respectively, they set out claims for breach of an express contract to defend and indemnify (Count II), breach of an oral contract (Count III), breach of an implied in fact contract (Count IV) and breach of a contract by estoppel (Count V). Count VI includes claims against all defendants for breach of the implied covenant of good faith and fair dealing.  Counts VII, VIII and IX are claims against all defendants for fraud, negligent misrepresentation and violation of section two of Massachusetts General Laws chapter 93A ("chapter 93A").

PROCEDURAL BACKGROUND

Plaintiffs filed this action in June 2009 in Massachusetts Superior Court (Suffolk County).  (Docket Entry # 6).  In August 2009, American Guarantee, Zurich North, B&B, BBC and Calsurance (collectively "defendants") filed a timely notice of removal. Shortly after removal, B&B, BBC and Calsurance filed a motion to dismiss the claims lodged against them in the original complaint pursuant to Rule 9(b), Fed. R. Civ. P., and Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)").

In particular, B&B, BBC and Calsurance moved to dismiss the claims for breach of an oral contract to provide insurance (Count I), breach of an implied in fact contract to provide insurance

3

(Count II), breach of contract by estoppel (Count III) and breach of the implied covenant of good faith and fair dealing (Count VIII) due to the absence of an allegation of a contract. In addition to asserting the untimeliness of the contract claims, B&B, BBC and Calsurance moved to dismiss the negligent misrepresentation, fraud and chapter 93A claims as untimely and the fraud claim due to the lack of particularity. They also sought to dismiss the claims brought by plaintiffs, except those asserted by Caplitz, because Caplitz was the only plaintiff seeking the errors and omission insurance at issue. (Docket Entry ## 8 & 9).

The district judge allowed the motion on counts I and II because plaintiffs had not "alleged an express contract." (Docket Entry # 24, pp. 3-4 & 9). He also dismissed the fraud claim without prejudice, allowed plaintiffs leave to file a motion to amend to set out the fraud claim with particularity and otherwise denied the motion.

On February 9, 2010, this court allowed a motion to amend and denied a motion for reconsideration. In the latter motion, B&B, BBC and Calsurance sought reconsideration of the denial of the motion to dismiss the negligent misrepresentation and chapter 93A counts as untimely and the breach of the implied covenant of good faith and fair dealing count as lacking an enforceable contract. In denying reconsideration, this court advised the

4

parties that:

> Defendants may renew the arguments on summary judgment based upon a more developed factual record and the different legal standard of review that applies to a summary judgment motion as opposed to a motion to dismiss. See McKenzie v. BellSouth Telecommunications, Inc., 219 F.3d 508, 513 (6th Cir. 2000); McAnaney v. Astoria Financial Corp., 2009 WL 3150430, *7 (E.D.N.Y. Sept. 29, 2009); see also Fisher v. Tarinor, 242 F.3d 24, 29 n.5 (1st Cir. 2001).

Currently before this court are the summary judgment motions filed by American Guarantee and Zurich North (Docket Entry # 46) and B&B, BBC and Calsurance (Docket Entry # 54) as well as the partial summary judgment motion filed by plaintiffs (Docket entry # 60).  After conducting a hearing on June 9, 2010, this court took the motions under advisement.


## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental &

Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A
fact is material if it carries with it the potential to affect
the outcome of the suit under the applicable law."  Id.  Facts
are viewed in favor of the non-moving party.  See Noon v.
Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  Cross-motions
for summary judgment do not alter the summary judgment standard,
but instead simply require a determination of "whether either of
the parties deserves judgment as a matter of law on the facts
that are not disputed."  Adria Int'l Group, Inc., v. Ferré
Development, Inc., 241 F.3d 103, 107 (1st Cir. 2001).


FACTUAL BACKGROUND[1]

Financial Resources is a Massachusetts corporation that
administers and maintains the FRN Plan, a qualified 401(k)
pension plan for Financial Resources employees.  FFH is the sole
stockholder of Financial Resources. Herman is an officer and a
director of Financial Resources.

In 2003, Financial Resources hired Caplitz who, among other
responsibilities, acted as Indianapolis Life's agent in issuing
insurance policies to employees of Financial Resources.  From
1998 through 2006 and during his employment at Financial
Resources, Caplitz "was a contracted agent with Indianapolis

---

[1]  Citations to the record are provided primarily only for direct
quotations.

Life." (Docket Entry # 63).

In 2002, Financial Resources hired Meiselman as a technical analyst. As an employee of Financial Resources, Meiselman elected to participate in the FRN Plan and executed a tax free rollover of his retirement funds into the FRN Plan amounting to $11,242,853.20. Herman and Caplitz used funds in Meiselman's account to pay for insurance policies on the lives of Meiselman and his wife ("the Meiselman life insurance policies"). Herman signed the two, July 2003 applications along with Meiselman and his wife with the FRN Plan as the designated owner rather than either of the Meiselmans. Caplitz received the aforementioned commission.

As a contracted agent of Indianapolis Life, Caplitz was enrolled in the E&O Policy provided by American Guarantee, a subsidiary of Zurich North, for Indianapolis Life insurance agents from 2001 to July 2004. BBC, a subsidiary of B&B, offered the insurance "through Calsurance, a division of BBC." (Docket Entry # 63, ¶ 6). Calsurance acknowledged and approved applications received from Indianapolis Life agents for the policies provided by American Guarantee. Lancer Claims Services, Inc. ("Lancer"), a division of BBC, provided claims services for the policies.

The E&O policy afforded professional liability coverage for life insurance agents such as Caplitz against "[a]ny 'Claim'

arising out of a negligent act, error or omission of the 'Insured' . . . in rendering or failing to render Professional Services."  (Docket Entry # 48, Ex. 2, ¶ I(A)(1)).  In greater detail, the relevant language of the E&O policy provides that:

> The Company shall pay on behalf of the Insured" all sums which the "Insured" shall become legally obligated to pay as "Damages" as a result of:
>
> 1.  Any "Claim" arising out of a negligent act, error or omission of the "*Insured*", or any person for whose acts the "Insured" is legally liable, in rendering or failing to render "*Professional Services*" for others in the conduct of the "Insured's" profession as a licensed Life, Accident and Health Insurance Agent, Broker, General Agent or Manager, Notary Public or Registered Representative, while there is in effect a contract between Named Insured and the insurance company named in Item 1 of the Declarations.

(Docket Entry # 48, Ex. 2, ¶ I(A)(1)) (emphasis added).

The term "Claim" is a defined term in the policy.  It "mean[s] a written demand received by the 'Insured' seeking *monetary* damages."  (Docket Entry # 48, Ex. 2) (emphasis added). The E&O Policy defines the term "damages" using similar pecuniary language.  The definition states that, "'Damages' shall mean the *monetary amounts* for which an 'Insured' is legally liable, including *sums* paid as judgments, awards, or settlements . . .." (Docket Entry # 48, Ex. 2) (emphasis added).  The definition additionally states that, "'Damages' does not include: . . . 3. the return or withdrawal of fees, *commissions*, or brokerage charges; 4. *Non-pecuniary* or injunctive relief; or 5. Judgments or awards from acts deemed uninsurable by law."  (Docket Entry #

8

48, Ex. 2,  ¶ II(D)) (emphasis added).

     The term "Professional Services" is also defined.  It means
"[t]he sale or servicing of: . . . (c) Employee Benefit Plans . .
. including . . . Ordinary Pension or Profit Sharing Plans . . .
and (e) 'Financial Planning Activities.'"  (Docket Entry # 48,
Ex. 2,  ¶ II(J)).  The term "Financial Planning Activities" meant
"recommendation or preparation of a financial program for a
client involving the client's present and anticipated assets and
liabilities, including recommendations regarding saving,
investments, insurance, anticipated retirement or other employee
benefit."  (Docket Entry # 48, Ex. 2, ¶ II(J)) (emphasis added).

     The term "Insured" under the policy is defined to include:

          The Named Insured set forth in Item 1 of the Declarations,
          including:  a.  All Agents or General Agents of the
          insurance company named in Item 1 of the Declarations
          provided they are party to an agent contract with the
          insurance company named in Item 1 of the Declarations.

(Docket Entry # 48, Ex 2, ¶ II(F)).  Immediately below the words
"Named Insured" in item one of the declarations page appears the
language, "The Career Agents and Personal Producing Agents of
AmerUs Life, Indianapolis Life and Bankers Life of New York."
(Docket Entry # 48, Ex 2).  As a "contracted agent with
Indianapolis Life" (Docket Entry # 63), Caplitz was therefore a
named insured within the meaning of the E&O Policy.

As set out in section II(F)(3) of the policy,[2] the term "Insured" also includes "Any person acting on behalf of the Named Insured who was or is . . . an employee of the Named Insured or Named Insured's business entity, provided such person is not a party to an agent or broker contract with any insurance company, and then only with respect to 'Professional Services' provided by the Named Insured."  (Docket Entry # 48, Ex. 2, ¶ II(F)(3)).

As with most insurance policies, the E&O Policy contains a number of exclusions.  Exclusions A, E, I, L and T are relevant to the case at bar.  They read that:

This Policy does not apply to any "Claim":

A.  arising out of any act, error, or omission of the "Insured" committed with dishonest, fraudulent, criminal, malicious, knowingly wrongful purpose or intent; however, notwithstanding the foregoing, the "Insured" shall be afforded a defense, subject to the terms of this Policy, until the allegations are subsequently proven by a final adjudication.  In such event, the "Insured" shall reimburse the Company for all "Defense Costs" incurred by the Company; . . .

E.  made against the "Insured" based upon or arising out of any Pension, Profit Sharing, Health and Welfare or other Employee Benefit Plan or Trust sponsored by the "Insured" as an employer; . . .

I.  arising out of, or contributed to by, any commingling of, or use of client funds; . . .

L.  arising out of disputes by or between "Insureds" or the insurance company named in Item 1 of the Declarations . . . or any other insurance company, agent or broker, including but not limited to, disputes concerning commissions, fees,

---

[2] American Guarantee and Zurich North rely on this section to argue that Meiselman was an insured under the E&O Policy.

client lists or entitlements; . . . .

    T.  based solely upon a loss alleged to have been sustained
    through fluctuation in market value of any security; . . ..

(Docket Entry # 48, Ex. 2, ¶ VI).

    The 2002 to 2003 "Policy Year E&O Plan Highlights," issued

each year to policy holders, expressly states:

    For your protection, the policy also includes an "Awareness
    Provision."  This allows you to provide written notice of
    circumstances that could reasonably be expected to give rise
    to a claim.  Then if a claim subsequently arises out of the
    described circumstances, it will be considered to be a claim
    during the Policy Period in which the written notice was
    received.

(Docket Entry # 63, Ex. 2).

    The policy ended on July 1 of each year.  The enrollment

form for the 2004 to 2005 E&O Policy permitted "[a]gents with

[e]xpiring [c]overage" to "[e]nroll within 30 days of

[e]xpiration."  (Docket Entry # 63).  From July 2001 until July

2003, Caplitz was enrolled in the E&O Policy and paid the premium

annually by credit card.  In 2004, Calsurance "changed its

policy" to require "payment by check only."  (Docket Entry # 63).

    Caplitz attests that on or about July 30, 2004, he

"delivered to Calsurance" an enrollment form as well as check

number 2018 dated July 29, 2004, in full payment of the premium

in order to enroll in the 2004 to 2005 E&O Policy.  (Docket Entry

# 63, ¶ 9).  Caplitz also avers that he "had no knowledge" and no

reason to believe that his coverage had not been renewed.  He

further attests that, "no defendant advised me at the end of the

11

policy year ending July 1, 2004," of a nonrenewal.  (Docket Entry # 63, ¶ 12).

By certified letter dated June 30, 2004, Meiselman voiced his objections and those of his wife to Herman, trustee of the FRN Plan, to the purchase of the life insurance policies including the use of funds from the FRN Plan.  The letter directed Herman, as trustee, to transfer all his assets in the FRN Plan to a third party account.  When Herman purportedly failed to respond, disagreements escalated between Meiselman and Financial Resources, Herman and Caplitz.  In what he thought was in accordance with the Awareness Provision, Caplitz orally reported the disagreements to Lancer on or about August 8, 2004.

