UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FINANCIAL RESOURCES NETWORK, INC.,
FINANCIAL FAMILY HOLDINGS LLC,
ROSALIND HERMAN and GREGG D. CAPLITZ,
　　Plaintiffs,


　　　　　　v.                                    CIVIL ACTION NO.
                                               09-11315-MBB

BROWN & BROWN, INC., BROWN & BROWN OF
CALIFORNIA, INC., AMERICAN GUARANTEE
AND LIABILITY INSURANCE COMPANY, ZURICH
NORTH AMERICA COMPANY and CALSURANCE,
　　Defendants.


**MEMORANDUM AND ORDER RE:**
**RENEWED MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS AMERICAN**
**GUARANTEE AND LIABILITY INSURANCE COMPANY, ZURICH NORTH**
**AMERICA COMPANY, BROWN & BROWN, INC., BROWN & BROWN OF**
**CALIFORNIA, INC., AND CALSURANCE (DOCKET ENTRY # 85); PLAINTIFFS'**
**CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**
**(DOCKET ENTRY # 92); DEFENDANTS' MOTION TO STRIKE**
**PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY**
**JUDGMENT (DOCKET ENTRY # 99); PLAINTIFFS'**
**AMENDED CROSS MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 100); AND DEFENDANTS' MOTION**
**TO STRIKE PORTIONS OF THE AFFIDAVITS OF**
**GREGG CAPLITZ AND ROSALIND HERMAN**
**(DOCKET ENTRY # 103)**


**March 30, 2012**

**BOWLER, U.S.M.J.**

　　Pending before this court is a renewed motion for summary
judgment on the remaining causes of action in the first amended
complaint (Docket Entry # 28) filed by defendants American
Guarantee and Liability Insurance Company ("American Guarantee"),
Zurich North America Company ("Zurich North"), Brown & Brown,
Inc. ("B&B"), Brown & Brown of California ("BBC") and Calsurance

(collectively "defendants").  (Docket Entry # 85).  Plaintiffs
Financial Resources Network, Inc. ("Financial Resources"),
Financial Family Holdings LLC ("FFH"), Rosalind Herman ("Herman")
and Gregg D. Caplitz ("Caplitz") (collectively "plaintiffs")
filed a cross motion for partial summary judgment seeking inter
alia jury instructions that plaintiffs were insured under a Life
Insurance Agents Errors & Omissions Liability Policy ("E&O
Policy") against claims made by Rudy K. Meiselman, M.D.
("Meiselman"), that defendants failed to defend and indemnify
plaintiffs in connection with the Meiselman's cross claim and
that defendants misled plaintiffs by misrepresenting the coverage
under the E&O Policy.  (Docket Entry # 92).  Defendants filed a
motion to strike plaintiffs' cross motion for summary judgment as
untimely and as introducing new facts.  (Docket Entry # 99).
Defendants also filed a motion to strike portions of the
affidavits of Caplitz and Herman as containing statements
improperly based upon the beliefs of the parties, speculative and
conclusory assertions, statements in contradiction with prior
pleadings and sworn statements and statements in support of
issues barred by issue preclusion.  (Docket Entry # 103).

    The claims subject to the alleged coverage under which
American Guarantee and Zurich North had a duty to defend and
indemnify originate from a November 2004 civil action ("the
Indianapolis action") filed in this district by Indianapolis Life

Insurance Company ("Indianapolis Life") against Herman, Caplitz, Meiselman and his wife, Hope E. Meiselman, ("the Meiselmans") and the Financial Resources Network Plan, Inc. Profit Sharing Plan and Trust ("the FRN Plan"). A default judgment was issued in January 2006 on the claims in the complaint as well as those in a cross claim filed by Meiselman ("Meiselman cross claim"). This final judgment ordered inter alia the rescission of life insurance policies on Meiselman and his wife and the return of a $650,297.01 commission previously paid to Caplitz. On appeal, the First Circuit affirmed. Indianapolis Life Ins. Co. v. Herman, 2006 WL 3233837 (1st Cir. Nov. 9, 2006).

Thereafter, in the Indianapolis action, the district court denied a motion by Herman to stay enforcement and correct execution of the judgment. On appeal, the First Circuit affirmed, holding that the default judgment ran against Herman in her personal capacity. Indianapolis Life Ins. Co. v. Herman, 516 F.3d 5 (1st Cir.), cert. denied, 129 S.Ct. 137 (2008).

In 2008, Herman, Caplitz, and Financial Resources filed suit in Massachusetts Superior Court (Suffolk County) against Meiselman and various members of his family. Meiselman removed the matter to federal court and the district court dismissed on claim preclusion grounds. On appeal, the First Circuit affirmed. Herman v. Meiselman, 541 F.3d 59 (1st Cir. 2008).

Count I in this proceeding sets out claims against B&B, BBC and Calsurance for breach of contract by estoppel. (Docket Entry # 28). Counts II through V consist of claims against Zurich North and American Guarantee for breach of contract. Respectively, these claims allege breach of an express contract to defend and indemnify (Count II), breach of an oral contract (Count III), breach of an implied in fact contract (Count IV) and breach of contract by estoppel (Count V). Count II remains only as to the duty to defend and indemnify Financial Resources, Herman and Caplitz against the Meiselman cross claim. (Docket Entry # 72, pp. 28, 38 & 40). Count VI includes claims against all defendants for breach of the implied covenant of good faith and fair dealing. As noted below, this court allowed summary judgment on counts VII, VIII and IX. (Docket Entry # 72, p. 72).

## PROCEDURAL BACKGROUND

Plaintiffs filed this action in June 2009 in Massachusetts Superior Court (Suffolk County). (Docket Entry # 6). In August 2009, defendants filed a timely notice of removal. Shortly after removal, B&B, BBC and Calsurance filed a motion to dismiss the claims lodged against them in the original complaint pursuant to Rule 9(b), Fed. R. Civ. P., and Rule 12(b)(6), Fed. R. Civ. P.

In particular, B&B, BBC and Calsurance moved to dismiss the claims for breach of an oral contract to provide insurance (Count

I), breach of an implied in fact contract to provide insurance (Count II), breach of contract by estoppel (Count III) and breach of the implied covenant of good faith and fair dealing (Count VIII) due to the absence of an allegation of a contract. In addition to asserting the untimeliness of the contract claims, B&B, BBC and Calsurance moved to dismiss the negligent misrepresentation, fraud and chapter 93A claims as untimely and the fraud claim due to the lack of particularity. They also sought to dismiss the claims brought by plaintiffs, except those asserted by Caplitz, because Caplitz was the only plaintiff seeking the errors and omission insurance at issue. (Docket Entry ## 8 & 9).

The court allowed the motion on counts I and II because plaintiffs had not "alleged an express contract." (Docket Entry # 24, pp. 3-4 & 9). The court also dismissed the fraud claim without prejudice, allowed plaintiffs leave to file a motion to amend to set out the fraud claim with particularity and otherwise denied the motion.

On February 9, 2010, this court allowed a motion to amend and denied a motion for reconsideration. (Docket Entry ## 28 & 26). In the latter motion, B&B, BBC and Calsurance sought reconsideration of the denial of the motion to dismiss the negligent misrepresentation and chapter 93A counts as untimely and the breach of the implied covenant of good faith and fair

dealing count as lacking an enforceable contract.  In denying

reconsideration, this court advised the parties that:

> Defendants may renew the arguments on summary judgment based
> upon a more developed factual record and the different legal
> standard of review that applies to a summary judgment motion
> as opposed to a motion to dismiss.  See McKenzie v.
> BellSouth Telecommunications, Inc., 219 F.3d 508, 513 (6th
> Cir. 2000); McAnaney v. Astoria Financial Corp., 2009 WL
> 3150430, *7 (E.D.N.Y. Sept. 29, 2009); see also Fisher v.
> Tarinor, 242 F.3d 24, 29 n.5 (1st Cir. 2001).

Thereafter, American Guarantee and Zurich North filed a

motion for summary judgment (Docket Entry # 46) on counts II

through IX of the first amended complaint.  Adopting the

arguments in American Guarantee's and Zurich North's motion, B&B,

BBC and Calsurance also moved for summary judgment.  (Docket

Entry # 54).  Plaintiffs filed a cross motion for partial summary

judgment seeking a declaration that "plaintiffs' claims are not

time barred" and that "defendants were obligated to provide

coverage to the plaintiffs."  (Docket Entry ## 59 & 60).

On November 18, 2010, this court allowed defendants' motions

for summary judgment as to counts VII, VIII and IX and denied

them as to counts II through VI.  (Docket Entry # 72).  In

allowing summary judgment on the fraud, negligent

misrepresentation and chapter 93A claims as time barred, this

court noted that "plaintiffs reasonably should have known that

they were injured as a result of defendants' conduct no later

than March or April 2005."  Plaintiffs filed this action in June

2009, after the expiration of the three year limitations period

applicable to the fraud and negligence tort claims and the four year limitations period applicable to chapter 93A.

This court also denied plaintiffs' cross motion for partial summary judgment. (Docket Entry # 72). As explained supra, plaintiffs were not entitled to a declaration that their claims were timely and "the record contains sufficient evidence to allow a reasonable jury to find that the [E&O] policy never issued thereby precluding summary judgment in plaintiffs' favor."

Currently before this court is the renewed summary judgment motion filed by defendants (Docket Entry # 85), the cross motion for partial summary judgment filed by plaintiffs (Docket Entry # 92), the motion to strike plaintiffs' cross motion for partial summary judgment filed by defendants (Docket Entry # 99), the amended cross motion for summary judgment filed by plaintiffs (Docket Entry # 100) and the motion to strike portions of the affidavits of Caplitz and Herman filed by defendants (Docket Entry # 103). After conducting a hearing on October 5, 2011, this court took the motions under advisement.

STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir.

2007).  Summary judgment is appropriate when the record shows
"there is no genuine issue of material fact, and the moving party
is entitled to judgment as a matter of law."  Rule 56©, Fed. R.
Civ. P.  "A dispute is genuine if the evidence about the fact is
such that a reasonable jury could resolve the point in the favor
of the non-moving party."  American Steel Erectors, Inc. v. Local
Union No. 7, International Association of Bridge, Structural,
Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir.
2008).  "A fact is material if it carries with it the potential
to affect the outcome of the suit under the applicable law."  Id.

   Facts are viewed in favor of the non-movant.  Noonan v.
Staples, Inc., 556 F.3d 20, 23 (1st Cir 2009).  When "the
nonmovant has the burden of proof and the evidence on one or more
of the critical issues in the case is not significantly
probative, summary judgment may be granted."  Davila, 498 F.3d at
12 (internal quotation marks, citation and ellipses omitted);
accord Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (if
moving party makes preliminary showing, nonmoving party must
"produce specific facts, in suitable evidentiary form, to
establish the presence of a trialworthy issue" with respect to
each element on which he "would bear the burden of proof at
trial") (internal quotation marks and citations omitted).

   Defendants submit a LR. 56.1 statement of undisputed facts.
Uncontroverted statements of fact in the LR. 56.1 statement

comprise part of the summary judgment record.  See <u>Cochran v.</u>
<u>Quest Software, Inc.</u>, 328 F.3d 1, 12 (1st Cir. 2003) (the
plaintiff's failure to contest date in LR. 56.1 statement of
material facts caused date to be admitted on summary judgment);
<u>Stonkus v. City of Brockton School Department</u>, 322 F.3d 97, 102
(1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed
material facts that the plaintiff failed to controvert).


## <u>FACTUAL BACKGROUND</u>[1]

Financial Resources is a Massachusetts corporation that
administers and maintains the FRN Plan, a qualified 401(k)
pension plan for Financial Resources employees.  FFH is the sole
stockholder of Financial Resources.  Herman wholly owns FFH and
is FFH's sole member.