In response to his telephone call, Caplitz received a letter dated August 19, 2004, from Stephen Casey ("Casey"), Director of Lancer.  Casey informed Caplitz that Lancer had been engaged to handle the Meiselman matter on behalf of American Guarantee. Notably, the letter states, "we would like to advise you that your Policy, issued to Amerus by American Guarantee, is effective for the Policy Period of 07/01/2004 to 07/01/2005."  (Docket Entry # 63, Ex. C).

On October 29, 2004, however, Caplitz received a letter from Cynthia Renner ("Renner"), "Senior Director-Coverage" for "Lancer Claims Service for American Guarantee," stating that Lancer and American Guarantee "have not been able to confirm your enrollment

12

for the Policy Period July 1, 2004 to July 1, 2005." (Docket
Entry # 63, Ex. E).  The letter requested that Caplitz provide
"proof of payment of premium" and confirmation of a completed
renewal form.  (Docket Entry # 63, Ex. E).  Shortly thereafter on
November 5, 2004, Caplitz faxed a copy of his enrollment form,
dated July 30, 2004, and a copy of the premium check.  In the
cover sheet, he stated "Please note that the check still has not
cleared the account."  (Docket Entry # 63, Ex. F).

     Calsurance responded to the facsimile on December 2, 2004.
The reply facsimile from Stanley R. Rob, Account Executive/Vice
President of Calsurance, states, "We have no record of having
received either the enrollment form or your check."  (Docket
Entry # 64, Ex. I).  The facsimile concludes with the "regret
that we cannot be of service to you."  (Docket Entry # 63, Ex.
I).

     Meanwhile, on October 28, 2004, Meiselman filed a lawsuit
against Financial Resources, Herman and Caplitz ("Meiselman I")
when Herman allegedly failed to respond to Meiselman's request to
transfer his funds in the FRN Plan into the third party account.
On November 19, 2004, Caplitz executed a release and settlement
agreement agreeing to transfer the funds to the third party
account.  Caplitz forwarded the settlement agreement to Lancer.

     On November 23, 2004, Indianapolis Life filed the complaint
in the Indianapolis action against the FRN Plan, Herman,

identified as trustee of the FRN Plan, Caplitz and the Meiselmans seeking to rescind the Meiselman life insurance policies and a return of the $650,297.01 commission paid to Caplitz.  The five count complaint alleged inter alia intentional and material misrepresentations in the applications for the Meiselman life insurance policies.[3]  In March 2005, Attorney Wayne Murphy ("Attorney Murphy") filed an answer to the complaint on behalf of Caplitz, Herman, Financial Resources[4] and the FRN Plan.[5]  The only reasonable assumption to draw is that these parties incurred defense costs as a result of Attorney Murphy's work.[6]

On January 26, 2006, the district court in the Indianapolis action (the "Indianapolis court") allowed Indianapolis Life's

---

[3]  The discussion section sets out the particular counts in the complaint in greater detail.

[4] The complaint in the Indianapolis action did not name Financial Resources as a defendant.

[5]  Attorney Murphy also included in the answer counterclaims brought by Caplitz and Financial Resources against Indianapolis Life.

[6]  In opposing the summary judgment motion filed by American Guarantee and Zurich North, plaintiffs admit that they "incurred attorney's fees as the result of defendants' refusal to provide coverage" although they did not know that they incurred those fees as the result of defendants' wrongdoing.  (Docket Entry # 60, pp. 37-38); see Taylor v. Blakey, 490 F.3d 965, 973 (D.C.Cir. 2007) (noting in parenthetical that "representation in brief may be treated as admission on file" within meaning of Rule 56(c)), vacated and remanded on other grounds, 553 U.S. 880 (2008); Stallard v. U.S., 12 F.3d 489, 496 n.27 (5th Cir. 1994); United States v. One Heckler-Koch Rifle, 629 F.2d 1250, 1253 (7th Cir. 1980); 10A Charles Alan Wright Federal Practice and Procedure § 2723 ("Admissions in the brief of the party opposing the motion may be used in determining that there is no genuine issue as to any material fact, however, since they are functionally equivalent to 'admissions on file,' which are expressly mentioned in Rule 56(c)").

motion for summary judgment.  The motion sought summary judgment on all five counts in the complaint.  The decision, rendered without an opinion, thus allowed the rescission of the Meiselman life insurance policies as well as the return of the $650,297.01 commission paid to Caplitz in procuring the policies.

Prior to the decision allowing summary judgment, Meiselman filed a crossclaim against Herman, Caplitz and Financial Resources ("Meiselman crossclaim") on February 9, 2005, on the basis that Herman and Caplitz allegedly used $49,849.69 of Meiselman's retirement funds in the FRN Plan to pay a retainer fee to counsel to defend themselves in Meiselman I.  (Docket Entry # 48, Ex. 5).  The crossclaim sought a declaratory judgment nullifying the release in Meiselman I (Count I) and further alleged breach of an employment contract (Count II), breach of fiduciary duty (Count III), breach of contract (Count IV) and conversion (Count V).  (Docket Entry # 48, Ex. 5).  Attorney Murphy did not file an answer to the crossclaim thereby resulting in entries of defaults on June 28, 2005.  In August 2005, the Indianapolis court allowed Meiselman's motion for a default judgment.

On January 27, 2006, a final judgment issued in favor of Indianapolis Life rescinding the Meiselman life insurance policies.  The judgment also awarded Indianapolis Life $650,297.01 against Caplitz reflecting the amount of the commission.  The Indianapolis court also awarded Meiselman

15

$938,640.14 on the crossclaim against Herman, Caplitz and
Financial Resources.

The First Circuit affirmed the judgment in November 2006.
The opinion reflects and establishes that there is "no dispute
that Caplitz acted with the intent to deceive Indianapolis Life
by submitting an income verification statement for the
Meiselmans, which he intentionally misrepresented to have been
prepared by a CPA."  Indianapolis Life Ins. Co. v. Herman, 2006
WL 3233837, *1 (1st Cir. Nov. 9, 2006).[7]


DISCUSSION

American Guarantee and Zurich North move for summary
judgment on all counts in the first amended complaint except for
Count I.  Count I is a breach of contract by estoppel claim
against B&B, BBC and Calsurance.

American Guarantee and Zurich North seek summary judgment
regarding the absence of the duty to defend and indemnify
"plaintiffs" under the E&O Policy against the claims in the
complaint and in the Meiselman crossclaim in the Indianapolis
action.  (Docket Entry # 46).  Count II of the first amended
complaint, which sets out the breach of the express contractual

---

[7]  The opinion describes the action brought by the Meiselmans as
"seeking a declaratory judgment that it properly rescinded a
'second to die' policy that it had issued on the lives of the
Meiselmans," Indianapolis Life Ins. Co. v. Herman, 2006 WL
3233837, *1 (1st Cir. Nov. 9, 2006), whereas the complaint in the
Indianapolis action refers to the two polices.

duty to defend and indemnify, presents the logical starting place to analyze the existence of coverage.

B&B, BBC and Calsurance also move for summary judgment and adopt the arguments made by American Guarantee and Zurich North. (Docket Entry # 54).  Plaintiffs bring counts I and VI through IX against B&B, BBC and Calsurance.  They reason that if there is no coverage under the E&O Policy for the claims in the complaint and the Meiselman crossclaim in the Indianapolis action, their alleged failure or refusal to enroll Caplitz does not give rise to liability.  For purposes of the two summary judgment motions only, defendants assume that the E&O Policy did in fact issue.

Plaintiffs, in turn, seek a partial summary judgment that, "1.  The defendants were obligated to provide coverage to the plaintiffs in the Indianapolis action under the policy which they have proffered; [and] 2.  The plaintiffs' claims are not time barred."  (Docket Entry # 59).  The supporting memorandum likewise seeks summary judgment on the basis "that (1) the Zurich Defendants were obligated to provide coverage to the plaintiffs in the Indianapolis action under the Zurich Policy [Doc. #48-3] and (2) the plaintiffs' claims are not time barred."  (Docket Entry # 60).

After American Guarantee and Zurich North opposed the motion because of factual issues regarding whether the E&O Policy issued (Docket Entry # 69), however, plaintiffs' sur-reply altered the first request to read "that (1) *if it is determined that the*

*Zurich Policy [Doc. #48-3] issued*, the Zurich Defendants were
obligated to provide coverage to the plaintiffs under that
policy." (Docket Entry # 71) (emphasis added). The attempt to
change the argument in a surreply is improper for the same
reasons, discussed infra, that American Guarantee and Zurich
North's attempt to change their argument in the reply brief
regarding Count II is improper. See EEOC v. Aldi, Inc., 2008 WL
859249, *5 n.6 (W.D.Pa. March 28, 2008) ("[b]ecause Aldi conceded
this element in its opening brief and only challenges it in its
reply brief, the Court finds that Aldi waived any challenge to
the second prong for purposes of summary judgment"); D'Aiuto v.
City of Jersey City, 2007 WL 2306791, *4 n.1 (D.N.J. Aug. 8,
2007) (declining to consider new argument raised in reply brief);
Berwind Property Group Inc. v. Environmental Management Group,
Inc., 2007 WL 4707647, *6 (D.Mass. Feb. 5, 2007) (not allowing
the defendant "to amend the nature of its [summary judgment]
motion in a reply brief").


I.   Defendants' Summary Judgment Motions (Docket Entry ## 46 &
54)

     Following the lead of American Guarantee and Zurich North,
this court addresses the summary judgment arguments in the
context of the separate counts in this action beginning with
Count II.

A.   Count II

18

Count II alleges that American Guarantee and Zurich North breached the express contractual duty to defend and indemnify plaintiffs in the E&O Policy.  Citing various definitions, language and exclusions in the E&O Policy, American Guarantee and Zurich North argue that the policy did not provide coverage for the claims in the complaint in the Indianapolis action and the claims in the Meiselman crossclaim.

The relevant law is well settled.  Examining the duty to defend involves comparing the third party complaint and the policy provisions.

> "[T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions:  if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense."

Continental Cas. Co. v. Gilbane Bldg. Co., 461 N.E.2d 209, 212 (Mass. 1984); see Vappi & Co., Inc. v. Aetna Cas. & Sur. Co., 204 N.E.2d 273, 276 (Mass. 1965); Magoun v. Liberty Mutual Ins. Co., 195 N.E.2d 514, 517 (Mass. 1964); Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co., 260 F.3d 54, 64 (1st Cir. 2001) (using similar language); Terrio v. McDonough, 450 N.E.2d 190, 193 (Mass.App.Ct. 1983).  In addition, "The scope of an insurer's duty to defend is 'based not only on the facts alleged in the complaint, but also on the facts that are known or readily knowable by the insurer.'"  Timpson v. Transamerica Insurance Co., 669 N.E.2d 1092, 1095 (Mass.App.Ct. 1996) (quoting

19

<u>Desrosiers v. Royal Ins. Co. of America</u>, 468 N.E.2d 625, 627-628 (Mass. 1984)).

Furthermore, an insurer's duty to defend is not excused though "some, or even many, of the underlying claims may fall outside the duty of coverage."  <u>See</u> <u>Simplex Tech. Inc. v. Liberty Mutual Co.</u>, 706 N.E.2d 1135, 1137 (Mass. 1999).  "In Massachusetts, as elsewhere, an insurer must defend the entire lawsuit if it has a duty to defend any of the underlying counts in the complaint."  <u>Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.</u>, 260 F.3d at 63; <u>accord</u> <u>Mt. Airy Ins. Co. v. Greenbaum</u>, 127 F.3d 15, 19 (1st Cir. 1997) ("under Massachusetts law, if an insurer has a duty to defend one count of a complaint, it must defend them all").  An insurer is therefore liable for all defense costs unless it can show an allocation of such costs between covered and uncovered claims.  <u>See</u> <u>Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.</u>, 260 F.3d at 63; <u>Liquor Liability Joint Underwriting Ass'n of Massachusetts v. Hermitage Ins. Co.</u>, 644 N.E.2d 964, 969 (Mass. 1995) (insurer "should have the burden of allocating the judgment in the O'Brien lawsuit between the covered claim and noncovered claim").  Moreover, if "the theories relate to a common core of facts, defense costs are often hard to separate between theories" because "the witnesses and documents are often the same" which, in turn, ordinarily imposes "the allocation burden on the insurer who refused to defend a covered theory."  <u>Liberty Mutual Ins. Co. v.</u>

Metropolitan Life Ins. Co., 260 F.3d at 64.