In 1995, Caplitz began working as a contracted agent for
Financial Resources.  In 2004, Financial Resources hired Caplitz
who, among other responsibilities, acted as Indianapolis Life's
agent in issuing insurance policies to employees of Financial
Resources.  From June 1997 through October 2006 and during his
employment at Financial Resources, Caplitz was a contracted agent
with Indianapolis Life.

In 2002, Financial Resources hired Meiselman as a technical
analyst.  As an employee of Financial Resources, Meiselman

---

[1]  Citations to the record are provided primarily only for direct
quotations.

elected to participate in the FRN Plan and executed a tax free rollover of his retirement funds into the FRN Plan amounting to $11,242,853.20. Herman and Caplitz used funds in Meiselman's account to pay for insurance policies on the lives of Meiselman and his wife. Herman signed two July 2003 applications with the Meiselmans with the FRN Plan as the designated owner rather than either of the Meiselmans.

On or about July 30, 2003, Caplitz submitted an application for a $22,000,000 life insurance policy purchased by the FRN Plan on behalf of Meiselman. The policy was effectively purchased on November 23, 2003, and by letter dated November 25, Caplitz and Herman informed Meiselman that they had completed the underwriting and placement of the policy with Indianapolis.

By letter dated November 28, 2003, Meiselman wrote to Caplitz to inform him that he did not wish to accept the policy and asked Caplitz to "immediately direct the return by wire of the moneys removed from [his] account." (Docket Entry # 87, Ex. R). Caplitz responded to Meiselman's letter the same day, refuting the points Meiselman made and explaining Caplitz's "executive decision to put the policy in place." (Docket Entry # 87, Ex. S).

Herman avers that as trustee she made the decision to purchase the insurance policy while Caplitz acted as "broker" and "advisor" and had "no control" over her decision. (Docket Entry

10

# 96, ¶ 7).  Herman contacted Meiselman on December 6, 2003, refusing to honor Meiselman's request to cancel the policy.  By letter dated December 12, 2003, Wayne Murphy, Esq. ("Attorney Murphy"), who represented Financial Resources and/or Herman, the FRN Plan and Herman, confirmed his clients' intent to keep the policy in full force and effect.  In two letters to Meiselman dated December 30, Indianapolis Life indicated that the policy would remain in effect as per Herman's instructions.

On or about January 5, 2004, Meiselman filed a complaint against Indianapolis Life and Caplitz with the Massachusetts Office of Consumer Affairs and Business Regulation – Division of Insurance ("the Insurance Division"), claiming that Caplitz solicited him to purchase a life insurance policy, that Meiselman decided he did not want the policy, that Caplitz informed him that the order was cancelled and that Indianapolis Life maintained that the policy was in force.  The complaint points out that Caplitz and Herman stood to earn several hundred thousand dollars in commissions from the purchase of the policy. (Docket Entry # 87, Ex. V).

By letter dated February 12, Caplitz responded to the complaint filed with the Insurance Division.  He disputed Meiselman's claims and offered his own explanation, averring that the Meiselmans "are the insured and not the owners," that Caplitz's obligation was to follow the instructions of the policy

owner, Herman, and that Herman had acted in the Meiselmans' best interest. (Docket Entry # 87, Ex. W).

On May 4, 2004, Caplitz wrote to John Cleavenger ("Cleavenger"), senior vice president for AmerUS Life Insurance Co. ("AmerUS"), Indianapolis Life's parent company, to follow up on an April 30 telephone conversation he had with Cleavenger regarding a complaint Meiselman filed with Indianapolis Life. In this letter, Caplitz states:

> Dr. Meiselman's complaint to Indianapolis Life is his last gasp effort in a series of complaints he has made to attempt to force a concession from me. He filed complaints with the NASD, since dismissed[,] . . . the US Department of Labor determined to be baseless and dismissed and the complaint with the Massachusetts Insurance Department that is currently being investigated.

(Docket Entry # 87, Ex. X). By letter dated June 14, Cleavenger wrote to Herman regarding Meiselman's request to rescind the Indianapolis policy. In the letter, Cleavenger concluded that the Meiselman policy should be rescinded and that the premiums paid would be returned with interest. (Docket Entry # 87, Ex. Y).

As a contracted agent of Indianapolis Life, Caplitz was enrolled in the E&O Policy provided by American Guarantee, a subsidiary of Zurich North, for Indianapolis Life insurance agents from July 1, 2001 to July 1, 2004. BBC, a subsidiary of B&B, offered the insurance through Calsurance, a division of BBC. Calsurance acknowledged and approved applications received from

12

Indianapolis Life agents for the policies provided by American

Guarantee.  Lancer Claims Services, Inc. ("Lancer"), also a

division of BBC, provided claims services for the policies.

Because Caplitz was enrolling late for the 2003-2004 E&O

Policy, he signed a letter on December 8, 2003, representing the

following:

> 1.  After a review of my records and the records of those acting under my personal direction and control, I have no knowledge or information of any fact or circumstance, or any allegation, contention or incident which may result in a claim, suit, or arbitration against me or those acting under my personal direction and control.

> 2.  If the representation and warranties in this letter are false, American Guarantee & Liability Ins. Group may, at its sole discretion, void any insurance coverage issued in reliance on these warranties and representations and/or deny coverage for specific claims asserted under such coverage.

(Docket Entry # 87, Ex. O).  Caplitz then signed an enrollment

form for the 2003-2004 E&O Policy on December 9, 2003,

representing the following:

> I have no knowledge of any pending claim or incident that could give rise to a claim under the proposed policy.  It is agreed and understood that if any such claim exists, or knowledge or information exists and any claim or action arises therefrom, it is excluded from coverage for which this enrollment form applies.

(Docket Entry # 87, Ex. O).

The E&O Policy afforded professional liability coverage for

life insurance agents such as Caplitz against "[a]ny 'Claim'

arising out of a negligent act, error or omission of the

'Insured' . . . in rendering or failing to render 'Professional

13

Services.'"  (Docket Entry # 87, Ex. A, § I(A)(1)).  In greater

detail, the relevant language of the E&O policy provides that:

> The Company shall pay on behalf of the "Insured" all sums
> which the "Insured" shall become legally obligated to pay as
> "Damages" as a result of:
>
> 1.  Any "Claim" arising out of a negligent act, error or
> omission of the "Insured", or any person for whose acts the
> "Insured" is legally liable, in rendering or failing to
> render "Professional Services" for others in the conduct of
> the "Insured's" profession as a licensed Life, Accident and
> Health Insurance Agent, Broker, General Agent or Manager,
> Notary Public or Registered Representative, while there is
> in effect a contract between the Named Insured and the
> insurance company named in Item 1 of the Declarations, or
> its authorized "Broker/Dealer" subsidiary, as applicable.

(Docket Entry # 87, Ex. A, § I(A)(1)).

The term "Claim" is defined in the policy as "a written

demand received by the 'Insured' seeking monetary damages,

including the service of suit . . . against the 'Insured'."

(Docket Entry # 87, Ex. A, § II(C)).  The E&O Policy defines

"Damages" using similar pecuniary language:  "'Damages' shall

mean the monetary amounts for which an 'Insured' is legally

liable, including sums paid as judgments, awards or settlements .

. .."  (Docket Entry # 87, Ex. N, § II(D)).

The term "Professional Services" is defined in relevant part

as "[t]he sale or servicing of: . . . (C) Employee Benefit Plans

. . . including . . . Ordinary Pension or Profit Sharing Plans .

. . and (e) 'Financial Planning Activities.'"  (Docket Entry #

87, Ex. A, § II(J)(1)).  The term "Financial Planning Activities"

is defined as "the recommendation or preparation of a financial

program for a client involving the client's present and anticipated assets and liabilities, including recommendations regarding saving, investments, insurance, anticipated retirement or other employees benefit."  (Docket Entry # 87, Ex. A, § II(L)).

The term "Insured" under the policy is defined to include:

> The Named Insured set forth in Item 1 of the Declarations, including:  a.  All Agents or General Agents of the insurance company named in Item 1 of the Declarations provided that they are party to an agent contract with the insurance company named in Item 1 of the Declarations.

(Docket Entry # 87, Ex. A, § II(F)(1)).  Immediately below the words "Named Insured" in item one of the declarations page appears the language, "The Career Agents and Personal Producing Agents of AmerUs Life, Indianapolis Life and Bankers Life of New York."  (Docket Entry # 87, Ex. A).  As a contracted agent with Indianapolis Life, Caplitz was therefore a named insured within the meaning of the E&O Policy.  The term "Insured" also includes:

> 2.  Any corporation, partnership or other business entity which engages in "Professional Services" and which is either owned or controlled by the Named Insured and then only with respect to those operations of the business entity related to the "Professional Services" provided by the Named Insured.

> 3.  Any person acting on behalf of the Named Insured who was or is a partner, officer, director, stockholder or an employee of the Named Insured or Named Insured's business entity, provided such person is not a party to an agent or broker contract with any insurance company, and then only with respect to "Professional Services" provided by the Named Insured.

(Docket Entry # 87, Ex. A, § II(F)).

The policy contains an Awareness Provision ("Awareness Provision") which reads in relevant part as follows:

> If, during the "Policy Period," the Company shall be given written notice of any negligent act, error or omission which could reasonably be expected to give rise to a "Claim" against an "Insured" under this Policy . . . then any "Claim" which subsequently arises out of such negligent act, error or omission shall be considered to be a "Claim" made during the "Policy Period" in which the written notice was received.

(Docket Entry # 87, Ex. A, § V). The term "Policy Period" is defined as "the period from the effective date of this Policy to the expiration date or earlier termination date, if any, of this Policy." (Docket Entry # 87, Ex. A, § II(I)). The 2002 to 2003 Policy Year E&O Plan Highlights ("E&O Highlights"), issued each year to policy holders, reiterates the substance of the Awareness Provision, stating:

> For your protection, the policy also includes an "Awareness Provision." This allows you to provide written notice of circumstances that could reasonably be expected to give rise to a claim. Then if a claim subsequently arises out of the described circumstances, it will be considered to be a claim during the Policy Period in which the written notice was received.

(Docket Entry # 87, Ex. E).

The E&O Policy contains the following conditions:

> As a condition precedent to the right of insurance coverage afforded herein, the "Insured" . . . which seeks coverage shall:  (a) As soon as practicable, but not more than (60) days after the termination of coverage, give to the Company written notice of any "Claim" made against the "Insured"  . . . during the "Policy Period" . . ..  (b) Immediately forward to the Company . . . every "Claim", notice, summons or other process received directly by the "Insured" . . . or

16

by the "Insured's" . . . representatives in the event suit
is brought against the "Insured" . . ..

(Docket Entry # 87, Ex. A, § VII(A)).  Lynn Johnson ("Johnson"),
president of Calsurance and vice president of B&B, and Jeanette
Younger ("Younger"), a Calsurance account administrator, suggest
that Lancer may have accepted at least a "potential claim" or an
"initial report" of claims orally over the telephone.  (Docket
Entry # 98, Ex. TT, pp. 138-140 & Ex. WW, pp. 18-20).

       The policy ended on July 1 of each year.  The enrollment
form for the 2004-2005 E&O Policy allowed "[a]gents with
[e]xpiring [c]overage" to "[e]nroll within 30 days of
[e]xpiration."  (Docket Entry # 87, Ex. M).  In a number of years
prior to 2004, Caplitz enrolled after the 30 day time period.
From July 2001 until July 2003, Caplitz was enrolled in the E&O
Policy and paid the premium annually by credit card.  In 2004,
Calsurance "did away with that procedure and mandated that a
check be sent."  (Docket Entry # 87, Ex. B, p. 79).

       Caplitz attests that on or about July 30, 2004, he
"delivered to Calsurance" an enrollment form as well as check
number 2018 dated July 29, 2004, in full payment of the premium
in order to enroll in the 2004-2005 E&O Policy.  (Docket Entry #
95, ¶ 9).  Younger in his deposition, however, states that
CalSurance has no record of receiving a July 29, 2004 enrollment
form and a premium check on or about July 30, 2004.  (Docket
Entry # 106, ¶ 32).  Caplitz further avers that he "had no

knowledge or reason to believe" that his coverage had not been renewed.  He further attests that, "no defendant advised me at the end of the policy year ending July 1, 2004," of a nonrenewal. (Docket Entry # 95, ¶ 12).