Language in an insurance policy is construed "'according to the fair meaning of the language used, as applied to the subject matter.'" Scottsdale Insurance Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009) (quoting Jacobs v. United States Fidelity & Guaranty Co., 627 N.E.2d 463, 464 (Mass. 1994)). Unambiguous words in an insurance contract are "construed in their usual and ordinary sense." Jacobs v. United States Fidelity & Guaranty Co., 627 N.E.2d at 464); accord Scottsdale Insurance Co. v. Torres, 561 F.3d at 77 (citing Jacobs, 627 N.E.2d at 464, and quoting same language). Language is ambiguous if it "is susceptible to more than one meaning." Scottsdale Insurance Co. v. Torres, 561 F.3d at 77. In the event language is ambiguous, it is construed against the insurance company and in favor of the insured. See Id. ("[a]mbiguous policy terms are construed in favor of the insured"); Massamont Insurance Agency, Inc. v. Utica Mutual Life Insurance Company, 448 F.Supp.2d 329, 331 (D.Mass. 2006); see also Preferred Mutual Ins. Co. v. Gamache, 675 N.E.2d 438 (Mass.App.Ct. 1997).

The insured "bears the burden of establishing coverage." Finn v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, 896 N.E.2d 1272, 1275 (Mass. 2008). The insurer bears the burden of establishing "the applicability of an exclusion." Id. Exclusions are "construed narrowly." Id. at 1277.

The 2004 to 2005 E&O Policy includes a section describing the policy's coverage for defense and settlement.  It expressly states:

> The Company shall have the right and duty to defend any "Claim" against the "Insured" an[sic] "Additional Insured" seeking "Damages" to which this insurance applies even if any of the allegations of the "Claim" are groundless, false or fraudulent.

(Docket Entry # 48, Ex. 2, ¶ I(C)).  The fair meaning of this language applied to the subject matter at hand requires a defense for claims to which the insurance applies even if the allegations are groundless.  As reasoned by the Massachusetts Supreme Judicial Court, "An insurer's duty to defend is broader than it's duty to indemnify."  Doe v. Liberty Mut. Ins. Co., 667 N.E.2d 1149, 1151 (Mass. 1996).  Consequently, if an insurer has no duty to defend, the insurer has no duty to indemnify.  See United Nat'l Ins. Co. v. Parish, 717 N.E.2d 1016, 1020 (Mass.App.Ct. 1999).

With these principles in mind, this court turns to the duty to defend in the context of the claims in the complaint in the Indianapolis action and thereafter those in the Meiselman crossclaim.  (Docket Entry # 28, Ex. 1).

1.  Indianapolis Claims

The claims alleged in the complaint in the Indianapolis action are:  (1) rescission due to misrepresentation (Count I); (2) rescission due to mutual mistake (Count II); (3) breach of contract seeking the return of the commission (Count III); (4)

22

conversion based on Caplitz's retention of the commission (Count IV); and (5) unjust enrichment for retaining the commission (Count V). (Docket Entry # 48, Ex. 4). In essence, Indianapolis Life sought rescission of the Meiselman life insurance policies and the return of the commission earned by Caplitz in connection with those policies. (Docket Entry # 48, Ex. 4).

A. Counts I and II

Addressing counts I and II, they sought rescission of the Meiselman life insurance policies. Count I against Herman, as well as the FRN Plan and the Meiselmans, sought rescission based on misrepresentations and an omission in the applications. The misrepresentations regarding a change in Meiselman's health status and information in an income verification statement. The omission consisted of a failure to disclose an additional life insurance policy. Count II sought rescission based on a mutual mistake between Indianapolis Life and the FRN Plan because the Meiselmans never wanted the life insurance policies. (Docket Entry # 47).

The Meiselman life insurance policies contain an incontestability clause which states:

> This policy has a two year contestable period based upon statements made in the application. We cannot claim your policy is void or deny payment of any benefits after the policy has been inforce[sic] . . . for two years from its Issue Date.

(Docket Entry # 63, Ex. H). The language of the clause gives Indianapolis Life the ability to void the policies within two

23

years of issuance for any contestable statements made in the
applications.  In making a necessary finding, the First Circuit
decided that Caplitz prepared an income verification statement of
the Meiselmans and misrepresented its preparation by a CPA.[8]
Because of Caplitz's actual intent to deceive, "Indianapolis Life
was not required to show that the misrepresentation increased its
risk of loss" and the Indianapolis court therefore "properly
awarded summary judgment." Indianapolis Life Ins. Co. v. Herman,
2006 WL 3233837, *2 (1st Cir. Nov. 9, 2006).  Indianapolis Life
therefore correctly rescinded the Meiselman life insurance
policies based on the misstatements made in the applications
within the two year period.

---

[8]  As determined by the First Circuit:

> It is undisputed that Indianapolis Life required the
> defendants to submit a statement of the Meiselmans'
> financial condition prepared by a certified public
> accountant (CPA) as part of the underwriting process.
> Caplitz provided Indianapolis Life with an income
> verification statement for the Meiselmans purporting to be
> from CPA James Goodness.  At Caplitz's request, the
> verification statement was in fact prepared by James
> Goodness' son, Daniel, who was not a CPA.  Caplitz asked
> Daniel Goodness to place the verification statement on his
> father's stationery and to sign his father's name so that it
> would appear to have been prepared by a CPA.  There is thus
> no dispute that Caplitz acted with the intent to deceive
> Indianapolis Life by submitting an income verification
> statement for the Meiselmans, which he intentionally
> misrepresented to have been prepared by a CPA.

Indianapolis Life Ins. Co. v. Herman, 2006 WL 3233837, *1 (1st
Cir. Nov. 9, 2006).

24

Matching the allegations to the policy, counts I and II undeniably sought declarations to rescind the Meiselman life insurance policies.  A claim for rescission is decidedly not a covered claim.  The E&O Policy covers "any 'Claim'" and defines "claim" as "seeking *monetary* damages" and "damages" as meaning "*monetary* amounts."  (Docket Entry # 48, Ex. 2, ¶ II(C)&(D)) (emphasis added).  Furthermore, the definition of damages excludes "non-pecuniary . . . relief."  (Docket Entry # 48, Ex. 2, ¶ II(D)).  Rescission is a claim for non-pecuniary relief expressly excluded from the definition of damages in the E&O Policy.  Counts I and II seeking rescission are therefore not covered claims.  See 116 Commonwealth Condominium Trust v. Aetna Cas. & Sur. Co., 742 N.E.2d 76, 78-79 (Mass. 2001) (liability insurance policy did not include equitable action for injunction due to lack of ambiguity in the term "damages" because "[t]his Commonwealth defines damages as 'the word which expresses in dollars and cents the injury sustained by the plaintiff'").  The allegations in counts I and II are not reasonably susceptible of an interpretation that they state or adumbrate a covered claim.  As such, they do not impose a duty to defend on American Guarantee or on Zurich North.

With respect to Caplitz, exclusion L acts as a separate basis to reject imposing a duty to defend.  Exclusion L of the E&O Policy rejects coverage for claims "arising out of disputes by or between 'Insureds' or the insurance company named in Item 1

of the Declarations." (Docket Entry # 48, Ex. 2). The E&O Policy defines named insureds in the declarations page as "The Career Agents and Personal Producing Agents of AmerUs Life, Indianapolis Life and Bankers Life of New York." (Docket Entry # 48, Ex. 2). Indianapolis Life was therefore one of the insurance companies named in the declarations page within the meaning of exclusion L. Agents of the insurance company named in the declarations page who "are party to an agent contract with the insurance company" are insureds under the policy. (Docket Entry # 48, Ex. 2, ¶ II(F)(1)(a)). As a contracted agent with Indianapolis Life, Caplitz is therefore a named insured under the E&O Policy. Exclusion L therefore eliminates any duty to defend Caplitz against the claims by Indianapolis Life as to counts I and II.

B. Counts III through V

Counts III, IV and V in the complaint in the Indianapolis action, brought only against Caplitz, sought the return of the $650,297.01 commission that Caplitz earned in connection with the sale of the life insurance policies. (Docket Entry 48, Ex. 4). Uniformly, these counts asserted that Caplitz received the $650,297.01 commission and either refused to refund it, retained and converted it for his own use or retained it unjustly. All three counts sought damages in the exact amount of the commission.

26

The definition of damages in the E&O Policy, however, expressly excludes "the return or withdrawal of fees, *commissions* or brokerage charges." (Docket Entry 48, Ex. 2) (emphasis added). As also stated in the E&O Policy, American Guarantee had a "duty to defend any 'Claim' against the 'Insured,'" i.e., Caplitz, "seeking damages to which this insurance applies . . .." (Docket Entry # 48, Ex. 2). "[D]amages to which this insurance applies" does not include damages for the return of a commission. The plain meaning of the policy's definition of damages eviscerates any duty to defend Caplitz against the allegations in counts III, IV and V. Such allegations are not reasonably susceptible of an interpretation that the claims in counts III through V are covered under the E&O Policy.

Furthermore, "An insured does not incur an insurable loss when [he] is merely forced to disgorge money or other property to which [he] is not entitled." Genzyme Corporation v. Federal Insurance Co., 657 F.Supp.2d 282, 287 (D.Mass. 2009); see also Pacific Ins. Co., Ltd v. Eaton Vance Management, 369 F.3d 584, 591 (1st Cir. 2004). The Indianapolis court on summary judgment already ruled that, "because the defendants had made an intentional misrepresentation in applying" for the insurance, Indianapolis Life properly rescinded it and "was entitled to a return of the commission." Indianapolis Life Ins. Co. v. Herman, 2006 WL 3233837, *1 (1st Cir. Nov. 9, 2006) (describing lower

court's summary judgment ruling).   The First Circuit affirmed the decision.   Id. at *2.

In short, the return or retention of the commission Caplitz received for procuring the Meiselman life insurance policies is not covered by the E&O Policy.   The facts in the Indianapolis action and those known or knowable by American Guarantee are not reasonably susceptible of stating or adumbrating a claim covered by the E&O Policy.   Accordingly, Caplitz is not entitled to a defense for counts III, IV and V.

In light of the foregoing, none of the counts in the complaint in the Indianapolis action impose a duty to defend Caplitz or any other plaintiff against any of the claims in the complaint in the Indianapolis action.[9]   Plaintiffs' remaining arguments relative to the counts in the complaint in the Indianapolis action do not warrant a different finding.

   2.   Meiselman Crossclaim

Plaintiffs next submit that the E&O Policy required American Guarantee and Zurich North to defend Caplitz against the claims in the Meiselman crossclaim.   The introductory paragraph of the crossclaim depicts that, "It is based upon the FRN Plan Trustee's

_____

[9]   In light of the decision below to deny summary judgment as to Count II in the Meiselman crossclaim and the failure of American Guarantee and Zurich North to argue an allocation at this time, the issue remains whether the duty to defend Count II of the crossclaim imposes a duty to defend the counts in the complaint in the Indianapolis action.   See generally Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co., 260 F.3d 63.

conversion of funds totaling approximately $70,000.00 which should have been rolled over to Meiselman's Individual Retirement Account."  (Docket Entry # 48, Ex. 5).  As to the Meiselman crossclaim and as noted previously, the Indianapolis court allowed the motion to enter a default judgment and in January 2006 entered the final judgment against Herman, Caplitz and Financial Resources in favor of Meiselman on all counts in the crossclaim.

Count I of the crossclaim sought a declaratory judgment that the release in Meiselman I did not bar the present suit.  (Docket Entry # 48, Ex. 5).  The duty to defend in the E&O Policy, however, only covered claims "seeking *damages* to which this insurance applies." (Docket Entry # 48, Ex. 2, ¶ I(C)) (emphasis added).  The policy defines the term claim as a demand for "monetary damages."  (Docket Entry # 48, Ex. 2, ¶ II(C)).  The policy also defines the term damages as meaning "monetary amounts" and as "not includ[ing]" non-pecuniary relief.  (Docket Entry # 48, Ex. 2, ¶ II(D)).