Caplitz further alleges that on or about August 8 or 12, "as a consequence of escalating disagreements" between himself, Herman and Financial Resources on the one hand, and Meiselman on the other, Caplitz "called and reported these disagreements to Lancer under the 'Awareness Provision' of the [E&O] Highlights." (Docket Entry # 95, ¶ 14; Docket Entry # 94, ¶ 18).  By letter dated August 19 to Caplitz, Stephen Casey ("Casey") at Lancer acknowledged receipt of the potential Meiselman claim.  The letter advised that the policy was "effective for the Policy Period of 07/01/2004 to 07/01/2005," while noting that "this claim is subject to all other applicable terms and conditions of the policy."  It further states that:

> [a] complete coverage evaluation will be completed on this matter within the next 30 days.  If there are any coverage issues that need to be addressed, you will receive notice of those issues under separate cover.  In the meantime, American Guarantee considers all rights mutually reserved.

(Docket Entry # 97, Ex. N).

On October 28, 2004, Meiselman filed a civil action in this district against Financial Resources, the FRN Plan, Herman and Caplitz when Herman allegedly failed to respond to Meiselman's request to transfer Meiselman's funds in the FRN Plan into a

third party account ("the Meiselman I complaint").  (Docket Entry
# 97, Ex. Q).  By letter dated October 29, Cynthia Renner
("Renner"), senior director of coverage for Lancer, informed
Caplitz that Lancer was in the process of determining whether
there was E&O coverage for Meiselman's claim and that Lancer was
unable to confirm Caplitz's enrollment for the 2004-2005 E&O
Policy period.  Caplitz then faxed a copy of a check and
enrollment form, each dated July 30, 2004, to Renner on November
5.

Meiselman's claims in the Meiselman I complaint were settled
by execution of a Release and Settlement Agreement on or about
November 19, 2004, under which the parties agreed to transfer
Meiselman's funds in the FRN account into an individual
retirement account at Meiselman's direction.  Caplitz states that
he forwarded this agreement to Lancer and informed Stanley Robb
("Robb") at Calsurance about the settlement agreement around that
same time.[2]  (Docket Entry # 95, ¶ 33).  According to Johnson,
however, Lancer did not receive the Release and Settlement
Agreement until October 10, 2005.  (Docket Entry # 106, ¶ 76).
On November 23, 2004, Indianapolis Life filed the complaint in
the Indianapolis action against Herman, the FRN Plan, Caplitz and
the Meiselmans seeking inter alia rescission of the Meiselman

_____

[2]  There is, however, no dispute that Caplitz did not send
the Meilselman cross claim filed in February 2005 to Lancer.
Rather, Lancer first received notice of that claim on August 31,
2004, in an email from Meiselman's attorney.

insurance policies and recovery of Caplitz's $650,297.01 commission. (Docket Entry # 97, Ex. T).

By email dated November 29, Younger sent Caplitz an enrollment form for retroactive coverage for the 2004-2005 E&O Policy year with an individual effective date of August 1, 2004. As a condition of enrollment, Calsurance required that Caplitz sign a letter acknowledging that he was not currently enrolled in the E&O Policy and that he had a "potential gap in coverage" and would have "no prior acts coverage." (Docket Entry # 87, Ex. DD). Caplitz did not sign the letter and by another letter dated December 3, 2004, Younger informed Caplitz that his coverage would not be renewed and that he would "no longer have coverage" under the E&O policy "as of the expiration date of [his] last active policy, July 1, 2004." (Docket Entry # 97, Ex. Y).

On December 6, 2004, Caplitz was served with the complaint in the Indianapolis action. (Docket Entry # 98, Ex. YY). On February 9, 2005, Meiselman filed the aforementioned Meiselman cross claim against Herman, the FRN Plan and Caplitz. (Docket Entry # 87, Ex. H). By letter dated February 24, Casey informed Caplitz that, due to a lack of activity, Lancer had closed its file because "it appears that [Meiselman] will not pursue a claim against [Caplitz]" that Caplitz had orally reported to Lancer. (Docket Entry # 87, Ex. I). Lancer thereafter reopened the file after receiving a copy of the Meiselman cross claim in an August

31 email from Meiselman's attorney. (Docket Entry # 87, Ex. J).

On October 10, 2005, Caplitz faxed a copy of the Release and Settlement Agreement signed by Meiselman to Lancer. (Docket Entry # 87, Ex. K). Johnson states that this was the first time these documents were provided to Lancer. (Docket Entry # 87, Ex. G). By letter dated November 22, Lancer told Caplitz that "there has been no further activity" on the Meiselman file, that Lancer was closing his reopened file and that Caplitz should contact Lancer "if circumstances change in any way." (Docket Entry # 87, Ex. L). Caplitz never contacted Lancer.

In 2007, Herman, Caplitz and the FRN Plan brought a legal malpractice suit in Massachusetts Superior Court (Suffolk County) ("the malpractice action") against Attorney Murphy, the attorney who had represented them in the underlying litigation. (Docket Entry # 87, Ex. CC). In a settlement, Attorney Murphy satisfied the default judgment on the Meiselman cross claim and Meiselman therefore released Herman, Caplitz and the FRN Plan. On December 9, 2010, Meiselman's counsel filed a satisfaction of judgment of the Meiselman cross claim in the Indianapolis action.[3] (Docket Entry # 87, Ex. BB). Neither Herman, Caplitz nor the FRN Plan paid any money in satisfaction of the default judgment in the Meiselman cross claim in the Indianapolis action. Herman, however, did "pay attorney's fees" although she could not

---

[3] Prior thereto, Herman and Caplitz incurred legal fees to Attorney Robert D. Cohan, Esq. ("Attorney Cohan").

determine the portion of the alleged $660,000 amount (Docket Entry # 28, ¶ 46) she paid.  (Docket Entry # 87, Ex. C, pp. 131-133).

On November 11, 2009, Caplitz received a bankruptcy discharge eliminating liability on the judgment in the Indianapolis action including liability on the Meiselman cross claim.  On June 23, 2011, the court in the malpractice action issued a decision against Attorney Murphy following a bench trial.  (Docket Entry # 87, Ex. CC).  The court found that Caplitz did not suffer any damages as a result of Attorney Murphy's conduct and rejected Caplitz's testimony that he paid Attorney Murphy $10,000 for legal services at an undetermined time.  (Docket Entry # 94, ¶ 49).

Specific to the Meiselman cross claim, therefore, Attorney Murphy satisfied the default judgment.  Neither Caplitz nor Herman paid any money in satisfaction of the default judgment. Meiselman executed a release and, in any event, a bankruptcy discharge eliminated Caplitz's liability on the Meiselman cross claim.  That said, construing the record in plaintiffs' favor and as discussed below, Caplitz incurred legal fees to Attorney Cohan after Attorney Cohan entered his appearance on December 21, 2006, in the Indianapolis action.  Caplitz also had an agreement with Herman to reimburse her for half of the attorneys' fees incurred.[4]

---

[4]  The statement is subject to a motion to strike which, as discussed below, is denied as to this statement.

Finally, Caplitz testified to experiencing a loss of commission income.[5] He assigned the commission to Herman "or an entity of her choosing."[6] (Docket Entry # 87, Ex. B, p. 80).

## DISCUSSION

Defendants seek summary judgment "on all remaining claims in this case" (Docket Entry # 86, p. 25), in other words, counts I through VI.[7] For purposes of the motion, they assume that the E&O "Policy was issued to Caplitz." (Docket Entry # 86, p. 2). They do not, however, distinguish the different causes of action in counts I through VII beyond a brief reference to the remaining claims of "breach of contract, whether oral, written or contract

---

[5] Caplitz's loss of commission income, if any, does not fall within the reach of "Damages" covered under the E&O Policy. "Damages" is a defined term in the E&O Policy. It "mean[s] the monetary amounts for which an 'Insured' is legally liable." (Docket Entry # 87, Ex. A & N, § II(D)). The definition also states that damages "does not include . . . the return or withdrawal of . . . . commissions." (Docket Entry # 87, Ex. A & N, § II(D)).

[6] This court recently presided over pretrial matters in <u>United States v. Gregg D. Caplitz et al.</u>, Criminal No. 12-10015-WGY, in which a Superceding Indictment charges Caplitz and Herman with conspiracy in violation of 18 U.S.C. § 371 and impeding the administration of the internal revenue laws in violation of 18 U.S.C. § 7212(a). The Superceding Indictment also charges Caplitz with filing false tax returns in violation of 18 U.S.C. § 7206(1). This court disclosed its involvement in the criminal case at a February 7, 2012 status conference. Neither party objected to this court continuing to preside over this civil case.

[7] As previously noted, this court allowed summary judgment on counts VII, VIII and IX. (Docket Entry # 72, p. 72). Count II remains only as to the duty to defend and indemnify Financial Resources, Herman and Caplitz against the Meiselman cross claim. (Docket Entry # 72, pp. 28, 38 & 40).

by estoppel, and breach of the implied covenant of good faith and fair dealing." (Docket Entry # 86). Indeed, they fail to identify the remaining counts and they fail to mention any difference in the law or the facts between the causes of action.

Defendants move for summary judgment on grounds that Financial Resources and Herman were never insureds under the E&O Policy (Docket Entry # 86, pp. 7-11); that Caplitz was not entitled to coverage under various provisions of the E&O Policy (Docket Entry # 86, pp. 12-20); and that Caplitz has suffered no damages as a result of his lack of coverage (Docket Entry # 86, pp. 20-24). All of the arguments in support of the first two grounds are specific to the language in the E&O Policy as opposed to any oral representation or conduct that might give rise to an estoppel (counts I and V), breach of an oral contract (Count III), breach of an implied in fact contract (Count IV) and breach of the covenant of good faith and fair dealing (Count VI). In other words, the import of the arguments in the first two grounds centers around the viability of coverage under the terms, conditions and language in the E&O Policy. The arguments are therefore specific to Count II because that is the only count based on the written contract, to wit, the E&O Policy itself. Accordingly, this court construes the first two grounds as seeking summary judgment only under Count II.[8]

_____

[8] Although there may be viable arguments to dismiss counts I, III, IV, V and VI, including the principle that the covenant

The third ground that Caplitz suffered no damages has a more global reach. It is addressed after the discussion of the first two grounds that challenge Count II and the coverage afforded under the terms, conditions and language in the express E&O Policy.

Plaintiffs seek partial summary judgment for the court to instruct the jury that plaintiffs were insured against the Meiselman cross claim under either the 2003-2004 or the 2004-2005 E&O Policy; that defendants failed to defend or indemnify plaintiffs in connection with the Meiselman cross claim; and that defendants misled plaintiffs by failing to disclose the existence of the Automatic Extended Reporting Period, misrepresenting to plaintiffs that they were not insured and misrepresenting to

_____

of good faith "'is only as broad as the contract that governs the particular relationship,'" FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009), defendants do not raise them. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see, e.g., In re Pharmaceutical Industry Average Wholesale Price Litigation, 588 F.3d 24, 31, (1st Cir. 2009) ("district court properly held that anything raised in [prior] pleading that Howe did not explain in the reply brief was waived"); see generally U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting in context of appellate argument that court cannot be expected to do counsel's work, "[j]udges are not . . . mindreaders" and "a litigant has an obligation 'to spell out its arguments squarely and distinctly'"). In the event defendants wish to raise additional and more specific arguments relative to these counts, they should file a motion to extend the dispositive motion deadline and, if allowed, proceed to file a summary judgment motion.

plaintiffs that coverage would be provided. (Docket Entry # 92).
In seeking partial summary judgment and in opposing defendants'
summary judgment motion, plaintiffs rely on their memorandum of
law, the affidavit of Herman, the affidavit of Caplitz and the
exhibits and deposition transcripts appended to the affidavit of
Attorney Cohan. (Docket Entry # 92).