A declaratory judgment is not a claim for monetary damages. It is a claim for non-pecuniary relief in the form of a declaration.  In essence, a declaratory judgment claim seeks non-pecuniary relief that the policy's definition of damages expressly does not include.  See 116 Commonwealth Condominium Trust v. Aetna Cas. & Sur. Co., 742 N.E.2d at 78-79 (liability insurance policy did not include equitable action for injunction

due to lack of ambiguity in the term "damages" because "[t]his Commonwealth defines damages as 'the word which expresses in dollars and cents the injury sustained by the plaintiff'").

Accordingly, the facts in the crossclaim and those known or knowable by American Guarantee are not reasonably susceptible of an interpretation that they state or adumbrate Count I as covered by the E&O Policy.  Count I of the Meiselman crossclaim therefore does not impose a duty to defend.  (Docket Entry # 48, Ex. 2).

Counts II through V of the Meiselman crossclaim allege:  (1) breach of Meiselman's employment contract against Financial Resources and Herman (Count II); (2) breach of fiduciary duty against Herman, Financial Resources and Caplitz (Count III); (3) breach of contract against Herman, Financial Resources and Caplitz (Count IV); and (4) conversion against Herman, Financial Resources and Caplitz (Count V).  (Docket Entry # 48, Ex. 5).

Turning to Count II, it alleged a breach of Meiselman's employment contract based upon "the failure of Herman and [Financial Resources] to pay over to [Meiselman] certain portions of his salary earned for services provided, namely, $15,000.00 in excess matching [profit sharing plan] contributions and $8,000.00 in salary for 2004."  (Docket Entry # 48, Ex. 5, ¶ 26).  Count II further alleged that Financial Resources and Herman made excess matching fund contributions of $15,000 of Meiselman's salary into the FRN Plan in "breach of the at-will contract of employment between the parties."  (Docket Entry # 48, Ex. 5, ¶ 26).  Because

30

the $15,000 amount exceeded the matching contributions, Financial Resources and Herman purportedly should have paid the amount directly to Meiselman as ordinary income. (Docket Entry # 48, Ex. 5, ¶ 16). The count additionally alleged that Financial Resources owed Meiselman $8,000 of his salary which "should have been paid into his pension plan tax free." (Docket Entry # 48, Ex. 5, ¶ 17).

In seeking summary judgment relative to the duty to defend Count II, American Guarantee and Zurich North, as well as B&B, BBC and Calsurance by adopting the former's arguments, raise two arguments. First, they maintain that Meiselman's claim for salary as an employee of Financial Resources "is not a claim for Damages arising out of the rendering or failure to render Professional Services by the insureds as those terms are defined in the Policy." (Docket Entry # 47). They submit that the conduct of not paying Meiselman's salary arises out of the ordinary business operations of Financial Resources. Consequently, the alleged misconduct does not constitute "Professional Services" which, according to defendants, "must involve 'the need for specialized learning or training and arise out of those services.' Roe, 412 Mass. at 48, 587 N.E.2d at 217." (Docket Entry # 47).

It is true that a claim under the E&O Policy must involve "rendering or failing to render 'Professional Services' . . .." (Docket Entry # 48, Ex. 2, ¶ I(A)). American Guarantee and

31

Zurich North's reliance on Roe, however, is misplaced.  Putting
aside the fact that the decision does not contain the precise
language quoted, Roe involves the construction of the term
"Professional Services" in the context of a dentist's
professional liability insurance policy for medical malpractice.
"Professional Services" is a defined term in the E&O Policy,
which is a professional liability policy for life insurance
agents, and it is the language of that policy that controls over
the construction of the same term in the somewhat different kind
of insurance policy in Roe.

In addition, Roe focused on the acts or services being
"professional" in the sense of "'[s]omething more than an act
flowing from mere employment or vocation.'"  Roe, 587 N.E.2d at
217 (quoting Nebraska state court decision interpreting
"Professional Services" as used in medical malpractice insurance
policy).  Here, Herman was the plan administrator of the profit
sharing plan and the policy defines "Professional Services" as
including the servicing of such a plan.  (Docket Entry # 48, Ex.
2, ¶ II(J)).  Servicing the FRN Plan involved "[s]omething more,"
Roe, 587 N.E.2d at 217, than merely paying or not paying
Meiselman his salary because the acts at issue implicated
decisions regarding contribution levels and tax free payments
into a profit sharing plan.

Plaintiffs correctly point out that the E&O Policy defines
"Professional Services" to include "[t]he sale or servicing of: .

32

. . (c) Employee Benefit Plans, . . . , including . . . Profit
Sharing Plans . . . and, (e) 'Financial Planning Activities.'"[10]
(Docket Entry # 48, Ex. 2, ¶ II(J)(1)(c)&(e)).  They reason,
again correctly, that transferring salary into a profit sharing
plan such as the FRN Plan falls within the language of
"servicing" a "profit sharing plan."

The precise allegations in the Meiselman crossclaim relative
to Count II state that the additional salary of $8,000 "should
have been paid into his pension plan account tax free in
accordance with the salary deferral agreement on file with the
trustee."  The allegations also complain about $15,000 in "excess
matching contributions" made by Financial Resources that was
"contributed to" the "401K pension plan" instead of being paid
directly to Meiselman as salary.  The Meiselman crossclaim
unequivocally denotes the FRN Plan as a "Profit Sharing Plan."
(Docket Entry # 48, Ex. 5).

Matching these allegations against the fair meaning of the
E&O Policy's definition of "Professional Services" as the
"servicing of . . . . Employee Benefit Plans, . . . , including .
. . Ordinary Pension or Profit Sharing Plans" (Docket Entry # 48,

---

[10]  Because the employee benefit plan definition for "Professional
Services" (Docket Entry # 48, Ex. 2, ¶ II(J)(1)(c)) serves as a
basis to state or adumbrate a covered claim, it is not necessary
to address whether the financial planning activities definition
for "Professional Services" (Docket Entry # 48, Ex. 2, ¶¶
II(J)(1)(e) & II(L)) defeats American Guarantee and Zurich
North's argument that Count II lies outside coverage due to the
absence of professional services.

Ex. 2, ¶ II(J)) and the coverage provided for "[a]ny 'Claim' *arising out of* a negligent act or error" by Caplitz in "rendering or failing to render Professional Services" (Docket Entry # 48, Ex. 2, ¶ I(A)) (emphasis added) yields a finding that the allegations are reasonably susceptible of stating or adumbrating a covered claim.  "Arising out of" professional services means "'having a connection with'" or "'growing out of'" the failure to render professional services in servicing the FRN Plan.  See Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000) (defining "arising out of" as meaning "'growing out of,' . . . or 'having connection with'").

In sum, the allegations in Count II for the breach of an employment contract against an employer (Financial Resources) and a plan administrator (Herman) for improperly transferring or not transferring an employee's salary into an ERISA profit sharing plan[11] is reasonably susceptible of an interpretation that it falls within the policy's language which covers "[a]ny "'Claim' arising out of" an error in rendering "Professional Services," a term that includes "servicing" a "Profit Sharing Plan."  (Docket Entry # 48, Ex. 2, ¶¶ I(A)(1) & II(J)(1)(c)).  Simply put, the argument that the definition of "Professional Services" in the

---

[11]  The Meiselman cross claim, as previously noted, identifies the FRN Plan as a profit sharing plan "promulgated pursuant to the Employee Retirement Income Security Act of 1997 (ERISA), as amended, 29 U.S.C. § 1001, et seq."  (Docket Entry # 48, Ex. 5, ¶ 2).

E&O Policy falls outside the duty to defend fails.  Hence, a
conclusion that American Guarantee and Zurich North did not have
a duty to defend Financial Resources and Herman with respect to
Count II of the Meiselman crossclaim lacks merit.

Turning to the second argument, American Guarantee and
Zurich North, as well as B&B, BBC and Calsurance by adopting this
argument, submit there was no duty to defend Count II because
Meiselman, as "an employee of the . . . Named Insured's business
entity" (Docket Entry # 48, Ex. 2, ¶ II(F)(3)), "would himself
have been an insured under the Policy."  (Docket Entry # 47).
Exclusion L excludes claims "arising out of disputes by or
between 'Insureds'" (Docket Entry # 48, Ex. 2, ¶ VI(L)) and
would therefore operate as a bar to coverage, according to
American Guarantee and Zurich North.  Section II(F)(3) and
exclusion L therefore form the basis of the second argument.

The allegations of the Meiselman crossclaim identify
Meiselman as an employee of Financial Resources who elected to
participate in the FRN Plan.  (Docket Entry # 48, Ex. 5, ¶ 6).
Thus, Meiselman was an employee of Financial Resources and in the
crossclaim he brought a claim against his employer, Financial
Resources, as well as against Herman, the company president, for
breach of the employment contract due to unpaid and earned
salary.

Section II(F)(3) of the E&O Policy, the section of the

policy cited by American Guarantee and Zurich North,[12] limits the definition of an "Insured" to "[a]ny person acting *on behalf of* the Named Insured who was or is . . . an employee of the Named Insured or Named Insured's business entity, . . . and then only with respect to 'Professional Services' provided by the Named Insured."  (Docket Entry # 48, Ex. 2, ¶ II(F)(3)) (emphasis added).  Thus, for Meiselman to be an "insured" under section II(F)(3), the section requires that, in addition to being an employee of the insured or the insured's business, he must act "on behalf of the Named Insured . . . and then only with respect to 'Professional Services' provided by the Named Insured." (Docket Entry # 48, Ex. 2, ¶ II(F)(3)).

Assuming that Financial Resources or Herman was the named insured under section II(F)(3), the qualifying language places Meiselman outside the realm of section II(F)(3)'s definition of an insured.  It is true that the allegations of Count II support a finding that Meiselman was an employee of Financial Resources or Herman thus matching the language in section II(F)(3)'s definition of an insured as "an employee of the Named Insured or Named Insured's business entity."  (Docket Entry # 48, Ex. 2, ¶

---

[12]  With respect to Count II of the Meiselman crossclaim, American Guarantee and Zurich North do not cite or rely on section II(F)(2) to argue that Financial Resources was a named insured under this section.  They simply argue that Meiselman was an employee of Financial Resources and thus would have been an insured under the E&O Policy as the "'employee of the Named Insured or the Insured's business entity'" under section II(F)(3).  This court declines to raise the argument sua sponte.

II(F)(3)).  The allegations of Count II, however, do not match
the definition of an insured in section II(F)(3) as a person
"acting on behalf" of Financial Resources or Herman in the
context of their providing professional services in servicing the
FRN Plan, an ERISA profit sharing plan, in making the $15,000
transfer of excess matching contributions or in failing to pay
the $8,000 portion of Meiselman's salary into the FRN Plan tax
free.  In fact, as the allegations in the crossclaim indicate,
Meiselman, a technical analyst, did not take part in the
transactions let alone render professional services on behalf of
Financial Resources as an employee.  Indeed, Meiselman acted on
his own behalf and against the interest of Financial Resources by
objecting to Herman's and/or Financial Resources' actions in
making or failing to make the transfers into the plan once
Meiselman discovered them after the fact by virtue of an outside
audit.  (Docket Entry # 48, Ex. 5, ¶¶ 14 & 16).

The same finding applies in the event Caplitz is a named
insured.[13]  First, the allegations of the crossclaim do not
denote Meiselman as an employee of Caplitz's or Caplitz's
business entity with respect to the professional services
provided by Caplitz, to wit, servicing an employee benefit plan
or profit sharing plan.  Second, Meiselman did not act on behalf
of Caplitz.  Rather, he objected to the transfer or the failure

---

[13]  As noted, Meiselman did not bring Count II against Caplitz.

to transfer once he discovered the conduct due to an outside audit.

Thus, even assuming Meiselman was "an employee of the Named Insured or Named Insured's business entity" under section II(F)(3), the allegations in Count II of the crossclaim are not reasonably susceptible of an interpretation that Meiselman was acting "on behalf of" Financial Resources or Herman (or Caplitz) within the meaning of section II(F)(3).  Hence, he was not an insured under this section of the policy.  The exclusion barring claims arising out of disputes by and between insureds (Docket Entry # 48, Ex. 2, ¶ VI(L)) therefore does not apply.  Positing no other argument specific to Count II of the Meiselman crossclaim,[14] American Guarantee and Zurich North are not entitled to summary judgment on Count II of the first amended complaint insofar as it sets out the claim that they breached the duty to defend and indemnify vis-à-vis Count II of the Meiselman crossclaim.