Defendants move to strike plaintiffs' cross motion for
partial summary judgment as untimely in violation of this court's
December 15, 2010 scheduling order. (Docket Entry # 99).
Defendants also move to strike portions of the affidavits of
Caplitz and Herman on grounds that certain statements: (1) "are
improperly based upon the beliefs of the parties;" (2) "contain
speculative and conclusory assertions;" (3) "contradict prior
pleadings and sworn statements;" and (4) "support issues barred
by issue preclusion, rendering them irrelevant." (Docket Entry #
103). Because Caplitz's and Herman's affidavits figure
prominently in plaintiffs' opposition to defendants' motion for
summary judgment and plaintiffs' cross motion for partial summary
judgment considered infra, this court initially examines the
motion to strike.

I. Defendants' Motion to Strike Portions of the Affidavits of
Caplitz and Herman (Docket Entry # 103)

Defendants move to strike statements of Caplitz's (Docket Entry # 95) and Herman's (Docket Entry # 96) affidavits which: (1) are improperly premised on belief; (2) contain speculative or conclusory statements; (3) contradict prior pleadings and sworn statements; or (4) concern issues barred by issue preclusion. This court addresses each ground seriatim.

A. <u>Statements Premised on Belief</u>

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4), Fed. R. Civ. P. ("Rule 56(c)(4)"). Defendants contend that Caplitz and Herman improperly submitted affidavit statements not based on the "personal knowledge" mandate of Rule 56(c)(4). "Motions based upon 'information and belief' do not satisfy the [Rule 56(c)(4)] standard." <u>Murphy v. Ford Motor Co.</u>, 170 F.R.D. 82, 84 (D.Mass. 1997) (quoting <u>Sheinkopf v. Stone</u>, 927 F.2d 1259 (1st Cir. 1991)).

The second sentence of paragraph 13, as well as the whole of paragraphs 32 and 34 of Caplitz's affidavit, are explicitly premised on belief. Paragraph two of Herman's affidavit is also admittedly based on her belief. Consequently, that sentence and those paragraphs are stricken and afforded no weight in opposition to defendants' motion for summary judgment or in

support of plaintiffs' cross motion for partial summary judgment.

B.  Conclusory Statements

Defendants also argue that Caplitz's affidavit contains arguments and conclusory assertions based on factual assumptions. "[A]ffidavits may not contain arguments or conclusory assertions" that would not be admissible at trial.  Murphy v. Ford Motor Co., 170 F.R.D. at 85; see also Wynne v. Tufts Univ. School of Medicine, 976 F.2d 791, 796 (1st Cir. 1992); Sheinkopf v. Stone, 927 F.2d at 1262.

To the extent that Caplitz's affidavit includes such conclusory statements not based upon personal knowledge, those statements will be given no weight in opposition to defendants' motion for summary judgment or in support of plaintiffs' cross motion for partial summary judgment.  Thus, the first sentence of paragraph 35, the whole of paragraph 36 and the first sentence of paragraph 42 are stricken.[9]

C.  Statements Contradicting Prior Testimony

Defendants further contend that paragraphs 50 and 85 in Caplitz's affidavit contain statements that are contradictory to Caplitz's prior deposition testimony and interrogatory answers.

--------

[9]  In the alternative, in deciding defendants' summary judgment motion (Docket Entry # 85), it was not necessary to rely on the first sentences of paragraph 35 and 42 or paragraph 36.  Put another way, even if this court considered these portions of Caplitz's affidavit, it would not alter this court's decision on the summary judgment motion (Docket Entry # 85).

Plaintiffs submit that the paragraphs do not contradict the prior deposition testimony.

"It is bedrock law in this Circuit that a party cannot vary his . . . testimony with an affidavit unless there is an explanation for the variance." Spilman v. Mosby-Yearbook, Inc., 115 F.Supp.2d 148, 155 (D.Mass. 2000); Murphy v. Ford Motor Co., 170 F.R.D. at 85. Absent a satisfactory explanation, a "party opposing summary judgment cannot create a genuine issue of material fact by the simple expedient of filing an affidavit that contradicts clear answers to unambiguous questions in an earlier deposition." Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 26 (1st Cir. 2002); accord Colantuoini v. Afred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994); Lowery v. Airco, Inc., 725 F.Supp. at 85-86 (when party gives "clear answers to unambiguous deposition questions, he or she cannot raise an issue of fact by submitting a subsequent affidavit that merely contradicts the deposition testimony"); see also Chapman Ex Rel. Est. of Chapman v. Bernard's, Inc., 167 F.Supp.2d 406, 419 (D.Mass. 2001). "Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility," however, that is properly resolved by the finder of fact. Tippens v. Celotex Corporation, 805 F.2d 949, 954 (11th Cir. 1986) (reversing allowance of summary judgment and finding that affidavit was not inherently inconsistent with deposition testimony and should have been considered); accord

<u>Hernandez-Loring v. Universidad Metropolitana</u>, 233 F.3d 49, 54
(1st Cir. 2000) ("lapse of memory, new sources of information or
other events can often explain a revision").

In paragraph 50, Caplitz avers that, "Left without coverage,
Herman, FRNI and I hired Attorney Wayne Murphy . . . to
represent us." (Docket Entry # 95, ¶ 85). Defendants submit
that Caplitz testified at his deposition that Herman, not
Caplitz, chose Attorney Murphy to serve as their counsel in the
Indianapolis action. (Docket Entry # 104, p. 6).[10] Elsewhere
during his deposition, however, Caplitz testified at one point
that he chose Attorney Murphy,[11] at another point that Herman
chose Attorney Murphy[12] and at another point that "other attorneys
were interviewed" in addition to Attorney Murphy. (Docket Entry
# 87, Ex. B, p. 208). Caplitz also testified that Attorney
Murphy was on a quarterly retainer as opposed to being paid by
the hour.[13] The fact that "Herman, FRN1 and [Caplitz] hired

---

[10] Defendants cite pages 185 to 187 and page 208 as
containing the above testimony. The summary judgment record does
not include pages 185 to 187 of the deposition. It also fails to
include page 32.

[11] The testimony is as follows:
Q. But you chose Mr. Murphy. Correct?
A. Mr. Murphy? Yes.
(Docket Entry # 87, Ex. B, p. 206).

[12] The testimony is as follows:
Q. And he [Attorney Murphy] was chosen because he was the
best. Right? At least in your mind.
A. First off, I didn't make the choice.
Q. Well, Ms. Herman is not a stupid woman, is she?
A. Not likely.
(Docket Entry # 87, Ex. B, p. 208).

[13] The relevant deposition testimony reads as follows:
Q. Were you paying Wayne Murphy by the hour?
A. No.

Attorney" Murphy to represent them in the Indianapolis action, as
stated in the affidavit, does not directly or necessarily
contradict the prior deposition testimony that Caplitz or Herman
chose Attorney Murphy as counsel.  Although paragraph 50 raises
credibility questions regarding Caplitz and his memory, it is not
contradictory with the prior testimony and therefore constitutes
part of the summary judgment record.

Turning to paragraph 85, Caplitz avers by affidavit that,
"Furthermore, although I paid none of those attorneys' fees, I
have an agreement with Herman to reimburse her for half that
amount, with interest at 6% per annum.  To date, I owe over
$900,000 with interest."  (Docket Entry # 95, ¶ 85).  In a
previous interrogatory, Caplitz stated that he had paid $262,533
in attorneys' fees to Cohan, Rasnick & Meyerson, LLP and $172,000
in attorneys' fees to Attorney Murphy and his law firm to defend
against the Indianapolis action and the Meiselman cross claim.
(Docket Entry # 87, Ex. Z).  In December 2006, Attorney Cohan of
Cohan, Rasnick & Meyerson, LLP began representing Herman and
Caplitz in the Indianapolis action after the default judgment and

---

Q.  You weren't paying him by the hour?
A.  No.  He was on a quarterly retainer, as I understand.
Q.  Of how much?
A.  I believe it at one point was [$]12,000 a quarter and I
believe it increased to 20.
(Docket Entry # 87, Ex. B, pp. 209-210).  The existence of a
quarterly retainer does not directly contradict a statement
regarding which entity and/or person made the decision to hire
Attorney Murphy.

the appeal. (Docket Entry # 98, Ex. MM, p. 16). At his prior deposition, Caplitz testified to paying Attorney Cohan $50,000, which Caplitz corrected in an errata sheet to $25,000.[14] (Docket Entry # 87, Ex. B, p. 33). Plaintiffs' admissions to a number of statements in defendants' LR. 56.1 statement (Docket Entry # 94, ¶¶ 43, 47, 48 & 49) also raise additional credibility issues regarding the amount of damages.

The clause in the affidavit statement that "I paid none of those attorneys' fees" contradicts the above deposition testimony[15] as well as his sworn answer to the foregoing interrogatory.[16] Viewing the affidavit statement in its entirety, Caplitz further states that, "I have an agreement with Herman to reimburse her for half that amount, with interest at 6% per annum. To date, I owe over $900,000 with interest." (Docket Entry # 95, ¶ 85). The statement is not contradictory with the prior deposition and interrogatory answer. The amount Caplitz

---

[14] The interrogatory answer and the deposition testimony setting out differences in the amount of attorneys' fees are not stricken because, to state the obvious, they are not affidavits. As previously indicated, although defendants cite to page 32 of Caplitz's deposition, the page is not in the summary judgment record. As to payments to Attorney Murphy, Caplitz believes he paid Attorney Murphy $10,000 in legal fees (Docket Entry # 94, ¶ 48) although this evidence is not in the excerpts of deposition testimony filed by defendants.

[15] Elsewhere in the deposition, Caplitz testified that he did not "pay any legal fees in connection with" the Meiselman cross claim. (Docket Entry # 87, Ex. B, p. 33). This prior testimony is in accord with the above clause.

[16] This court does not rely on this testimony for purposes of making a ruling on the damages' argument in defendants' summary judgment motion.

*owes* Herman under an agreement does not contradict the amount he *paid* in fees to Cohan, Rasnick & Meyerson, LLP to Attorney Murphy. In addition, plaintiff offers a satisfactory explanation, to wit, "what he owes" is "not what he has paid." (Docket Entry # 105). In sum, this court does not rely on the clause that Caplitz "paid none of those attorneys' fees" and the statement that Caplitz has "an agreement with Herman to reimburse her for half" the amount of attorneys' fees she paid does not contradict the prior sworn statements that Caplitz paid Attorney Cohan $25,000. Paragraph 85 is not stricken and therefore remains as part of the summary judgment record.

D. <u>Statements Already Established by Issue Preclusion</u>

As a final matter, defendants contend that Caplitz's affidavit contains statements on issues precluded by prior litigation. <u>See</u> <u>Indianapolis Life Ins. Co. v. Herman</u>, 2006 WL 3233837 (1st Cir. Nov. 9, 2006). The federal common law of issue preclusion requires that:

> (1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided the issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits.

<u>Global NAPs, Inc. v. Verizon New England, Inc.</u>, 603 F.3d 71, 95 (1st Cir. 2010).

The requirements for issue preclusion are met in this instance. In the prior litigation, the First Circuit found inter

alia that:

> It is undisputed that Indianapolis Life required the
> defendants to submit a statement of the Meiselmans'
> financial condition prepared by a certified public
> accountant (CPA) as part of the underwriting process.
> Caplitz provided Indianapolis Life with an income
> verification statement for the Meiselmans purporting to be
> from CPA James Goodness.  At Caplitz's request, the
> verification statement was in fact prepared by James
> Goodness' son, Daniel, who was not a CPA.  Caplitz asked
> Daniel Goodness to place the verification statement on his
> father's stationery and to sign his father's name so that it
> would appear to have been prepared by a CPA.  There is thus
> no dispute that Caplitz acted with the intent to deceive
> Indianapolis Life by submitting an income verification
> statement for the Meiselmans, which he intentionally
> misrepresented to have been prepared by a CPA.