---

[14] It is also not appropriate to address any argument not raised initially in the supporting memoranda.  See EEOC v. Aldi, Inc., 2008 WL 859249, *5 n.6 (W.D.Pa. March 28, 2008) ("[b]ecause Aldi conceded this element in its opening brief and only challenges it in its reply brief, the Court finds that Aldi waived any challenge to the second prong for purposes of summary judgment"); D'Aiuto v. City of Jersey City, 2007 WL 2306791, *4 n.1 (D.N.J. Aug. 8, 2007); Berwind Property Group Inc. v. Environmental Management Group, Inc., 2007 WL 4707647, *6 (D.Mass. Feb. 5, 2007).  This court also notes that the crossclaim identifies Caplitz as "an undisclosed principal of [Financial Resources], who exercises control over its operations" (Docket Entry # 48, Ex. 5, ¶ 4).

The foregoing finding on Count II of the Meiselman crossclaim warrants a denial of summary judgment as to the coverage arguments involving the remaining counts in the Meiselman crossclaim.  As previously explained, "an insurer must defend the entire lawsuit if it has a duty to defend any of the underlying counts in the complaint."  Liberty Mutual Insurance v. Metropolitan Life Insurance, 260 F.3d at 63.  In particular, it is not necessary to address the remaining arguments posed by American Guarantee and Zurich North regarding whether the allegations in counts III and IV are reasonably susceptible of an interpretation that they state or adumbrate a claim covered under the E&O Policy.[15]

As a final argument relative to summary judgment on Count II of the first amended complaint with respect to the Meiselman crossclaim, American Guarantee and Zurich North point out, correctly, that FFH was not a defendant named in the Meiselman crossclaim or even in the complaint in the Indianapolis action. Because there was no claim lodged against FFH, American Guarantee and Zurich North correctly posit there was no duty to defend or indemnify FFH.

Plaintiffs unsuccessfully attempt to avoid a finding of no duty to defend FFH on the basis of FFH as an insured under

---

[15]  In the alterative, American Guarantee and Zurich North also omit any extended discussion targeted to Count V of the Meiselman crossclaim thereby waiving the issue for purposes of the present motion.

section II(F)(3) and the policy's highlights.  First, section II(F)(3) applies to "[a]ny person" as opposed to a limited liability company.  Second, it is true that Caplitz, as a contracting agent, was a named insured.  It is also true that the crossclaim alleges that Caplitz exercised control over all of the operations of Financial Resources.  (Docket Entry # 48, Ex. 5, ¶4).  The crossclaim, however, does not refer or identify FFH. Even assuming that FFH's identify as the sole stockholder of Financial Resources was a fact "'known or readily knowable the insurer,'" Timpson v. Transamerica Insurance Co., 669 N.E.2d at 1095, FFH's role is not identified and the factual allegations do not evidence that its role was readily knowable relative to the misconduct regarding the estimated $70,000 funds set out in the allegations in the Meiselman crossclaim.

In sum, Count II in the first amended complaint alleging that American Guarantee and Zurich North breached the express contractual duty to defend and indemnify Caplitz, Financial Resources and Herman is not subject to summary judgment in favor of American Guarantee and Zurich North.  It is, however, subject to summary judgment with respect to FFH.

The foregoing finding does not, however, inevitably lead to an allowance of plaintiffs' summary judgment motion.  As explained infra, genuine issues of material facts relative to the issuance of the E&O Policy preclude summary judgment on plaintiff's request regarding the obligation to provide coverage.

B.  Count III

American Guarantee and Zurich North move for summary
judgment on Count III because, although "possible to have an oral
contract for insurance," the factual allegations in the first
amended complaint make clear that "the parties never intended an
oral contract" of insurance.  (Docket Entry # 47).  American
Guarantee and Zurich North submit that there was either coverage
under the express E&O Policy because Caplitz delivered the
premium check and enrollment form to Calsurance or there was no
insurance because, absent such delivery, "plaintiffs simply are
not insureds."  (Docket Entry # 47).  Plaintiffs assert it is a
question of fact for the jury.

American Guarantee and Zurich North correctly concede it is
possible to have an oral contract for insurance.  See Cunningham
v. Connecticut Fire Ins. Co., 86 N.E. 787, 788 (Mass. 1909) ("nor
can it be argued that there may not be a valid contract of
insurance resting only in parol").  Commentators agree.  See 3D
Steven Plitt, Daniel Maldonado and Joshua Rogers Couch on
Insurance § 29:24 (3d ed. 2005) ("right to make a renewal by oral
agreement exists even though the policy stipulates that this
shall not be done"); see also 1 Jeffrey Thomas and Francis Mootz,
III New Appleman on Insurance Law § 3:02 (2009) ("[o]ral
contracts of insurance are enforceable . . . '[e]ven 'permanent'
contracts of insurance can be oral'").  The essential terms of an

41

oral contract for insurance may be implied if not expressly stated based upon the parties' "prior dealings and contracts between the parties" or industry custom and practice.  1 Jeffrey Thomas and Francis Mootz, III New Appleman on Insurance Law § 3:02 (2009).

The Cunningham decision, relied upon by American Guarantee and Zurich North to establish the correctness of their position, is distinguishable on its facts.  In Cunningham, which did not involve the renewal of an existing policy, "Nothing was said as to the companies by which the policies should be written, as to the amount to be assumed by each company, as to the premium, nor as to the term of the policies."  Cunningham v. Connecticut Fire Ins. Co., 86 N.E. at 788.  In contrast, the case at bar involves inter alia a prior course of dealing between the parties, an attempt to renew a preexisting policy which presents factual issues for the jury as to its success and the August 19, 2004 letter from Lancer advising Caplitz that "your policy, issued to Amerus by American Guarantee, is effective for the Policy Period of 07/01/2004 to 07/01/2005."  (Docket Entry # 63, Ex. C).

Accordingly, the existence of a meeting of the minds on the essential elements of an oral contract for insurance given the record before this court presents an issue of fact for the jury. See generally Salem Laundry Co. v. New England Teamsters and Trucking Industry Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987) ("existence of a prior oral contract depended on the intentions

of" the parties and "determining that intention involves
considering the credibility of witnesses, weighing competing,
plausible inferences that can be drawn from events and
documents"). Based on the arguments presented, Count III is not
subject to summary judgment.

C.  Count IV

American Guarantee and Zurich North next challenge the
implied in fact contract claim in Count IV because "plaintiffs"
never "provided any benefit to . . . defendants." (Docket Entry
# 47). In addition and similar to their argument on Count III,
they maintain that plaintiffs either have a breach of contract
claim based upon an express contract or they have no claim.

For similar reasons set out in the preceding section, the
latter argument is unavailing. The existence of an agreement
renewing the policy may be implied as long as all elements
necessary to form a contract are present. See 3D Steven Plitt,
Daniel Maldonado and Joshua Rogers Couch on Insurance §§ 29:12 &
29.14 (3d ed. 2005) (to form renewal policy "all elements"
necessary to form "contract of insurance . . . must be satisfied"
although "missing terms of what purports to be a contract to
renew may in some cases be implied"); see, e.g., Campbell v.
First American Title Insurance Co., 644 F.Supp.2d 126, 136 (D.Me.
2009) (discussing implied in fact contract for title insurance
albeit applying Maine law). The presence of the count for breach
of an express contract does not foreclose liability for breach of

43

an implied in fact contract which may have more generous terms relative to the delivery of the enrollment form and the premium check.   The existence of such an implied in fact contract presents a factual dispute properly addressed in this instance by a jury.   Summary judgment on Count IV on the basis of this argument is not appropriate.[16]

With respect to the former argument, American Guarantee and Zurich North maintain there was no benefit and thus no consideration because they did not cash the premium check. Plaintiffs respond that the returned premium check was the replacement check and not the original check.   Caplitz attests that he delivered the check and the enrollment form to Calsurance on or about July 30,2004.   The record includes a copy of the enrollment form dated July 30, 2004, as well as a check, not cashed, for the premium dated July 29, 2004.   A few weeks later, Caplitz received the August 19, 2004 letter from Casey stating that the policy issued for the July 1, 2004 to July 1, 2005 policy period.   Taking into account the entire summary judgment record, such evidence suffices to create a genuine issue of material fact for the jury with respect to whether there was consideration for the implied in fact contract alleged in Count

---

[16]   American Guarantee and Zurich North do not argue that Count IV is duplicative of Count III because it states the same theory of liability.   Hence, this court will not address the issue.

IV.[17]

D.  <u>Count V</u>

With respect to Count V, American Guarantee and Zurich North submit that the facts fail to create an estoppel.  They reason that if Caplitz's report of the disagreements with Meiselman on August 8, 2004, amounted to a claim, then "nothing Lancer did or failed to do could have affected Caplitz's conduct."  (Docket Entry # 47).  Alternatively, if the communication was not a claim, then "Caplitz could have obtained other insurance" prior to the October 28, 2004 letter advising him of the inability to confirm his completion of a renewal form.  (Docket Entry # 47).

Massachusetts insurance law adheres to "the rule that a liability insurer, 'having led the assured to rely exclusively on its protection during the period when he might have protected himself . . . cannot, in fairness, thereafter withdraw that protection.'"  <u>Specialty National Ins. Co. v. OneBeacon Ins. Co.</u>, 486 F.3d 727, 735 (1st Cir. 2007) (quoting <u>Salonen v. Paananen</u>, 71 N.E.2d 227, 230 (Mass. 1947)).  Accordingly, to establish such an estoppel "under a liability insurance policy, an insurer must say or do something intended to induce conduct on the part of its insured; the insured must act or refrain from acting in

---

[17]  It is therefore not necessary to decide whether refraining from the purchase of insurance from another company provides sufficient consideration.  <u>Compare</u> 3D Steven Plitt, Daniel Maldonado and Joshua Rogers <u>Couch on Insurance</u> § 29:15 (3d ed. 2005), <u>with</u> <u>Rapp v. Lester L. Burdick, Inc.</u>, 146 N.E.2d 368, 371 (Mass. 1957).

45

reasonable reliance on the insurer's representation; and the insured must suffer some detriment as a result." Id. (citing Salonen v. Paanenen, 71 N.E.2d at 230).

In the case at bar, Lancer represented in late August 2004 that the policy issued and "is effective" for the 2004 to 2005 policy period (Docket Entry # 63, Ex. C) even after Caplitz advised Lancer about the disagreements with Meiselman. Assuming that the notice was not a claim, as posited by American Guarantee and Zurich North, they note that, "Caplitz could have obtained other insurance." The assumption is not necessarily correct inasmuch as the absence of a "claim" is not dispositive of Caplitz's inability to obtain other insurance which could take place prior to the existence of a claim. See SCA Services, Inc. v. Transportation Insurance Co., 646 N.E.2d 394, 397 (Mass. 1995) ("insurable risk is eliminated in the instance where an insured knows, when it purchases a policy, that there is a substantial probability that it will suffer or has already suffered a loss"). Hence, the point in time when the detriment in the form of an inability to obtain replacement coverage took place could easily have occurred after the August notice yet before the October letter. It also remains a factual issue for the jury as to whether Caplitz refrained from purchasing other insurance in reasonable reliance on the August representation and suffered detriment as a result. Summary judgment on Count V in favor of American Guarantee and Zurich North is not appropriate.

E.   <u>Count VI</u>

American Guarantee and Zurich North maintain that Count VI is either duplicative of the "breach of contract claim," presumably Count II, or the claim does not exist.[18]  (Docket Entry # 47, p. 16).  First, they assume that if there was no contract, no breach of the covenant took place.  Alternatively, if there was a contract and it did not contain a duty to defend and indemnify, there would also be no breach of the covenant. Finally, assuming the existence of a contract that did contain a duty to defend and indemnify, they assert that a breach of the implied duty of good faith "adds nothing."  (Docket Entry # 47, pp. 16-17).