Indianapolis Life Ins. Co. v. Herman, 2006 WL 3233837 at *2.

Paragraphs 19, 20 and 65 to 80 address the same issues of law and

fact as those in Indianapolis Life, namely, the legal and factual

basis of Caplitz's insurance coverage for claims alleged in the

prior litigation, claims that are vital to a determination of

coverage in the case at bar.  The parties actually litigated the

issues in Indianapolis Life and a final judgment was issued in

Indianapolis's favor.  Finally, the First Circuit's finding of

Caplitz's intentional misrepresentation was essential to a

judgment on the merits where Indianapolis Life was seeking

rescission of a life insurance policy based on intentional

misrepresentation pursuant to Massachusetts General Laws chapter

175, section 186.  Caplitz's assertions in paragraphs 19, 20 and

65 to 80 are thus subject to issue preclusive effect and are

stricken.

Finally, this court did not rely on paragraphs 19 and 20 of Caplitz's affidavit in ruling on defendants' summary judgment motion (Docket Entry # 85). In other words, even considering these paragraphs, it does not alter this court's decision on the summary judgment motion (Docket Entry # 85).

## II. <u>Defendants' Motion to Strike Plaintiffs' Cross Motion for Partial Summary Judgment (Docket Entry # 99)</u>

Defendants move to strike plaintiffs' cross motion for summary judgment (Docket Entry # 92) as untimely in violation of this court's December 15, 2010 scheduling order. Plaintiffs oppose the motion and maintain that the motion was timely filed.

On December 15, 2010, this court held a status conference at which dates were set for discovery, expert discovery, dispositive motions and responses to such motions. Motions were due July 15, 2011, and responses were due July 29, 2011. On July 15, this court allowed a joint motion extending the time "to file motions for summary judgment" to July 29. (Docket Entry # 83).

On July 29, 2011, defendants filed their renewed motion for summary judgment (Docket Entry # 85) and on August 10 this court allowed an assented to motion to extend the time to September 6 for plaintiffs to respond. (Docket Entry # 89). On September 6, this court allowed Caplitz's emergency motion for extension of time to September 12 to respond to defendants' motion for summary

judgment.  (Docket Entry # 90).  This court further noted there
"shall be no additional briefing."

On September 8, plaintiffs not only filed a response to
defendants' motion for summary judgment but also a cross motion
for partial summary judgment.  (Docket Entry # 92).  The motion
comes nearly six weeks after the extension to July 29, 2011,
allowed to file "motions," plural, for "summary judgment."
(Docket Entry # 83).  Thereafter, plaintiffs filed the amended
cross motion for summary judgment on September 19, 2011.  This
motion was more than seven weeks after the July 29, 2011
deadline.

"[L]itigants have an unflagging duty to comply with clearly
communicated case-management orders." Rosario-Diaz v. Gonzalez,
140 F.3d 312, 315 (1st Cir. 1998).  "The Civil Rules endow trial
judges with formidable case-management authority.  This authority
specifically includes – indeed mandates – setting deadlines for
the filing of pretrial motions." Rosario-Diaz v. Gonzalez, 140
F.3d at 315 (citing Rule 16(b)(2), Fed. R. Civ. P.).  "In
exercising this power, 'Trial judges enjoy great latitude.'"  Id.
at 315 (quoting Jones v. Winnepesaukee Realty, 990 F.2d 1, 5 (1st
Cir. 1993); accord Tower Ventures, Inc. v. City of Westfield, 296
F.2d 43, 46-7 (1st Cir. 2002) ("litigant who ignores case-
management deadlines does so at his peril . . . when
noncompliance occurs, the court may choose from a broad universe

36

of possible sanctions"); see also Rule 16(f), Fed. R. Civ. P.
("on motion or on its own, the court may issue any just orders,
including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a
party or its attorney: . . . (c) fails to obey a scheduling or
other pretrial order").

Plaintiffs improperly rely on Camilo-Robles v. Hoyos for the
principle that district courts may consider and grant cross
motions for summary judgment in response to a timely filed motion
for summary judgment and may do so "without limit of time."
Camilo-Robles v. Hoyos, 151 F.3d 1, 4 (1st Cir. 1998).  The motion
at issue in Camilo-Robles was not a cross motion for summary
judgment, as plaintiffs suggest, but rather a timely filed cross
motion seeking additional time in which to oppose summary
judgment because the plaintiff had been stonewalled during
pretrial discovery.  Id. at 4.

Although the court may, "[a]fter giving notice and a
reasonable time to respond, . . . grant summary judgment for a
nonmovant . . . or consider summary judgment on its own," Rule
56(f), Fed. R. Civ. P., plaintiffs cite no authority to suggest
that courts must consider untimely cross motions for summary
judgment.  Plaintiffs do identify a case where the court
entertained such motions filed two and ten days late.  Hampshire
Community Action Commission v. United Auto Workers Local 2322,
2004 WL 989206, *1 (1st Cir. May 3, 2004).  Hampshire, however,

involved a significantly shorter period of time after the deadline and simply confirms the discretion and latitude afforded a court to enforce scheduling orders.

In the case at bar, as in <u>Rosario-Diaz v. Gonzalez</u>, plaintiffs filed a motion for summary judgment weeks after the expiration of an already extended deadline for filing dispositive motions. Similarly, "they proffered no compelling reason for their delinquency." <u>Rosario-Diaz v. Gonzalez</u>, 140 F.3d at 315.

Plaintiffs also assert that they properly filed their cross motion under Rule 56(f) within the time permitted for their opposition. (Docket Entry # 101). This is neither true nor compelling. Plaintiffs' amended cross motion was filed under Rule 56(a) and (g), Fed. R. Civ. P., 55 days after the deadline for filing summary judgment motions.

Because plaintiffs' cross motion for summary judgment (Docket Entry # 92) and amended cross motion for summary judgment (Docket Entry # 100) are untimely, they are stricken. To the extent plaintiffs' memorandum (Docket Entry # 93) supports their opposition to defendants' renewed motion for summary judgment, however, plaintiffs' arguments will be considered below.


III. <u>Renewed Motion for Summary Judgment of Defendants American Guarantee and Liability Insurance Company, Zurich North America</u>

Company, Brown & Brown, Inc., Brown & Brown of California, Inc., and Calsurance (Docket Entry # 85)

As previously explained, defendants seek summary judgment on three grounds. This court initially turns to the first two grounds before addressing the third ground, i.e., the absence of damages.

The first two grounds are specific to Count II which alleges that defendants breached the express contractual duty in the E&O Policy to defend and indemnify Financial Resources, Herman and Caplitz against the Meiselman cross claim. Citing to the E&O Policy and relevant case law, defendants argue that Financial Resources and Herman were never insureds under the policy and that Caplitz was not entitled to coverage under either the 2003-2004 E&O Policy or the 2004-2005 E&O Policy. Plaintiffs, in turn, rely upon a substantially different interpretation of the E&O Policy by arguing that the contract language is ambiguous.

A. Massachusetts law

Under Massachusetts law, "the duty to defend is broader than the duty to indemnify." Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399 (1st Cir. 2009) (citing Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 531 (Mass. 1997)). Case law provides that:

> The question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are

39

> "reasonably susceptible" of an interpretation that they
> state or adumbrate a claim covered by the policy terms, the
> insurer must undertake the defense.

Continental Casualty Co. v. Gilbane Building Co., 461 N.E.2d 209,

212 (Mass. 1984); Vappi & Co., Inc. v. Aetna Casualty & Surety

Co., 204 N.E.2d 273, 276 (Mass. 1965); Magoun v. Liberty Mutual

Ins. Co., 195 N.E.2d 514, 517 (Mass. 1964); Terrio v. McDonough,

450 N.E.2d 190, 193 (Mass.App.Ct. 1983); see also HDH Corp. v.

Atlantic Charter Ins. Co., 681 N.E.2d 847, 850 (Mass. 1997)

("insurer has a duty to defend if the allegations of the

complaint are reasonably susceptible of an interpretation that

they state a claim covered by the terms of the insurance

policy"). "The scope of an insurer's duty to defend is 'based

not only on the facts alleged in the complaint, but also on the

facts that are known or readily knowable by the insurer.'"

Timpson v. Transamerica Insurance Co., 669 N.E.2d 1092, 1095

(Mass.App.Ct. 1996) (quoting Desrosiers v. Royal Ins. Co. of

America, 468 N.E.2d 625, 627-628 (Mass. 1984)).

"In Massachusetts, as elsewhere, an insurer must defend the

entire lawsuit if it has a duty to defend any of the underlying

counts in the complaint." Liberty Mutual Life Ins. Co. v.

Metropolitan Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001);

accord Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir.

1997) ("under Massachusetts law, if an insurer has a duty to

defend one count of the complaint, it must defend them all").

"[A] duty to defend," however, "does not exist until it is shown that the person claiming coverage was, in fact, an insured under the policy." Timpson, 669 N.E.2d at 1094; see Allan D. Windt, 1 Insurance Claims and Disputes § 4:5 (5th ed. 2011). Furthermore, "the insured bears the burden of establishing coverage," while "the burden is on the insurer to establish the applicability of an exclusion." Finn v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 896 N.E.2d 1272, 1275 (Mass. 2008).

Under Massachusetts law, "the interpretation of insurance contracts is generally a matter of law for the court." Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009). Massachusetts courts utilize general rules of contract interpretation to construe an insurance policy. Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Inc. Co., 220 F.3d 1, 4 (1st Cir. 2000) ("[u]nder Massachusetts law, we construe an insurance policy under the general rules of contract interpretation"). A policy's actual language is "given its plain and ordinary meaning" considering "'what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.'" Id.; accord National Union Fire Ins. Co. of Pittsburg, Pennsylvania v. West Lake Academy et al., 548 F.3d 8, 13 (1st Cir. 2008) (courts "'begin with the actual language of the policies, given its plain and ordinary meaning'" and "'[i]n so doing, we consider what an objectively reasonable insured,

reading the relevant policy language, would expect to be covered'") (quoting <u>Brazas</u>, 220 F.3d at 4); <u>see also</u> <u>Scottsdale Ins. Co.</u>, 561 F.3d at 77 (courts "'construe the words of the policy according to the fair meaning of the language used, as applied to the subject matter'"). Moreover, "every word in an insurance contract 'must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable.'" <u>Allmerica Financial Corp. v. Certain Underwriters at Lloyd's London</u>, 871 N.E.2d 418, 425 (Mass. 2007) (quoting <u>Jacobs v. United States Fid. & Guar. Co.</u>, 627 N.E.2d 463, 464 (Mass. 1994)). In giving words in an insurance contract meaning and effect, however, courts should not accord "undue emphasis to any particular part over another." <u>Boston Gas Co. v. Century Indemnity Co.</u>, 910 N.E.2d 290, 305 (Mass. 2009).

An insurance contract is also examined and construed "'with reference to all of its language and to its general structure and purpose.'" <u>Cofman v. Acton Corp.</u>, 958 F.2d 494, 498 (1st Cir. 1992) (quoting <u>Radio Corp. of America v. Raytheon Mfg. Co.</u>, 14 N.E.2d 141, 143 (Mass. 1938)); <u>accord</u> <u>In re 604 Columbus Ave. Realty Trust</u>, 968 F.2d 1332, 1357 (1st Cir. 1992) (court should consider each phrase and clause in light of all other phraseology); <u>see</u> <u>also</u> <u>Sullivan v. Southland Life Ins. Co.</u>, 854 N.E.2d 138, 142 (Mass.App.Ct. 2006) ("trial judge erred in relying solely on a dictionary definition of the word 'single'

and ignoring the consistent language used throughout the policy").  Both the structure and the specific words set out an insurance policy's meaning.  <u>Boston Edison Co. v. F.E.R.C.</u>, 856 F.2d 361, 366 (1st Cir. 1988); <u>see</u>, <u>e.g.</u>, <u>Sullivan</u>, 854 N.E.2d at 142-143 (terms of insurance policy unambiguous when read as a whole and in light of use of similar language on various pages of policy).