Massachusetts law implies a covenant of good faith and fair dealing into every contract.  See <u>FAMM Steel, Inc. v. Sovereign Bank</u>, 571 F.3d 93, 100 (1st Cir. 2009).  "'The scope of the covenant is only as broad as the contract that governs the particular relationship.'"  <u>FAMM Steel, Inc. v. Sovereign Bank</u>, 571 F.3d at 100; <u>Chokel v. Genzyme Corporation</u>, 867 N.E.2d 325, 329 (Mass. 2007).  The covenant requires that the parties not "'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  <u>Nile v. Nile</u>, 734 N.E.2d 1153, 1160 (Mass.

_____

[18]  Plaintiffs also bring Count VI against B&B, BBC and Calsurance.  As previously noted, these defendants adopt the arguments raised by American Guarantee and Zurich North.

2000); see Uno Restaurants v. Boston Kenmore Realty, 805 N.E.2d 957, 964 (Mass. 2004) (covenant "preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract").  American Guarantee therefore had a duty to be honest in its dealings with Caplitz, see Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925, 926 (Mass.App.Ct. 1993) ("duty of good faith would require that the bank be honest in its dealings . . . and that it not purposefully injure [the plaintiff's] right to obtain the benefits of her contract"), and "not to act 'to defeat any intended coverage or diminish the protection purchased by the insured.'"  Sarnafil, Inc. v. Peerless Insurance Co., 609 N.E.2d 1234, 1238 (Mass.App.Ct. 1993).

The record includes copies of the July 2004 premium check and the enrollment form that Caplitz avers he delivered to Calsurance.  In August 2004, Lancer acknowledged that the policy was effective.  Several months later when the claim became a more likely prospect, Lancer advised Caplitz it could not confirm the enrollment even though Caplitz timely delivered the premium check and the enrollment form.

A reasonable jury could find that Calsurance received the check and the enrollment form, initially issued coverage and then, after the claim materialized to a greater degree, disavowed receipt of the enrollment form and the check.  The record therefore gives rise to genuine issues of material fact,

including Calsurance's candor in denying the delivery, that are sufficient to support a jury finding a breach of the covenant separate and apart from a breach of the express duty to defend and indemnify.  Such a claim is not duplicative of a breach of the express duty to defend and indemnify although the jury would not be allowed to award duplicative damages for the same loss. Count VI is therefore not subject to summary judgment based on the arguments presented by American Guarantee and Zurich North.

    F.  <u>Counts VII, VIII and IX</u>

American Guarantee and Zurich North next move for summary judgment on the fraud and negligence claims due to the absence of the necessary elements of reasonable reliance and/or damages. They further contend that the three year limitations period applicable to both torts, as well as the four year limitations period applicable to chapter 93A, bar all three counts as untimely.  Adopting these arguments, B&B, BBC and Calsurance also seek summary judgment on these counts.

As presented by plaintiffs (Docket Entry # 60, ¶ III(H)) and alleged in the first amended complaint (Docket Entry # 28, ¶¶ 36-37, 74-75, 80 & 84), the fraud, negligent misrepresentation and chapter 93A claims arise out of the false, negligent or deceptive representation that Caplitz had not timely enrolled and, therefore, American Guarantee would not provide coverage under the E&O Policy.  The summary judgment record evidences and a jury could find that Caplitz timely delivered the premium check and

the enrollment form on or about July 30, 2004.  Lancer confirmed the enrollment and the coverage by letter dated August 19, 2004. After the Meiselman claim became evident, however, Lancer's October 29, 2004 letter advised Caplitz incorrectly, negligently or deceptively of an inability to confirm his enrollment.  By facsimile dated December 2, 2004, Calsurance likewise informed Caplitz incorrectly, negligently or deceptively that it had no record of receipt of the enrollment form or the check and that it could not backdate coverage to July 2004.

Led to believe they did not have coverage, Caplitz, Herman and Financial Resources retained Attorney Murphy who then filed an answer and a counterclaim in the Indianapolis action on their behalf in March 2005.  Hence, they incurred defense costs based upon the negligent, false or deceptive representation that they did not have coverage due to nonreceipt of the enrollment form and the check.  Attorney Murphy thereafter allowed a default judgment to enter in January 2006 on the crossclaim by not filing an answer.  Notwithstanding these facts, Caplitz avers that, "I did not know until about March or April, 2007, in consultation with [Attorney] Murphy, that I had claims against the defendants because Lancer had told me that there was no coverage because they never received my premium check."  (Docket Entry # 63).

B&B, BBC and Calsurance first challenged the timeliness of the fraud, negligent misrepresentation and chapter 93A claims in the August 2006 motion to dismiss the corresponding claims in the

original complaint.  To support the argument, they filed the
answer and counterclaim that Attorney Murphy filed in response to
the complaint in the Indianapolis action thus evidencing his
representation of these parties as of the March 2005 filing date.
In opposing the untimeliness argument then and now, plaintiffs
argue that the gist of the action was for breach of contract
thereby requiring the application of the six year contract
limitations period to the fraud, negligence and chapter 93A
claims.

In addition to this argument, plaintiffs presently argue
that the law of the case precludes revisiting the district
judge's denial of B&B, BBC and Calsurance's motion to dismiss the
claims as untimely as well as this court's denial of the motion
to reconsider the denial as to the negligent misrepresentation
and chapter 93A claims as untimely.[19]  Alternatively, they
maintain, as previously argued, that the gist of the claims is
contractual and therefore governed by the six year limitations
period.

At the outset, it is worth noting the distinctions between
the existing breach of contract claims in counts I and II.  The
contract claim in Count I against BBC, B&B and Calsurance rests
on the breach of their contract to procure "plaintiffs,"

---

[19]  The latter ruling is not the law of the case because it
explicitly allows a presentation of the untimeliness argument on
summary judgment.

including Caplitz, an insurance policy whereas the contract claim
in Count II against American Guarantee and Zurich North rests on
the breach of their duty to defend Caplitz and others under the
E&O Policy.

Turning to the law of the case argument, the district judge
addressed the negligent misrepresentation,[20] fraud and chapter
93A actions against BBC, B&B and Calsurance brought in the
original complaint and, against a Rule 12(b)(6) attack, allowed
the claims to proceed.  In denying reconsideration of the denial
of the Rule 12(b)(6) motion, this court carefully couched the
ruling with the statement that, "Defendants may renew the
arguments on summary judgment based upon a more developed factual
record and the different legal standard of review that applies to
a summary judgment motion as opposed to a motion to dismiss."

The law of the case doctrine has two branches.  Remexcel

---

[20]   In order to prevail on a negligent misrepresentation claim:

> the plaintiffs must establish in this context that the
> defendants, in the course of their business, profession or
> employment, or in any other transaction in which they had a
> pecuniary interest, supplied false information for the
> guidance of others in their business transactions without
> exercising reasonable care or competence in obtaining or
> communicating the information, that those others justifiably
> relied on the information, and that they suffered pecuniary
> loss caused by their justifiable reliance upon the
> information.

Cumis Insurance Society, Inc. v. BJ's Wholesale Club, Inc., 918
N.E.2d 36, 47-48 (Mass. 2009); see Nota Construction Corp. v.
Keyes Associates, Inc., 694 N.E.2d 401 (Mass.App.Ct. 1998)
(same).

Managerial Consultants, Inc. v. Arlequin, 583 F.3d 45, 53 (1st Cir. 2009); see Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002) (same).  This case falls under the more flexible branch.  Under that branch, the doctrine constrains "but does not altogether prohibit[] reconsideration of orders within a single proceeding by a successor judge."  Ellis v. United States, 313 F.3d at 646 (also explaining policies behind prohibition against reconsideration); accord Filbotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997) ("not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work manifest injustice").  Reconsideration is permissible "if the initial ruling was made on an inadequate record or was designed to be preliminary or tentative[,] . . . there has been a material change in controlling law [or] . . . newly discovered evidence bears on the question."  Ellis v. United States, 313 F.3d at 647-648.  Avoidance of manifest injustice may also provide a basis for reconsideration.  Id. at 648.  Nonetheless, "neither doubt about the correctness" of the first ruling "nor a belief that the litigant may be able to make a more convincing argument the second time around will suffice to justify reconsideration."  Ellis v. United States, 313 F.3d at 648 (further noting that "there is a meaningful difference between an arguably erroneous ruling . . . and an unreasonable

53

ruling that paves the way for a manifestly unjust result").

Taking into account the policies underlying the law of the case doctrine and in light of the preliminary and interlocutory ruling made on the motion to dismiss, the law of the case does not foreclose addressing the timeliness of the claims on summary judgment.[21]  As explained in the First Circuit case this court cited in the February 9, 2010 ruling, "Fisher is simply wrong that the court's earlier ruling constitutes the law of the case: 'an initial denial of summary judgment does not foreclose, as the law of the case, a subsequent grant of summary judgment on an amplified record.'"  Fisher v. Trainor, 242 F.3d 24, 29 (1st Cir. 2001).

The circumstances are more compelling when faced with an initial denial of a motion to dismiss and a subsequent summary judgment motion.  A motion to dismiss addresses the plausibility of the claims in the complaint and assumes facts therein as true whereas a motion for summary judgment addresses whether genuine issues of material fact exist to support the claims.  A different factual record and a different standard of review govern summary judgment motions.  The facts in the Rule 12(b)(6) record while similar are not identical to those in the summary judgment

---

[21]  It is also debatable as to whether the law of the case relative to the district judge's denial of the motion to dismiss by BBC, B&B and Calsurance regarding the timeliness of the claims against these defendants extends to the timeliness of the claims against the insurance carrier, American Guarantee and its parent, Zurich North.  The parties do not address this issue.

record.  A different legal standard of review also applies when
assessing the merits of defendants' summary judgment motions.
See McAnaney v. Astoria Financial Corp., 2009 WL 3150430, *7
(E.D.N.Y. Sept. 29, 2009) ("because of the divergent standard of
review applicable to motions to dismiss and motions for summary
judgment, the law of the case doctrine is inapposite to the
Court's analysis of whether, after the close of discovery,
genuine issues of fact have been raised which survive summary
judgment").  Pretrial rulings are oftentimes designed to be
preliminary and, as such, a "[d]enial of a motion to dismiss may
be followed by an order granting dismissal, or--in the very
nature of the difference between a ruling on the pleadings and an
examination of the record--an order granting summary judgment."
18B Charles Allan Wright, Arthur R. Miller and Edward H. Cooper
Federal Practice and Procedure § 4478.1 (2nd ed.).  Accordingly,
the law of the case doctrine does not bar reconsideration of the
timeliness finding made on different legal and factual record.
See generally Conley v. U.S., 323 F.3d 7, 13 (1st Cir. 2003) (en
banc) (Boudin, C.J.) (law of "case is not a straitjacket but can
be avoided--at the direction of the court that made the invoked
ruling--on several different bases").  This court therefore turns
to the timeliness of the three claims.

As to the negligent misrepresentation and fraud claims
against BBC, B&B and Calsurance, an insurance broker's failure to
procure coverage may support a breach of contract claim, see

Capital Site Management Associates v. Inland Underwriters Ins. Agency, Ltd., 806 N.E.2d 959, 962 & n.6 (Mass.App.Ct. 2004) ("insurance broker's failure to perform to" the professional standard applicable to similarly situated professionals "in obtaining coverage for its client may support a claim for breach of contract"), as well as a negligence claim.  See International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 124 (Mass.App.Ct. 1990) ("a negligence action may be maintained against an insurance agent or broker who undertakes to procure an insurance policy and fails to do so"); see also Rae v. Air-Speed, Inc., 435 N.E.2d 628, 631 (Mass. 1982) ("Massachusetts law . . . clearly permits a potential insured (Air-Speed, in this case) to recover in tort for the failure of an insurance agent to perform his duty to obtain an insurance policy"); see generally Capital Site Management Associates v. Inland Underwriters Ins. Agency, Ltd., 806 N.E.2d at 962 & n.6 (recognizing that contract and negligence claims against insurance broker for failure to obtain policy may co-exist as contract and tort claims with different limitations periods and accrual dates).[22]

The statute of limitations argument challenges the timeliness of the negligent misrepresentation, fraud and chapter

---

[22] The acknowledgment by the court in Capital Site of the different limitations periods serves as a recognition of the well settled distinction between breach of contract claims and negligence claims including negligent misrepresentation and fraud claims.