In the event words of a policy "are not ambiguous, 'they must be construed in their usual and ordinary sense.'" <u>Scottsdale Ins. Co.</u>, 561 F.3d at 77; <u>accord</u> <u>Nascimento v. Preferred Mut. Ins. Co.</u>, 513 F.3d 273, 276 (1st Cir. 2008) (absent ambiguity, words of insurance policy are construed "in their usual and ordinary sense").  An "[a]mbiguity exists when the policy language is susceptible to more than one meaning." <u>Scottsdale Ins Co.</u>, 561 F.3d at 77; <u>accord</u> <u>Genuine Bukuras v. Mueller Group, LLC</u>, 592 F.3d 255, 262 (1st Cir. 2010) ("'ambiguity requires language susceptible of more than one meaning so that reasonably intelligent persons would differ as to which meaning is the proper one'") (quoting <u>Basis Tech. Corp. v. Amazon.com, Inc.</u>, 878 N.E.2d 952, 958-59 (Mass.App.Ct. 2008)).  "Ambiguous policy terms are construed in favor of the insured." <u>Scottsdale Ins. Co.</u>, 561 F.3d at 77 (citing <u>Hazen Paper Co. v. U.S. Fid. & Guar. Co.</u>, 555 N.E.2d 576, 583 (Mass. 1990)).

That said, "it does not follow that ambiguity exists solely because the parties disagree as to the provision's meaning." Brazas Sporting Arms, Inc., 220 F.3d at 5; see Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370, 374 (1st Cir. 1991). "Nor does the mere existence of multiple dictionary definitions of a word, without more, suffice to create an ambiguity, for most words have multiple definitions." Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998) (stating the term "vacant land" not reasonably interpreted to include land containing a permanently affixed abandoned structure). Furthermore, "difficulty in comprehension does not equate with ambiguity." Sullivan, 854 N.E.2d at 142.

The case at bar concerns the interpretation of a claims made and reported errors and omissions insurance policy.[17] "Claims made and reported" policies are best understood in contrast with "occurrence" policies. New England Environmental Technologies v. American Safety Risk Retention Group, Inc., 738 F.Supp.2d 249, 255 (D.Mass. 2010) (a "brief comparison of the distinction between 'claims made' and 'occurrence' policies frames the Court's discussion"). "Although both policies aim to insure a policyholder during a specified period of time, an occurrence policy focuses on when the conduct occurs and provides coverage

_____

[17] The cover page of the E&O Policy unequivocally states, "NOTICE:  This is a CLAIMS MADE and REPORTED POLICY." (Docket entry # 87, Ex. A, p. 1).

if the covered act or omission occurs within the policy period, regardless of the date of discovery." Id. By contrast, a claims made and reported policy "covers the insured for claims made during the policy year and reported within that period or a specified period thereafter regardless of when the covered act or omission occurred." Chas. T. Main, Inc. v. Fireman's Fund Ins. Co., 551 N.E.2d 28, 29-30 (Mass. 1990) (also noting Massachusetts occurrence policy rule requiring insurer to demonstrate actual prejudice from the notice delay inapplicable to claims made policies).

As its name suggests, a claims made and reported policy contains two requirements, to wit, a claim *made* during the policy period and a claim *reported* within that period or a short time thereafter. In other words:

> coverage under a claims made policy is contingent on two
> requirements: 1) the claim must be first made against the
> insured during the policy period ("the claim requirement")
> and 2) the claim must be reported to the insurer within the
> policy period ("the notice requirement").

New England Environmental Technologies, 738 F.Supp.2d at 255. The E&O Policy was a claims and reported policy. In no uncertain terms, the policy states that it "applies to negligent acts . . . provided further that: 1. The 'Claim' is first *made* against the 'Insured' during the "Policy period' *and* is *reported* to the Company in writing during the 'Policy Period', or the Extended

45

Reporting period." (Docket Entry # 87, Ex. A, § ID(1)) (emphasis added).[18]

The reporting requirement[s] in a claims made and reported policy often include two types of notice requirements. See id. at 29 ("[t]here are, in general, two types of notice requirements found in policies"). The first notice requirement obligates the insured to give notice of the claim "as soon as practicable" after the insured event. Id. The second notice requirement obligates the insured to report the claim during the term of the policy or within a short period thereafter, which in the E&O Policy was 60 days. (Docket Entry # 87, Ex. A, § VII(A)). The E&O Policy contains both notice requirements in the following paragraph:

> As a condition precedent to the right of insurance coverage afforded herein, the "Insured" . . . which seeks coverage shall: (a) *As soon as practicable*, but *not more than (60) days after the termination of coverage*, give to the Company *written notice* of any "Claim" made against the "Insured" . . . during the 'Policy Period'. . .."

(Docket Entry # 87, Ex. A, § VII(A)) (emphasis added).

The purpose of the first notice requirement is "to permit an insurer to make an investigation of the facts and occurrence relating to liability." New England Environmental Technologies, 738 F.Supp.2d at 255. The purpose of the second notice requirement is to allow for "fairness in rate setting." Id.

---

[18]    See the previous footnote.

The paragraph also sets out the requirement as a condition precedent to coverage. Use of the language "condition precedent" and the language of the paragraph as a whole establish that the insured plaintiff bears the burden to establish compliance with these notice requirements. See, e.g., Cooper v. Prudential Insurance Company of America, 107 N.E.2d 805, 806 (Mass. 1952) (accidental death policy where receipt of "'due proof'" is a condition precedent to liability for the accidental death benefit and burden therefore rests on "the plaintiff to show that such due proof was supplied"); Howe v. National Life Insurance Company, 72 N.E.2d 425, 426 (Mass. 1947) (furnishing due proof was condition precedent to the defendant's liability and obligation to pay with the burden on "the plaintiff to show that she had given such proof"); Lamson Consolidated Store-Service Company v. Prudential Fire Insurance Company, 50 N.E. 943, 943 (Mass. 1898) (finding use of words "condition precedent" in clause requiring referral to three disinterested parties thereby placed burden on the insured to show compliance or waiver by the insurer); In Re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litigation, 870 F.Supp. 1293, 1356 (E.D.Pa. 1992) (notice requirement was condition precedent and "burden is on the insured to show that it has fulfilled all conditions precedent contained in the policies"); Fortress Re, Inc. v. Jefferson Insurance Company of New York, 465 F.Supp. 333, 336-337 (E.D.N.C. 1978) (notice provisions "are conditions precedent and the insured bears the burden of proof on showing he

47

has complied with this express contractual condition"). Finally, the requirement that notice of a claim be given during the policy period or shortly thereafter "'is of the essence in determining whether coverage exists.'" <u>Gargano v. Liberty Insurance Underwriters</u>, 572 F.3d 45, 49 (1st Cir. 2009) (quoting <u>Chas. T. Main, Inc.</u>, 551 N.E.2d at 30). With these principles in mind, this court now turns to the analysis of Financial Resources' coverage under the E&O Policy.

B. <u>Financial Resources' Coverage</u>

Defendants argue that even if the E&O Policy was in effect, Financial Resources does not fall within the definition of "Insured" and therefore is not entitled to coverage. As a person or entity seeking coverage, it is Financial Resources' burden to show it is an insured as defined in the E&O Policy. <u>Timpson</u>, 669 N.E.2d at 1095 (Timpson has the "burden to prove, as a person claiming coverage under the policy, that he is an insured as defined by the policy").

The E&O Policy defines "Insured" in relevant part as:

Any corporation, partnership or other business entity which engages in "Professional Services" and which is either owned or controlled by the Named Insured and then only with respect to those operations of the business entity related to the "Professional Services" provided by the Named Insured.

(Docket Entry # 87, Ex. A, § II(F)(2)).

Under any reasonable reading of the above definition, Financial Resources must meet two requirements for coverage: (1)

48

it must be a corporation, a partnership or a business entity which engages in "Professional Services;" and (2) it must be owned or controlled by the "Named Insured." The parties do not dispute that Caplitz is the "Named Insured" under the policy. The parties also do not dispute that Financial Resources is a corporation which engages in Professional Services as defined under the policy. The parties disagree, however, as to the meaning of "controlled by the Named Insured" and this phrase's application in light of the remainder of the above definition.

Even though this court concludes that the phrase "controlled by the Named Insured" is unambiguous, "words, which are clear by themselves, may become ambiguous when read in the context of an insurance policy." Lumbermens Mut. Casualty Co. v. Offices Unlimited, Inc., 645 N.E.2d 1165, 1169 (Mass. 1995). Plaintiffs correctly note that the policy does not define "controlled by" in reference to the Named Insured or otherwise. They contend that when this phrase is read together with the latter part of the definition of an insured corporation, it may reasonably be interpreted that Financial Resources is insured to the extent that Caplitz "has control over the covered 'Professional Services.'" (Docket Entry # 93, § III(B)(2), ¶ 4). A reading of the definition in its entirety, however, precludes this unreasonable interpretation.

A plain reading of the contract language shows that the latter part of the sentence, beginning with "and then only," shows the parties' intent to limit coverage to those operations related to Professional Services provided by the Named Insured. Use of the limiting phrase "and then only" unambiguously restricts the scope of coverage to those corporations or business entities which first meet the requirement that they be "owned or controlled" by the Named Insured.

Caplitz neither owns nor is in partnership with Financial Resources. (Docket Entry # 94, ¶ 6). The facts also show that Financial Resources is not "controlled by" Caplitz in the ordinary sense of this phrase or otherwise. Because there is no ambiguity in the above definition as applied in the context of the policy, Financial Resources does not qualify as an insured under the policy.

C. Herman's Coverage

Defendants argue that Herman, like Financial Resources, does not fall within the definition of "Insured" and is not entitled to coverage. The policy defines "Insured" in relevant part as:

> Any person acting on behalf of the Named Insured who was or is a partner, officer, director, stockholder or an employee of the Named Insured or Named Insured's business entity . . . and then only with respect to "Professional Services" provided by the Named Insured.

(Docket Entry # 87, Ex. A, § II(F)(3)).

Under any reasonable reading of the above definition, Herman

must meet two requirements for coverage: (1) she must be "acting on behalf of the Named Insured;" and (2) she must be "a partner, officer, director, stockholder or an employee of the Named Insured or Named Insured's business entity." (Docket Entry # 87, Ex. A, § II(F)(3)). The parties do not dispute that Herman is not an employee of Caplitz's. The parties disagree, however, as to the meaning of "Named Insured's business entity."

Plaintiffs contend that the phrase "Named Insured's business entity" is ambiguous because it is unclear whether it applies only to any business entity owned by the Named Insured or whether it applies equally to any business entity with which the Named Insured is affiliated. Plaintiffs find support for this alleged ambiguity in the omission of the qualifying language "owned or controlled" present in subsection (2) of the previously quoted definition of "Insured." This interpretation, however, defies a common sense reading of the definition.

When read in its entirety the definition applies to officers or employees of any business Caplitz, as the "Named Insured," owns or controls and who act on his behalf with respect to the "Professional Services" he provides. (Docket Entry # 87, § II(F)(3)). A common sense interpretation of the possessive phrase, "Named Insured's business entity," does not extend to any business entity with which Caplitz may have been affiliated. This plain reading finds support from the contract language that

requires that the insured officer or employee be "acting on behalf of the Named Insured."  (Docket Entry # 87, Ex. A, § II(F)(3)).