93A claims.  These claims arise out of the purportedly false
representation that "defendants" would not provide insurance
coverage because "plaintiffs" had not timely enrolled.  (Docket
Entry # 28, ¶ 74; Docket Entry # 60, ¶ III(H)).  Plaintiffs
submit that Lancer, on behalf of American Guarantee, and
Calsurance refused to acknowledge Caplitz's timely enrollment
with the delivery of the enrollment form and the premium check in
late July 2004.  According to plaintiffs, the representations
that Caplitz had not timely enrolled were false or negligently
made in breach of a duty of care owed to "plaintiffs."  (Docket
Entry # 28, ¶¶ 74, 75 & 80; Docket Entry # 60, p. 33).  Lancer
and Calsurance's representations that they had not received the
enrollment form and the premium check in a timely manner
allegedly induced plaintiffs to believe they lacked defense and
indemnity coverage and, in reliance thereon, they refrained from
taking action against defendants until filing this action in June
2004.  (Docket Entry # 28, ¶¶ 74-77 & 80-81; Docket Entry # 60,
pp. 4-6 & 33-34).  Plaintiffs maintain that the representations
that Caplitz lacked coverage and had not timely enrolled were
made in a negligent, fraudulent or deceptive manner thereby
leading to the causes of action in counts VII, IX and X with the
"gist" being contractual in nature.

Deciding "whether the contract or tort statute of
limitations applies is controlled by the essential nature of a
party's claim."  Oliveira v. Pereira, 605 N.E.2d 287, 290 (Mass.

1992); see Desmond v. Moffie, 375 F.2d 742, 743 (1st Cir. 1967)

("it is necessary to determine the essential nature of [the]

plaintiff's claim" to decide whether tort or contract limitations

statute applies) (citing Massachusetts cases); Siebe, Inc. v.

Louis M. Gerson Co., Inc., 908 N.E.2d 819, 830 (Mass.App.Ct.

2009) (to determine "which statute of limitations to apply to a

given claim, we 'must look to the "gist of the action"'"); Barber

v. Fox, 632 N.E.2d 1246, 1249 (Mass.App.Ct. 1994) (although fraud

and breach of fiduciary duty claims "sound in tort, the essence

of each claim is the complaint that Alden and Esther have failed

to do as they promised" and because "'gist of the action' is

contractual, the contract period of limitations applies to each

claim");[23] see also Hendrickson v. Sears, 310 N.E.2d 131, 132

(Mass. 1974) (in certain "situations we have looked to the 'gist

of the action' or the essential nature of the plaintiff's claim"

with dicta characterizing as a "sound proposition" to apply

"limitation statutes . . . equally to similar facts regardless of

---

[23] Plaintiffs' reliance on Barber is misplaced.  The case is
distinguishable on its facts as an action seeking specific
performance of an oral agreement to convey a portion of family
land along with fraud and breach of fiduciary duty claims based
on failure "to do as they [the defendants, one of eight children
and his wife] promised."  Barber v. Fox, 632 N.E.2d at 1249.  The
case at bar does not involve promises among family members,
transfers of land, or a complete failure to perform as
distinguished from a negligent or fraudulent performance.  Thus,
although this court considers the case as construing the essence
of a fraud claim as contractual, see id. at 1249, the decision
fails to convince this court to draw the same classification in
this insurance dispute among insurance companies.

the form of proceeding").

By statute, a four year limitations period applies to
chapter 93A claims.  Mass. Gen. L. Ch. 260, § 5A; see Cambridge
Plating Co., Inc. v. Napco, Inc., 85 F.3d at 761-762.  A four
year limitations period therefore applies to the chapter 93A
claim in Count IX.  See generally Tagliente v. Himmer, 949 F.2d
1, 4 (1st Cir. 1991) (statute of limitations legislatively
established will not be easily overlooked).

With respect to the fraud and negligent misrepresentation
claims against all defendants, Massachusetts case law
overwhelmingly construes negligent misrepresentation and fraud
claims as subject to the statutory three year limitations period
in section 2A of chapter 260.  See Salois v. Dime Savings Bank of
New York, FSB, 128 F.3d 20, 24 (1st Cir. 1997) (summarily noting
in case involving misrepresentations about terms of mortgage that
claims for inter alia fraud and negligent misrepresentation "are
governed by a three-year limitations period"); Cambridge Plating
Co., Inc. v. Napco, Inc., 85 F.3d 752, 761-762 (1st Cir. 1996)
(citing chapter 260, section 2A, for principle that "three-year
statute of limitations governs the intentional and negligent
misrepresentation claims"); Max-Planck-Gesellschaft Zur Forderung
Der Wissenchaften E.V. v. Whitehead Institute for Biomedical
Research, 2010 WL 2428690, *2 (D.Mass. June 11, 2010) ("statute
of limitations is six years for contract claims, three years for
negligent misrepresentation and . . . four years for claims

under" chapter 93A); <u>Stolzoff v. Waste Systems International, Inc.</u>, 792 N.E.2d 1031, 1038 (Mass.App.Ct. 2003) ("common-law torts of fraud and misrepresentation are subject to a three-year statute of limitations"); <u>Beaconsfield Townhouse Condominium Trust v. Zussman</u>, 733 N.E.2d 141, 145 (Mass.App.Ct. 2000) ("[m]isrepresentation is subject to a three-year statute of limitations" under chapter 260, section 2A); <u>Humana Foundation, Inc. v. Cantella & Co., Inc.</u>, 2000 WL 33774752, *3 (D.Mass. Nov. 17, 2000) ("Massachusetts statute of limitations for a negligent misrepresentation claim is three years," citing chapter 260, section 2A); <u>see also</u> <u>Genereux v. American Beryllia Corp.</u>, 577 F.3d 350, 359 (1st Cir. 2009) (fraudulent concealment claim subject to section 2A and three year limitations period); <u>Tagliente v. Himmer</u>, 949 F.2d at 4 ("action for fraudulent misrepresentation of material facts in a transaction is an action sounding in tort"); <u>Kent v. Dupree</u>, 429 N.E.2d 1041, 1043 (Mass.App.Ct. 1982) ("[f]raudulent misrepresentation, an action sounding in tort, is subject to a three-year statute of limitations"). Moreover, the foregoing cases provide little, if any, analysis regarding the application of section 2A to the negligent misrepresentation and fraud claims. Instead, they often simply cite to the statute. Such a brevis treatment of the issue indicates that the issue is relatively settled.

Plaintiffs provide little, if any, reason to depart from this authority. They primarily state that they entered into a

contract with American Guarantee and Zurich North whereby these
defendants agreed to provide insurance for plaintiffs. (Docket
Entry # 60, ¶ III(I)).  The argument fails to address why the
alleged contract to procure or provide insurance would convert
the essence of negligent misrepresentation and fraud claims
against the insurance broker for misrepresenting in a false or
negligent manner the nonrenewal of the policy into contract
claims.  Contrary to plaintiffs' position, the existence of a
contract, which is assumed for purposes of American Guarantee and
Zurich North's summary judgment motion, likewise does not convert
the gist of the negligent misrepresentation and fraud claims
against these defendants into contract claims.  If this were
true, almost all breach of insurance contract suits containing
negligence, negligent misrepresentation and fraud claims would
uniformly apply the six year limitations period applicable to
contract claims.

Case law is to the contrary.  Breach of contract claims in
insurance disputes that also include tort claims do not
eviscerate the statutory distinctions drawn by the Massachusetts
legislature between tort and contract limitations periods in
sections 2A and two of chapter 260.  See, e.g., Ferola v.
Allstate Life Insurance Co., 2007 WL 2705534, *9 (Mass.Super.
Aug. 30, 2007) (noting, in context of beneficiary's claim against
financial advisor for representing annuity as appropriate for his
father, was subject to three year statute of limitations even

though action included separate breach of contract claim).   In another case involving alleged misrepresentations by an insurance company about coverage under an annuity policy and an alleged breach of the annuity policy by the failure to provide the coverage under the policy, the First Circuit in Foisy v. Royal Maccabees Life Insurance Co., 356 F.3d 141 (1st Cir. 2004), summarily and without discussion applied a six year limitations to the contract claim and a three year limitations period to the negligent misrepresentation claim.   Id. at 146-147.

To provide another example, the court in International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d at 124, applied different statutory time periods to a negligence claim and a contract claim against an insurance broker who undertook, but failed, to provide excess insurance coverage for a fleet of ice cream vehicles, one of which injured a child resulting in the underlying negligence action.   In so doing, the court rejected the argument, also raised here by plaintiffs, that applying different accrual periods for the contract and negligence claims "is out of harmony with the general desirability of having statutes of limitations apply equally, irrespective of the form of the action" and, instead, deferred to the long history of applying different time periods for tort and contract claims.   Id. at 127 n.4.

Finally, the essential nature of the false or negligent representation[s] that "defendants would not provide coverage

because [Caplitz] had not timely enrolled for coverage" (Docket Entry # 28, ¶¶ 74 & 80) turn upon the nature and characterization of the conduct rather than the contractual promises that support the breach of contract claims against defendants.  In sum, based on the foregoing reasons, a three year limitations period applies to the negligent misrepresentation and fraud claims in counts VI and VII and a four year limitations period applies to the chapter 93A claim in Count IX.  See Mass. Gen. L. ch. 260, §§ 2A & 5A.

In seeking to avoid the running of these limitations periods, plaintiffs rely on the discovery rule.  Although plaintiffs acknowledge they "incurred attorneys' fees as the result of the defendants' refusal to provide coverage," they submit that factual issues preclude a summary judgment finding that they "knew or should have known prior to" the March or April 2007 discussion with Attorney Murphy "that they had been harmed by the defendants."  (Docket Entry # 60, pp. 37-38).

The three year limitations period in section 2A and the four year limitations period in section 5A both commence "after the cause of action accrues."  Mass. Gen. Laws ch. 260, §§ 2A & 5A.  Ordinarily, a cause of action for personal injury "accrue[s] at the time of injury."  Genereux v. American Beryllia Corp., 577 F.3d 350, 359 (1st Cir. 2009) (applying Massachusetts law).  Similarly, the "accrual of a chapter 93A claim typically occurs at the time injury results from the assertedly unfair or

deceptive acts." <u>Cambridge Plating Company, Inc. v. NAPCO, Inc.</u>, 991 F.2d at 25; <u>see</u> <u>Eaton Financial Corporation v. Dunlavey</u>, 1991 WL 241863 at * 6 (Mass.App.Ct. Nov. 7, 1991) (accrual date for chapter 93A claim is analogized according to "general principles which determine the accrual of actions for similar or underlying claims"); <u>International Mobiles Corp. v. Corroon &</u> <u>Black/Fairfield & Ellis, Inc.</u>, 560 N.E.2d at 125 ("accrual date for a c. 93A cause of action is determined by the same principles dispositive of the accrual dates of general tort actions").

Under the discovery rule, however, "'a cause of action does not accrue until the plaintiffs know or reasonably should have known that they were injured as a result of the defendant's conduct.'" <u>Genereux v. American Beryllia Corp.</u>, 577 F.3d at 359; <u>see also</u> <u>Hanson Housing Authority v. Dryvit System, Inc.</u>, 560 N.E.2d 1290, 1293 (Mass.App.Ct. 1990) (recognizing that "misrepresentation claims may be subject to the discovery rule"). "'Reasonable notice that a particular product or a particular act of another person may have been a cause of harm to the plaintiff creates a duty of inquiry and starts the running of the statute of limitations.'" <u>Brennan v. Boston Mutual Life Insurance Company</u>, 2010 WL 2998669, *3 (Mass.App.Ct. Aug. 3, 2010); <u>see</u> <u>Bowen v. Eli Lilly & Co.</u>, 557 N.E.2d at 742. The inquiry is twofold. The "'plaintiff must have (1) knowledge or sufficient

64

notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was.'" Genereux v. American Beryllia Corp., 577 F.3d at 360 (quoting Bowen, 557 N.E.2d at 742, with internal brackets omitted).