Plaintiffs nevertheless contend that Herman qualifies for coverage under a plain reading of the E&O Highlights' "Outline of Coverage."  (Docket Entry # 97, Ex. D, pp. 1-2).  They argue that as an "officer" or "director" of the "Insured Agent's Business Entity" that Herman is an "Additional Insured."  Where, as here, the language of the policy is unambiguous, plaintiffs' reliance on the external evidence of the E&O Highlights is misguided. Language in the E&O Highlights does not justify reading an ambiguity into otherwise unambiguous contract language.  See Bank v. International Business Machines Corp, 145 F.3d 420, 424 (1st Cir. 1998) (when construing fully integrated contract, court may consult external evidence only if it determines that the contract language is ambiguous, itself a matter of law for the court); Medical Group Financial Services, Inc. v. Manhattan Life Ins. Co., 1987 WL 12548, *2 (D.Mass. May 29, 1987) (denying summary judgment and noting that brochure setting out rates "is not, however, the contract between the parties"); see also Pizzini v. American International Specialty Lines Ins. Co., 210 F.Supp.2d 658, 672-673 (E.D.Pa. 2002).

As there is no ambiguity in the above definition, Herman does not qualify as an insured under the policy.  Accordingly,

this court turns to the analysis of Caplitz's coverage under the
E&O Policy.

D. <u>Caplitz's Coverage</u>

Defendants argue that Caplitz is not covered in connection
with Meiselman cross claim under either the 2003-2004 (Docket
Entry # 87, Ex. N) or the 2004-2005 (Docket Entry # 87, Ex. A)
E&O Policy.  They contend that Caplitz failed to report a claim
of either the Indianapolis action filed on November 24, 2004, or
the Meiselman cross claim filed on February 9, 2005 and therefore
failed to comply with a condition precedent to coverage under the
terms and conditions of the E&O Policy.

Plaintiffs argue that because Caplitz's claim was properly
reported under the Awareness Provision of the 2003-2004 E&O
Policy, he was covered under the Automatic Extended Reporting
Period.  They further contend that defendants received actual
notice of the Meiselman cross claim because Meiselman's attorney
emailed a copy of the cross claim to Lancer on August 31, 2005.
(Docket Entry # 87, Ex. J).  Plaintiffs also assert that
Caplitz's report of a potential claim during the 2004-2005 E&O
Policy satisfies the policy's notice requirements.  Finally, they
contend that defendants are estopped from asserting insufficient
notice because defendants had actual notice of the claim and
represented to Caplitz that the policy was not in effect.  This

court initially analyzes Caplitz's coverage under the 2003-2004 E&O Policy before addressing the 2004-2005 E&O Policy.

1. The 2003-2004 E&O Policy

The parties do not dispute that Caplitz never reported an actual claim during the 2003-2004 E&O Policy's policy period. Thus, the facts show that Caplitz orally reported a potential claim by Meiselman to Lancer on or about August 8 or 12, 2004. (Docket # 94, ¶ 18; Docket Entry # 95, 14). Defendants argue that Caplitz's failure to report an actual claim during the 2003-2004 E&O Policy period precludes coverage. Plaintiffs contend that Caplitz's report of a potential claim during the extended reporting period of the 2003-2004 E&O Policy satisfies the notice requirements.

The requirement that notice of a claim be reported during the claims made and reported policy period or shortly thereafter "is of the essence in determining whether coverage exists." Gargano, 572 F.3d at 49-51 (dismissing breach of contract claim for failure to state a claim where Gargano had not alleged a claim that was first made and reported during professional liability policy period). As previously noted, the Awareness Provision reads in part as follows:

> If, *during* the "Policy Period," the Company shall be given written notice of any negligent act, error or omission which could reasonably be expected to give rise to a "Claim" against an "Insured" under this Policy . . . then any "Claim" which subsequently arises out of such negligent act, error or omission shall be considered to be a "Claim" made

54

during the "Policy Period" in which the written notice was received.

(Docket Entry # 87, Ex. N, § V) (emphasis added).

The E&O Policy's Awareness Provision therefore allows the insured to report an act that may give rise to a claim, i.e., a potential claim, if the report is made "during the 'Policy Period.'" (Docket Entry # 87, Ex. N, § V). Caplitz's report of a potential claim during the 60 day extended reporting period does not satisfy the notice requirement of the 2003-2004 E&O Policy. Under a plain reading of the contract language, the Awareness Provision applies only to potential claims reported "during the 'Policy Period.'" (Docket Entry # 87, Ex. N, § V). The "Policy Period" is defined as "the period from the effective date of this Policy to the expiration date or earlier termination date, if any, of this Policy." (Docket Entry # 87, Ex. N, § II(I)). Item two of the policy notes that the "Policy Period" extends from July 1, 2003, to July 1, 2004. (Docket Entry # 87, Ex. N, Item 2). The General Purpose Endorsement notes the "Eff[ective] Date of [the] Pol[icy]" as "07/01/2003" and the "Exp[iration] Date of [the] Pol[icy]" as "07/01/2004." Thus, under the Awareness Provision a potential claim must be reported prior to the policy's expiration date of July 1, 2004, in order for coverage to extend to any "Claim" which subsequently arises. (Docket Entry # 87, Ex. N, § V).

Even though the language of the Awareness Provision is

unambiguous, plaintiffs argue that an ambiguity arises when the Awareness Provision is read together with the Automatic Extended Reporting Period provision (Docket Entry # 87, Ex. N, § IV(A)). The Automatic Extended Reporting Period provision states in relevant part that:

> In the event insurance under this Policy is terminated, the "Insured" shall have a period of sixty (60) days after the date of termination to report to the Company any "Claim" which (1) is first made during said sixty (60) day period, and (2) arises out of a negligent act, error or omission which occurred before the date of termination . . ..

(Docket Entry # 87, Ex. N, § IV(A)). "Claim" is defined under the policy as "a written demand received by the 'Insured' seeking monetary damages, including service of suit or the institution of arbitration proceedings against the 'Insured.'" (Docket Entry # 87, Ex. N, ¶ II(C)). Under a plain reading of the contract language, the Automatic Extended Reporting Period applies only to actual written demands for monetary damages first made and reported up to 60 days after July 1, 2004. Caplitz does not qualify for coverage under this unambiguous language because there was no claim within the meaning of the 2003-2004 E&O Policy until February 2005 when Meiselman filed the cross claim in the Indianapolis action. (Docket Entry # 87, Ex. H). Rather, until this time, there were disagreements that could give rise to a claim.

Moreover, Caplitz does not qualify for coverage under the 2003-2004 E&O Policy because he did not satisfy the "condition

precedent" for coverage which requires that the "Insured" who
seeks coverage shall, "[a]s soon as practicable, but not more
than sixty (60) days after the termination of coverage, give to
the Company written notice of any 'Claim' made against the
'Insured' . . . during the 'Policy Period.'" (Docket Entry # 87,
Ex. N, § VII(A)). This condition coincides with the plain
meaning of the Awareness Provision which applies to potential
claims reported "during the 'Policy Period.'" (Docket Entry #
87, Ex. N, § V). Caplitz does not qualify for coverage because
no "Claim" was made during the July 1, 2003 to July 1, 2004
policy period. At best, there was a potential claim that Caplitz
did not report until early August 2004.

Thus, in contrast to the language in New England
Environmental Technologies v. American Safety Risk Retention
Group, Inc., 738 F.Supp.2d 249 (D.Mass. 2010), involving an
extended reporting period without mention of an awareness
provision or "condition precedent" reinforcing reporting in 60
days of a claim made "during the 'Policy Period'" (Docket Entry #
87, § V & VII(A)), Caplitz only reported a potential claim during
the Extended Reporting Period and there was no actual "Claim"
seeking monetary damages within the meaning of the E&O Policy
prior to the termination or retroactive date. The E&O Policy
unambiguously covers only (1) those *potential* claims reported
*during the policy period* or (2) those *actual* claims made and

reported during the policy period or *first made and reported* during the Automatic Extended Reporting Period. (Docket Entry # 87, Ex. N, §§ IV, V & VII). Caplitz, therefore, fails to satisfy either of these requirements and therefore does not qualify for coverage in connection with the Meiselman cross claim under the 2003-2004 E&O Policy.

2. <u>The 2004-2005 E&O Policy</u>

For purposes of summary judgment, this court assumes that the 2004-2005 E&O Policy was issued to Caplitz with an effective date of July 1, 2004. This court also assumes arguendo that Lancer accepted oral reports of potential claims under the Awareness Provision and that therefore Caplitz reported a potential claim during the policy period by reporting negligent acts that reasonably could be expected to give rise to the Meiselman cross claim.

Defendants argue that the language of the Awareness Provision, taken in its ordinary sense and read in the context of the policy as a whole, requires the "Insured" to provide written notice of a "Claim" even when that "Claim" arises out of an already reported potential claim. Plaintiffs contend that a "'Claim' made" under the Awareness Provision includes a potential claim reported during the 2004-2005 E&O Policy period and which subsequently results in a "Claim." They further assert that defendants were provided with actual notice of the claim by

58

Meiselman's attorney and that defendants are otherwise estopped from asserting insufficient notice.

As analyzed supra, the Awareness Provision is unambiguous and applies to potential claims reported during the policy period. Caplitz, however, was still subject to the condition precedent in the E&O Policy. The condition states in relevant part that:

> As a *condition precedent* to the right of insurance coverage afforded herein, *the "Insured"* . . . which seeks coverage *shall*:  (a) As soon as practicable, but not more than (60) days after the termination of coverage, give to the Company *written notice* of any "Claim" made against the "Insured" . . . during the "Policy Period" . . ..  (b) *Immediately forward* to the Company . . . every "Claim", notice, summons or other process received directly by the "Insured" . . . or by the "Insured's" . . . representatives in the event suit is brought against the "Insured" . . ..

(Docket Entry # 87, Ex. A, § VII(A)) (emphasis added).  There is nothing in the plain language of the Awareness Provision which suggests to "a reasonable person, unacquainted with the niceties of insurance" that the duty to report a "Claim" is satisfied by reporting a potential claim.  <u>Marston v. American Employers Insurance Co.</u>, 439 F.2d 1035, 1039 (1st Cir. 1971).  The condition precedent unequivocally also requires the "Insured," as opposed to the opposing party's attorney, to provide "written notice of *any* 'Claim' made against the 'Insured' . . . during the 'Policy Period,'" and to "[i]mmediately forward . . . *every* 'Claim', notice, summons or other process received directly by the insured." (Docket Entry # 87, Ex. A, § VII(A)).  This reading of

59

the plain contractual language is further supported by the heading "INSURED'S DUTIES IN THE EVENT OF CLAIM OR SUIT." (Docket Entry # 87, Ex. A, § VII(A)).

Notwithstanding the parties' ongoing dispute regarding Caplitz's status as an "Insured" in February 2005, Caplitz cannot assert coverage because he failed to comply with this condition precedent to the right of coverage. As previously explained, Caplitz bears the underlying burden of proof to show he satisfied this condition precedent. Here, recognizing coverage against the unambiguous language of the E&O Policy undermines the very purpose of the notice requirements inherent in claims made and reported policies. See Chas. T. Main, Inc., 551 N.E.2d at 29-31. "The purpose of a notice requirement, 'as soon as practicable,' is to permit an insurer to make an investigation of the facts and occurrence relating to liability." Id. at 864 (citing Bayer & Mingolla Constr. Co. v. Deschenes, 205 N.E.2d 208, 212 (Mass. 1965)). If a claim is made against an insured, as it was here in early February 2005 when Meiselman filed the cross claim, but the insurer does not know about the claim until much later, then "the primary purpose of insuring claims rather than occurrences is frustrated." Id. at 865.