Although Caplitz attests that he "did not know" until March or April 2007 when he consulted with Attorney Murphy that he "had claims against the defendants" (Docket Entry # 28), the applicable standard is the plaintiff's actual knowledge or "'what a reasonable person in the plaintiff's position would have known or on inquiry would have discovered.'" Genereux v. American Beryllia Corp., 577 F.3d at 359 (internal brackets omitted); see Edwards, Jr. v. John Hancock Mutual Life Insurance Company, 973 F.2d 1027, 1030 (1st Cir. 1992) ("'controlling question is whether a plaintiff's knowledge, actual or attributed, of both harm to him and the likely cause of such harm, was sufficient to stimulate further inquiry'") (emphasis added). Furthermore, the running of the time period is only "delayed while 'the facts,' as distinguished from the 'legal theory for the cause of action,' remain 'inherently unknowable' to the injured party." Catrone v. Thoroughbred Racing Associations of North America, Inc., 929 F.2d 881, 885 (1st Cir. 1991).

It is also well established that "'[t]he plaintiff need not know the full extent of the injury before the statute starts to

run.'"  Massachusetts Eye and Ear Infirmary v. QLT

Phototherapeutics, Inc., 412 F.3d 215, 241 (1st Cir. 2005)

(quoting Bowen v. Eli Lilly & Co., 557 N.E.2d at 741); see Riley

v. Presnell, 565 N.E.2d 780 784 (Mass. 1991) (victim "need not

apprehend the full extent or nature of an injury in order for a

cause of action to accrue").  A similar analysis applies with

respect to connecting the defendant's conduct to the harm

suffered by the plaintiff.  Thus, the plaintiff need "not know or

have reason to know that the defendant violated a legal duty to

the plaintiff, but only that she knew or had reason to know that

she had been harmed by the defendant's conduct."  Bowen v. Eli

Lilly & Co., 557 N.E.2d at 741.

Finally, applying "the discovery rule ordinarily involves

questions of fact and therefore in most instances will be decided

by the trier of fact."  Genereux v. American Beryllia Corp., 577

F.3d at 360.  "Determining when a plaintiff had notice of the

likely cause of [an] injury is one example of such a [factual]

determination."  Id.

In the case at bar, Caplitz sent the enrollment form and the

check for payment in full of the premium to Lancer on or about

July 30, 2004.  Lancer confirmed that the renewal policy issued

in the August 19, 2004 letter.  At this point in time, Caplitz

neither knew nor reasonably should have known that he was injured

66

as a result of conduct on the part of American Guarantee, Calsurance or any other defendant.  Indeed, all indications pointed to the existence of coverage as confirmed by Lancer on August 19, 2004, even after Caplitz reported the disagreements with Meiselman.

The first inkling of harm occurred in October 2004.  Thus, in the October 29, 2004 letter, Caplitz received notice that neither Lancer nor American Guarantee had been able to confirm his enrollment.  Caplitz promptly forwarded a copy of the enrollment form dated July 30, 2004, to Lancer with a notation acknowledging that the premium "check still has not cleared the account."  (Docket Entry # 63, Ex. F).  Meiselman I settled and on November 23, 2004, Indianapolis Life filed the complaint in the Indianapolis action.  In light of Lancer's silence after receiving the copy of the enrollment form, Caplitz reasonably assumed he still had coverage and, for summary judgment purposes, lacked reasonable notice of any harm or, more specifically, a lack of coverage due to the asserted non-receipt of the enrollment form and the premium check.

On December 2, 2004, however, Calsurance informed Caplitz that the underwriter could not backdate coverage due to "the pending claim," referring to Meiselman I which, as noted, settled on November 19, 2004.  "The failure to obtain insurance obviously will not cause injury in every case."  International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d at

124 (addressing timeliness of negligence action against insurance broker who undertook but failed to obtain insurance coverage). As explained by the Mobiles court, a negligence claim against an insurance broker for not obtaining adequate coverage does not accrue until a realization of tangible harm such as the insured's payment of legal expenses to defend the underlying action.  See Id.[24]

Indianapolis Life filed the complaint in November 2004. Meiselman filed the crossclaim in the Indianapolis action in February 2005.  In March 2005, Attorney Murphy filed the answer to the complaint in the Indianapolis action on behalf of Financial Resources, Herman, Caplitz as well as the FRN Plan.[25] These entities and individuals thus incurred defense costs due to the failure to provide coverage.  Consequently, by March and April 2005, Herman, Caplitz and Financial Resources had reasonable notice of being harmed by incurring the defense costs. See Id. at 124-125.

Plaintiffs' attempt to avoid this finding by characterizing the February 24, 2005 letter from Casey as confirming

---

[24]  Due to the "relatively peculiar circumstance" in Mobiles in which "[t]he expense of Mobiles' defense . . . was borne entirely by Wausau," the negligence claim did not accrue until settlement of the underlying claim whereas the contract claim, subject to the longer six year limitations period, accrued earlier when Mobiles received the letter from the insurance carrier disclaiming coverage for the van involved in the accident.  Id. at 126.

[25]  The signature page of the answer evidences Attorney Murphy's representation of the above parties.

"defendants' recognized obligation to defend" (Docket Entry # 60, p. 6) is disingenuous.[26]  See Geo. Knight & Co., Inc. V. Watson Wyatt & Co., 170 F.3d 210, 214 (1st Cir. 1999) (rejecting "Knight's belated recharacterization" of underfunding of retirement plan as unavailing inasmuch as Knight "had the ability" to discover the underfunding).  The letter unequivocally states that Lancer was closing the file notwithstanding the pendency of the Indianapolis action and the claims, including those in the Meiselman crossclaim, against Caplitz, Herman and Financial Resources.  The letter also advised Caplitz to immediately contact Lancer if circumstances change.  If Caplitz had any doubts about American Guarantee's denial of coverage, he should and could have contacted Lancer after receiving this letter and confirmed the lack of coverage.  There is, however, no indication that Caplitz acted with any diligence in attempting to confirm any alleged intimation in the letter that defendants recognized their duty to defend.  See Catrone v. Thoroughbred Racing Associations of North America, Inc., 929 F.2d at 887 (summary judgment record "devoid of evidence that Catrone attempted, diligently or otherwise, to discover the defamatory statements contained in the 1974 special report or the 1978 newsletter").  To the contrary, the circumstances gave Caplitz

---

[26]  That said, it is not entirely apparent that plaintiffs wish to draw this inference.  This court addresses it out of an abundance of caution.

reasonable notice that American Guarantee and Zurich North would not defend the claims and he in fact retained an attorney at his own expense to defend against the claims.

The issue therefore devolves into whether plaintiffs reasonably should have known that defendants may have been the cause of their harm of incurring the defense costs.  See Bowen v. Eli Lilly & Co., Inc., 557 N.E.2d at 741 (crucial date for discovery rule is "when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct"). To state the issue answers the question.

Caplitz knew he sent the enrollment form and the premium check on or about July 30, 2004, to Lancer.  He also knew that Lancer initially represented in August 2004 that coverage existed thus indicating receipt.  Lancer thereafter advised Caplitz of an inability to confirm his enrollment.  Caplitz promptly faxed Lancer the copy of the enrollment form and the copy of the premium check noting that the check had not cleared his bank account.  These undeniable facts gave reasonable notice that certain defendants or their representatives, as opposed to any other actor, might not be telling the truth about Caplitz's untimely enrollment and the nonexistence of coverage.

As events played out, American Guarantee did not defend Caplitz, Herman or Financial Resources against the claims in the Indianapolis action thereby causing them to retain the services

of Attorney Murphy.  Thus, by March or April 2005, Caplitz, Herman, Financial Resources and FFH reasonably should have known and had all the necessary information to have known that the representation that constitutes the basis for the fraud, negligent misrepresentation and chapter 93A claims, to wit, "that the defendants would not provide coverage because the plaintiffs had not timely enrolled for coverage" (Docket Entry # 28, ¶¶ 36, 37, 74, 80 & 84), may have been false or made in a negligent or deceptive manner.  More generally speaking, Caplitz, Herman, Financial Resources and FFH reasonably should have known not only of the injury in the form of incurring defense costs but also "that they were injured as a result of the defendant[s']"[27] false, negligent or deceptive denial of coverage based on the non-receipt of a timely enrollment form and the premium check. See Geo. Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d at 214 ("'[t]here were only two possible villains in the piece, Watson Wyatt or Knight itself, and no stroke of genius on Knight's part was needed to point the finger at Watson Wyatt'"); Cambridge Plating Co., Inc. v. Napco, Inc., 991 F.2d at 29 ("a plaintiff who in the 1970s was told that her injury may have been caused by her mother's ingestion of DES was unable to invoke the discovery rule to save the lawsuit she filed a decade later, when she felt more certain of the causal connection"); see generally

---

[27] Genereux v. American Beryllia Corp., 577 F.3d at 359.

71

<u>Genereux v. American Beryllia Corp.</u>, 577 F.3d at 359 ("'cause of action does not accrue until the plaintiffs know or reasonably should have known that they were injured as a result of the defendant's conduct'").

In sum, although application of the discovery rule ordinarily results in questions of fact not suitable for summary judgment, the facts in this case unerringly point to a finding that plaintiffs reasonably should have known that they were injured as a result of defendants' conduct no later than March or April 2005.[28]   Plaintiffs filed this action more than four years later in June 2009.  Finally, because BBC, B&B and Calsurance seek summary judgment and adopt the arguments raised by American Guarantee and Zurich North, counts VII, VIII and IX are subject to summary judgment as to all defendants.

II.  <u>Plaintiffs' Summary Judgment Motion (Docket Entry # 59)</u>

In addition to opposing the motion for summary judgment filed by American Guarantee and Zurich North, plaintiffs separately move for summary judgment.  They raise two arguments. First, they contend that the fraud, negligent misrepresentation and chapter 93A claims are not time barred.[29]  For reasons

---

[28]  In light of this finding, it is not necessary to address the reliance and damages argument as an alternative basis to enter summary judgment on the fraud and negligent misrepresentation claims.

[29]  The summary judgment motion does not identify which claims plaintiffs submit are not time barred.  (Docket Entry # 59).  The

explained in the previous section, the argument does not entitle plaintiffs to a declaration that these claims are timely.

Second, plaintiffs submit that defendants were obligated to provide coverage in the Indianapolis Action.  Viewing the record in defendants' favor, genuine issues of material fact predominate whether the E&O Policy issued for the 2004 to 2005 year.  Lynn Kimmel Johnson ("Johnson"), Vice President of BBC, avers that Indianapolis Life "agents seeking to renew coverage under the errors and omissions master policy provided by American Guarantee for the Policy Period of July 1, 2004 to July 1, 2005 were required to send a fully completed enrollment form and premium check to Calsurance by July 30, 2004."  (Docket Entry # 69, Ex. 1).  The enrollment form requires agents with expiring coverage such as Caplitz to "Enroll within 30 Days of Expiration." (Docket Entry # 63, Ex. A).

Johnson also attests that, "Calsurance has no record of receiving an enrollment form or premium check for [Caplitz] by July 30, 2004."  (Docket Entry # 63, Ex. A).  Caplitz attests that he delivered the form and the check "[o]n or about July 30, 2004" as opposed to on or before July 30, 2004.  In any event,

---

supporting memorandum and reply brief address only the fraud, negligent misrepresentation and chapter 93A claims.  (Docket Entry # 60, pp. 36-37 & 41-42; Docket Entry # 71).  The failure to present a developed argument on the other counts waives the issue for purposes of plaintiffs' summary judgment motion.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999); see also LR. 7.1.

the record contains sufficient evidence to allow a reasonable jury to find that the policy never issued thereby precluding summary judgment in plaintiffs' favor.

## CONCLUSION

In accordance with the foregoing discussion, the motions for summary judgment filed by American Guarantee and Zurich North (Docket Entry # 46) and by BBC, B&B and Calsurance (Docket Entry # 54) are **ALLOWED** in part and **DENIED** in part.  Plaintiff's cross motion for summary judgment (Docket Entry # 59) is **DENIED.**  The parties shall appear for a status conference at 2:30 p.m. on December 15, 2010, to address the deadlines for fact and expert discovery and dispositive motions.  As is customary in this district, this court will entertain any future dispositive motions only after the parties have had the opportunity to complete fact and expert discovery.

        /s/ Marianne B. Bowler
    **MARIANNE B. BOWLER**
    United States Magistrate Judge