Citing Transamerica Ins. Co v. Norfolk & Dedham Mutual Fire Insurance Co., 279 N.E.2d 686, 689-90 (Mass. 1972), plaintiffs nevertheless argue that the August 31, 2005 email from

Meiselman's attorney satisfies the 2004-2005 E&O Policy's reporting requirements.  Transamerica is distinguishable for a number of reasons.  First, the case involved a motor vehicle insurance policy as opposed to a claims made and reported policy.  Second, the policy at issue required "that notice of an accident be given 'by *or for* the insured as soon as practicable.'"  Id. at 690 (emphasis added).  Here, the language unequivocally placed a "condition precedent" that "the 'Insured'" . . . shall . . . [a]s soon as practicable, but not more than" 60 days after termination of coverage "give the Company written notice of any 'Claim' made against the 'Insured' . . . during the 'Policy Period.'"  The E&O Policy also required the Insured to "[i]mmediately forward to the Company . . . every 'Claim', notice, summons or other process received directly by the 'Insured'" or the Insured's representative."  (Docket Entry # 87, Ex. A, § VII(A)).

Third, although the Transamerica court found that forwarding the summons by the Transamerica Insurance Company ("Transamerica"), as opposed to by the insured, satisfied the notice requirement that "'the insured forward to the company every summons received by him,'" Id. at 690 (omitting internal brackets and ellipses), the delay in sending the summons spanned a one month period.  Here, in contrast, the delay was longer than six months.  Lancer only learned about the February 2005 cross claim from Meiselman's lawyer on August 31, 2005, more than *six*

*months* after the claim was filed. (Docket Entry # 87, Ex. J, Docket Entry # 93, § III(C)(2)). Fourth, in finding proper notice, the Transamerica court relied on the absence of prejudice to the insurance company. Id. at 690. In a claims made and reported policy, such as the E&O Policy, giving the insurance company notice of a claim "is of the essence." Chas. T. Main, Inc., 551 N.E.2d at 30. A showing of "[p]rejudice for an untimely report" is "not an appropriate inquiry." Id.

As a final matter, in response to defendants' argument that there was no notice in compliance with the reporting requirements of the 2004-2005 E&O Policy, plaintiffs rely on an estoppel.[19] Citing the elements of estoppel, they submit that defendants "are estopped from avoiding coverage on the grounds that they did not receive notice of the Indianapolis Action and the Meiselman's cross-claim within the time specified by the Policy, where they had notice of the claim and responded to that notice by telling Caplitz the policy was not in effect." (Docket Entry # 93, p. 15). To support the argument, plaintiffs point to statements in a December 2, 2004 facsimile from Calsurance to Caplitz and the

---

[19] Plaintiffs assert affirmative estoppel claims in counts I and V. Given the nature of the arguments raised by defendants in their summary judgment motion, however, the merits of counts I and V are not before this court. Rather, as previously explained and except for the damages argument, this court construes defendants' summary judgment motion as challenging Count II which sets out the breach of the express E&O Policy. This court expresses no opinion on the merits of the estoppel claims in counts I and V which, in any event, rely on a number of different representations.

statement in the December 3, 2004 letter from Calsurance confirming that Caplitiz's "coverage would not be renewed for the current policy period of July 1, 2004 to July 1, 2005." (Docket Entry # 93, p. 16) (citing Docket Entry # 94, ¶¶ "81,93-96").  As to the December 2, 2004 facsimile, plaintiffs identify inter alia the statement that, "The underwriter has stated that he cannot backdate coverage at this time because of the pending claim . . . . *It is Lancer Claim Number 61380*." (Docket Entry # 94, ¶ 93; Docket Entry # 97, Ex. X) (emphasis added).  Plaintiffs reason that "defendants knew or should have known" that Caplitz would rely on defendants' December 2004 representation that he did not have coverage.  Relying on the absence of insurance coverage, Caplitz did not provide Lancer or Calsurance with notice of the Meiselman cross claim filed in February 2005.  Defendants are therefore estopped from citing the lack of notice as a means to avoid coverage, according to plaintiffs.

The familiar elements of an estoppel, including in the context of a duty to defend and indemnify insurance contract, require inter alia reasonable reliance by the insured plaintiff on the representation.  See <u>Safety v. Day</u>, 836 N.E. 2d 339, 347 (Mass.App.Ct. 2005); <u>see also</u> <u>Turnpike Motors v. Newbury Group</u>, 596 N.E.2d 989, 993 (Mass. 1992) ("the reliance of the party seeking the benefit of estoppel must have been reasonable").  Reasonable reliance is lacking.

Here, in early December 2004 Calsurance informed Caplitz that he no longer had coverage under the E&O Policy after July 1, 2004, as the reason for Zurich to deny coverage to claim number 61380 in Lancer's file.[20]  Within days of the filing of the cross claim, Lancer wrote a letter to Caplitz.  The February 24, 2005 letter refers to Lancer claim number 61380, the same claim identified in the December 2, 2004 facsimile.  The letter also identifies Caplitz as "Our Insured."  (Docket Entry # 87, Ex. I). It reads:

> As you are aware, Lancer Claims Services[] has been administering the above-captioned file on your behalf. There has been no activity and therefore, it appears that the claimant [Meiselman] will not pursue a claim against you at this time.  With this we are closing your file.
>
> Please be advised that should you receive any sort of communication about the claim; if suit is filed against you; or if circumstances change in any way, we request you contact this office immediately so that we may reopen your file and take the necessary steps to protect your interest.

(Docket Entry # 87, Ex. I).  At a minimum, a reasonable person in Caplitz's shoes would question the lack of coverage previously represented by Calsurance in early December 2004 under either policy.  In light of the letter, a reasonable person would also recognize as still viable the requirement that he "[i]mmediately forward . . . . every 'Claim', notice, summons or other process received" to American Guarantee.  (Docket Entry # 87, Ex. A, § VII(A)(1)).

---

[20]  Plaintiffs point out that the facsimile erroneously states that Calsurance had no record or receiving an enrollment or check from Caplitz for the 2004-2005 E&O Policy.  (Docket Entry # 94, ¶ 93).

In addition, the terms of the E&O Policy expressly bar the waiver of any of the terms of the policy unless done by an endorsement. The terms of the E&O Policy also state that knowledge or notice on the part of any agent or representative of American Guarantee, such as Lancer or Calsurance, does not effectuate a change or a waiver of any of the policy's terms.[21] See also Providence Washington Indemnity Co. v. Varella, 112 F.Supp. 732 (D.Mass. 1953) (relying on similar policy language to reject the insured's waiver and estoppel argument). Furthermore, as previously noted, the E&O Policy expressly requires notice as a condition precedent to coverage. In light of these circumstances, Caplitz's reliance on the December 2004 representation of the lack of coverage as a basis not to comply with the notice requirements of the E&O Policy by notifying American Guarantee of the Meiselman cross claim filed in early February 2005 was not reasonable.

In sum, the notice from Meiselman's attorney to Lancer does not satisfy the 2004-2005 E&O Policy's reporting requirements. Caplitz therefore does not have coverage under the 2004-2005 E&O

---

[21] The relevant language in the E&O Policy states:

Notices to any agent or representative, or knowledge possessed by any agent, representative or any other person shall not effect a waiver or a change in any part of this Policy or prevent the Company from asserting any rights under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsements issued to form a part of this Policy.

(Docket Entry # 87, Ex. N, § VII(D)).

Policy.  It is therefore not necessary to address defendants'
argument (Docket Entry # 86, § V), albeit well founded, that
Caplitz's knowledge of a potential claim by Meiselman prior to
the policies' effective dates bars coverage under the terms of
section I(D)(3) of the policies (Docket Entry # 87, Ex. A & N, §§
I(D)(3)).

     E.  <u>Damages</u>

     Defendants maintain that Caplitz did not suffer any damages
as a result of defendants' failure to provide coverage under the
2004-2005 E&O Policy.  (Docket Entry # 86, § VI).  According to
defendants, damages are an essential element of the remaining
causes of action based on breach of contract.  Accordingly, they
seek summary judgment on these remaining counts.[22]  (Docket Entry
# 86, p. 22).  In addition to other arguments, plaintiffs contend
that Caplitz owes money and that his damages are not speculative.

     The remaining causes of action are for estoppel (counts I
and V), breach of an oral contract (Count III), breach of an
implied in fact contract (Count IV) and breach of the implied
covenant of good faith and fair dealing (Count VI).  For purposes
of resolving defendants' summary judgment motion, this court
assumes that damages are an essential element of an insured's
claim for breach of the implied covenant of good faith and fair

---

    [22]  Having allowed summary judgment on Count II, it is not
necessary to make a finding based on this argument as applied to
a breach of the express E&O Policy.

dealing against the insurer.  <u>See</u> <u>generally</u> <u>Shiftlet v. Allstate</u>

<u>Insurance Co.</u>, 451 F.Supp.2d 763, 771-772 (D.S.C. 2006)

(insurer's breach of "covenant of good faith implied within the

insurance contract" requires inter alia a breach "causing damage

to the insured"); <u>Bartlett v. Nationwide Mutual Insurance Co.</u>,

348 S.E.2d 530 (Ct.App.Ct. 1986) (elements of cause of action for

insurer's breach of implied covenant of good faith and fair

dealing include "causing damage to the insured").  This court

makes the same assumption with respect to the claim for breach of

an oral contract for insurance in Count III.[23]  <u>See</u> <u>Price Chopper,</u>

<u>Inc. v. Consolidated Beverages, LLC</u>, 2011 WL 901817, *8 (D.Mass.

March 11, 2011) (applying Massachusetts law and noting that

elements of breach of implied contract include "damages resulting

from the breach"); <u>see</u> <u>also</u> <u>Mass Cash Register, Inc. v. Comtrex</u>

<u>Systems Corp.</u>, 901 F.Supp. 404, 415 (D.Mass. 1995) (damages are

essential element for breach of contract claim); <u>accord</u> <u>Coll v.</u>

<u>PB Diagnostic Systems, Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995).

This court also assumes dubitante that damages are a required

element of the breach of an implied in fact contract claim in

Count IV and the estoppel claims in counts I and V.

---

[23]  Massachusetts law recognizes a cause of action for
breach of an oral contract for insurance.  <u>See</u> <u>Cunningham v.</u>
<u>Connecticut Fire Ins. Co.</u>, 86 N.E. 787, 788 (Mass. 1909) ("nor
can it be argued that there may not be a valid contract of
insurance resting only in parol").

That said, it is a genuine issue of material fact that
Caplitz, as the insured, suffered damages as a result of any
breach.  Viewing the record in plaintiffs' favor, as required,
Herman paid attorneys' fees although she could not determine the
portion of the alleged $660,000 amount (Docket Entry # 28, ¶ 46)
she paid.  Caplitz as well as Herman incurred legal fees owed to
Attorney Cohan after Attorney Cohan entered his appearance on
December 21, 2006, in the Indianapolis action which took place
after the First Circuit affirmed the default judgment on the
Meiselman cross claim.  Post judgment motions ensued from which
this court draws the reasonable assumption that legal fees
ensued.  Even assuming that Capltiz did not pay any of the
attorneys' fees to defend against the Meiselman cross claim, he
has an agreement with Herman to reimburse her for half of the
attorneys' fees incurred.  Given such evidence and considering
the record as a whole, summary judgment is not warranted on the
basis of defendants' argument that damages are an essential
elements of the remaining causes of action and that plaintiffs
fail to provide evidence of such damages sufficient to allow a
jury to find in their favor.


## CONCLUSION

In accordance with the foregoing discussion, defendants'
motion to strike portions of the affidavits of Gregg Caplitz and

Rosalind Herman (Docket Entry # 103) is **ALLOWED** in part and **DENIED** in part.  The motion to strike plaintiffs' cross motion for partial summary judgment (Docket Entry # 99) is **ALLOWED** and plaintiffs' cross motion for partial summary judgment (Docket Entry #92) and amended cross motion for summary judgment (Docket Entry # 100) are therefore **DENIED** as untimely.  The renewed motion for summary judgment filed by defendants (Docket Entry # 85) is **ALLOWED** as to Count II and **DENIED** as to the remaining counts.

                        __/s/ Marianne B. Bowler__
                        **MARIANNE B. BOWLER**
                        United States Magistrate Judge