UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


FINANCIAL RESOURCES NETWORK, INC.,
FINANCIAL FAMILY HOLDINGS LLC,
ROSALIND HERMAN and GREGG D. CAPLITZ,
        Plaintiffs,


                v.                                    CIVIL ACTION NO.
                                                      09-11315-MBB


BROWN & BROWN, INC., BROWN & BROWN OF
CALIFORNIA, INC., AMERICAN GUARANTEE
AND LIABILITY INSURANCE COMPANY, ZURICH
NORTH AMERICA COMPANY AND CALSURANCE,
        Defendants.


**MEMORANDUM AND ORDER RE:
DEFENDANTS' SECOND RENEWED MOTION FOR SUMMARY
JUDGMENT (DOCKET ENTRY # 119);[1] PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
(DOCKET ENTRY # 115)**

**March 14, 2013**

**BOWLER, U.S.M.J.**

Pending before this court is a third summary judgment motion

filed by defendants American Guarantee and Liability Insurance

Company ("American Guarantee"), Zurich North America Company

("Zurich"), Brown & Brown, Inc. ("B&B"), Brown & Brown of

California, Inc. ("BBC") and Calsurance (collectively

"defendants").  (Docket Entry # 119).  They seek summary judgment

on counts I, III, IV, V and VI in the first amended complaint.

Plaintiffs Financial Resources Network, Inc. ("Financial

---

[1]  The caption of the motion is a misnomer.  The motion is a
third summary judgment motion.

Resources"), Rosalind Herman ("Herman") and Gregg D. Caplitz ("Caplitz") (collectively "plaintiffs")[2] seek partial summary judgment to establish certain facts under Rule 56(g), Fed. R. Civ. P. ("Rule 56"), and liability under Rule 56(a) in their favor.  After conducting a hearing in October 2012, this court took the motions (Docket Entry ## 115 & 119) under advisement.

PROCEDURAL BACKGROUND

Summary judgment opinions in November 2010 and March 2012 (Docket Entry ## 72 & 107) outline the procedural history in depth.  Briefly stated, this litigation concerns Life Insurance Agents Errors & Omissions Liability Policies for the July 1, 2003 to July 1, 2004 policy year ("2003-2004 E&O Policy") and for the the July 1, 2004 to July 1, 2005 policy year ("2004-2005 E&O Policy").  Caplitz, an agent of Indianapolis Life Company ("Indianapolis Life"), was enrolled in the 2003-2004 E&O Policy provided by American Guarantee, a wholly owned subsidiary of Zurich, for Indianapolis Life insurance agents from 2001 to July 2004.[3]  As a contracted agent with Indianapolis Life, he was a "Named Insured" under the 2003-2004 E&O Policy.  (Docket Entry # 72, p. 26).

---

[2]  Financial Family Holdings LLC ("FFH") is also a plaintiff.  It is the sole stockholder of Financial Resources.  Herman is an officer and director of Financial Resources.

[3]  Defendants' LR. 56.1 statement admits that Caplitz enrolled in the 2003-2004 policy for purposes of their summary judgment motion.

In 2002, Financial Resources hired Rudy K. Meiselman, M.D. ("Meiselman") as a technical analyst.  As an employee of Financial Resources, Meiselman elected to participate in the Financial Resources Network Plan and Trust ("the FRN Plan") and executed a tax free rollover of his retirement funds into the FRN Plan.  Herman and Caplitz used funds in Meiselman's account to pay for insurance policies on the lives of Meiselman and his wife ("the Meiselman life insurance policies").  The two, July 2003 applications identified the FRN Plan as the designated owner. Caplitz received a $650,297.01 commission.

On October 28, 2004, Meiselman filed a lawsuit against the FRN Plan, Herman, as trustee of the FRN Plan, and Caplitz ("Meiselman I") when Herman allegedly failed to respond to Meiselman's request to transfer his funds in the FRN Plan into a third party account.  On November 19, 2004, Caplitz executed a release and settlement agreement agreeing to transfer the funds to the third party account.

The claims subject to this insurance coverage dispute under which American Guarantee and Zurich had an alleged duty to defend and indemnify emanate from a complaint in a November 2004 civil action ("the Indianapolis action") filed in this district by Indianapolis Life against Herman, identified as trustee of the FRN Plan; Caplitz; Meiselman and his wife, Hope E. Meiselman, ("the Meiselmans"); and the FRN Plan.  On January 26, 2006, the

district court allowed Indianapolis' summary judgment motion on all five counts in the complaint ("the Indianapolis complaint"). The district court ruled that Indianapolis Life had properly rescinded the Meiselman policies.[4]  See Indianapolis Life Ins. Co. v. Herman, 2006 WL 3233837, *1 (1st Cir. Nov. 9, 2006).

The alleged duty to defend and indemnify also involves a February 2005 crossclaim Meiselman filed against Herman, Caplitz and Financial Resources ("Meiselman crossclaim") in the Indianapolis action.  The crossclaim sought a declaratory judgment nullifying the release in Meiselman I (Count I) and alleged breach of an employment contract (Count II), breach of fiduciary duty (Count III), breach of contract (Count IV) and conversion (Count V).  In August 2005, the district court allowed Meiselman's motion for a default judgment.

On January 27, 2006, the district court in the Indianapolis action entered a final judgment in favor of Indianapolis Life. The final judgment ordered inter alia the rescission of the Meiselman life insurance policies and a return of the $650,297.01 commission previously paid to Caplitz.  The Indianapolis court also awarded Meiselman $938,640.14 on the crossclaim.[5]

---

[4]  Prior thereto, Indianapolis Life rescinded or canceled the policies.

[5]  The First Circuit affirmed the judgment in November 2006. Indianapolis Life Ins. Co. v. Herman, 2006 WL 3233837, *1 (1st Cir. Nov. 9, 2006).

Count I of the first amended complaint in this action sets out claims against B&B, BBC and Calsurance for breach of a contract by estoppel. Counts II through V consist of claims against Zurich and American Guarantee for breach of contract. Respectively, they allege breach of the express E&O Policy to defend and indemnify (Count II), breach of an oral contract (Count III), breach of an implied in fact contract (Count IV) and breach of a contract by estoppel (Count V). Count VI is brought against all defendants for breach of the implied covenant of good faith and fair dealing. Counts VII, VIII and IX constitute claims against all defendants for fraud, negligent misrepresentation and violation of Massachusetts General Laws chapter 93A ("chapter 93A").

The November 2010 decision allowed defendants' summary judgment motions on counts VII, VIII and IX as untimely under applicable statutes of limitations. (Docket Entry # 72, pp. 49-50 & 55-72). With respect to Count II, summary judgment issued in defendants' favor only with respect to the breach of the duty to defend and indemnify the counts in the complaint in the Indianapolis action under the express 2003-2004 and 2004-2005 E&O Policies ("the E&O Policies"). Count II remained as to the Meiselman crossclaim except with respect to FFH. (Docket Entry # 72).

The March 2012 decision allowed defendants' summary judgment

motion (Docket Entry # 85) on the remaining portion of Count II, i.e., the breach of the duty to defend and indemnify the Meiselman crossclaim in violation of the express E&O Policies. The opinion also issued rulings on a motion to strike various paragraphs of affidavits by Caplitz (Docket Entry # 95) and Herman (Docket Entry # 96).

In June 2012, this court allowed a motion to reconsider (Docket Entry # 111) but only in light of plaintiffs' limited opposition.  In pertinent part, the Order reads:

> In light of plaintiffs' failure to oppose reconsideration if afforded an opportunity to file their own summary judgment motion, this court will allow defendants an opportunity to file a summary judgment motion on the remaining causes of action.  Plaintiffs may also file a summary judgment motion on the remaining causes of action . . . . the motion for reconsideration (Docket Entry # 111) is **ALLOWED** only to the extent that defendants and plaintiffs may each file one summary judgment motion subject to the above parameters.

(Docket Entry # 114, pp. 5 & 6).  The Order did not eviscerate or eliminate the effect of the prior summary judgment opinions as setting out the law of this case.  <u>See</u> <u>generally</u> <u>Iacobucci v. Boulter</u>, 193 F.3d 14, 19 (1st Cir. 1999) (noting that "trial court ordinarily is the best expositor of its own orders" and deferring to district judge's interpretation of her own order). For example, this court has not considered the portions of Caplitz's affidavit (Docket Entry # 95) and Herman's affidavit (Docket Entry # 96) that plaintiffs continue to cite and that this court struck from the prior summary judgment record.

Plaintiffs offer no basis to alter or reconsider that ruling.

At this point, the following claims remain:  (1) breach of contract by estoppel against B&B, BBC and Calsurance to provide plaintiffs insurance (Count I); (2) breach of an oral contract for insurance against Zurich and American Guarantee (Count III); (3) breach of an implied in fact contract for insurance against Zurich and American Guarantee (Count IV); (4) breach of contract by estoppel against Zurich and American Guarantee (Count V); and (5) breach of the implied covenant of good faith and fair dealing against defendants (Count VI).  Defendants presently seek summary judgment on these remaining counts.  (Docket Entry # 119).

In addition to a number of factual findings under Rule 56(g), plaintiffs seek partial summary judgment under Rule 56(a) insofar as:

> 1.  B&B, BBC and CalSurance are liable for breach of oral contract and breach of implied-in-fact contract to provide insurance.
> 2.  B&B, BBC and CalSurance are liable for breach of contract by estoppel to provide insurance.
> 3.  Zurich and American Guarantee are liable for breach of oral contract and breach of implied-in-fact contract to defend and indemnify.
> 4.  Zurich and American Guarantee are liable for breach of contract by estoppel to defend and indemnify.
> 5.  All defendants are liable for breach of the implied covenant of good faith and fair dealings.

(Docket Entry # 115).  Item numbers two through five involve counts I, III, IV, V and VI.

The first request, however, attempts to resurrect claims dismissed from the original complaint by the district judge on

October 21, 2009.  Count I in the original complaint alleged that B&B, BBC and Calsurance breached an oral contract to provide a insurance policy "for E&O Coverage effective July 1, 2004 to July 1, 2005."  (Docket Entry # 1-2, ¶¶ 50-54).  Count II alleged that B&B, BBC and Calsurance breached an implied in fact contract with plaintiffs to provide them "a policy of insurance for E&O Coverage effective July 1, 2004 to July 1, 2005." (Docket Entry # 1-2, ¶¶ 55-59).  In the context of B&B, BBC and Calsurance's argument to dismiss these counts due to the absence of an actual contract to procure an insurance policy, the district judge allowed the Rule 12(b)(6) dismissal on counts I and II.  (Docket Entry ## 8, 9 & 24).  The first amended complaint does not include these claims.  In fact, plaintiffs acknowledge the dismissal of these claims by the district judge but raise them "to preserve their right to appeal" in light of subsequent rulings.  (Docket Entry # 116).  They submit the ruling "was in error and should be revisited."  (Docket Entry # 116).

Properly construed, this portion of plaintiffs' partial "summary judgment" motion is a motion to reconsider the district judge's decision and is subject to a different and more exacting standard of review.  See generally Villanueva v. U.S., 662 F.3d 124, 128 (1st Cir. 2011).  As an interlocutory decision, the decision by the district judge remains subject to reconsideration.  See Harlow v. Children's Hospital, 432 F.3d 50,

8

55 (1st Cir. 2005) ("[i]nterlocutory orders . . . remain open to trial court reconsideration").  "The orderly functioning of the judicial process" nevertheless dictates "that judges of coordinate jurisdiction honor one another's orders and revisit them only in special circumstances." Ellis v. United States, 313 F.3d 636, 646-648 Id.  Reconsideration remains appropriate "where the movant shows a manifest error of law or newly discovered evidence, or where the district court has misunderstood a party or made an error of apprehension." Villanueva v. U.S., 662 F.3d at 128.

Plaintiff fails to make a proper showing.  Almost three years after the district judge's ruling, plaintiffs do not provide newly discovered facts previously unavailable that would establish an oral or an implied in fact contract to procure an insurance policy.  The Plan Highlights for the 2003-2004 E&O Policy existed prior to the ruling.  This court previously struck the conversation referenced by Herman from her affidavit and plaintiffs do not provide a basis to alter that ruling.  Lacking any justifiable basis to reconsider the ruling, reconsideration is denied.

STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Davila v. Corporacion De

Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'"  American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Id.  Facts are viewed in favor of the non-moving party.  See Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).

Cross motions for summary judgment are viewed separately under the summary judgment standard of review.  See OneBeacon America Insurance Co. v. Commercial Union Assurance Co. of Canada, 684 F.3d 237, 241 (1st Cir. 2012).  Each motion is examined "in the light most favorable to the non-moving party" with reasonable inferences drawn in favor of the non-moving party.  Id.

## FACTUAL BACKGROUND[6]

---

[6]  In accordance with a Procedural Order and defendants' response to the Order, the factual background includes facts in the summary judgment record applicable to both motions.  The discussion sections, one for each motion, resolve disputed facts in favor of the non-moving party.

From at least 1998 through 2006, Caplitz was a contracted agent of Indianapolis Life.  Indianapolis Life offered its contracted agents who sold insurance policies an errors and omissions liability insurance program.  As a contracted agent and having been continuously enrolled in the E&O Policies since January 1, 2002, Caplitz enrolled in the 2003-2004 E&O Policy. Since 2003, Caplitz was an employee of Financial Resources.[7] (Docket Entry # 124, ¶¶ 1-3 & 5).

Zurich provided the errors and omissions coverage and American Guarantee, Zurich's wholly owned subsidiary, issued the policies for Indianapolis Life agents.  (Docket Entry # 124, ¶ 3) (Docket Entry # 125, ¶ 2).  "B&B acted as an insurance intermediary through its subsidiary, BBC."  (Docket Entry # 125, ¶ 2).  BBC, in turn, "offered the insurance through Calsurance, a division of BBC."  (Docket Entry # 125, ¶ 2).  Calsurance served as a broker for American Guarantee.[8]  (Docket Entry # 121-2, p. 23).  Calsurance distributed information materials, including enrollment forms and plan highlights, to agents identified by Indianapolis Life, the sponsoring company, as contracted agents with Indianapolis Life.  Contracted agents with expiring coverage

---

[7]  For purposes of plaintiffs' partial summary judgment motion, Caplitz did not start working as an employee of Financial Resources until 2004.

[8]  Plaintiffs submit that "Calsurance acted as an agent and broker for Zurich and American Guarantee."  (Docket Entry # 116, pp. 13-14).  Calsurance's status is a disputed material fact.

such as Caplitz would then complete an enrollment form and send the form with a premium check to Calsurance within 30 days of the expiration.[9]  Calsurance would receive the enrollment form along with a premium and, "if everything was in order on the enrollment form and the premium" received, the contracted agent would be a Named Insured under the policy.  The policy itself was a master policy issued by American Guarantee.  Lancer Claims Services, Inc. ("Lancer"), a division of BBC, provided claims services for the annual policies.  Lancer did not make coverage decisions. (Docket Entry # 125, ¶¶ 1-2) (Docket Entry # 121-2, pp. 21, 23, 25-28 & 102-103) (Docket Entry # 124, ¶ 7).

Except with respect to the policy period, the relevant and material express terms of the 2003-2004 E&O Policy mirror those of the 2004-2005 E&O Policy.  (Docket Entry ## 121-4 & 121-5). Each policy afforded professional liability coverage for life insurance agents such as Caplitz against "[a]ny 'Claim' arising out of a negligent act, error or omission of the 'Insured' . . . in rendering or failing to render 'Professional Services.'" (Docket Entry ## 121-4 & 121-5, ¶¶ I(A)(1)).  Specifically, the E&O Policies provide that:

The Company shall pay on behalf of the "Insured" all sums

---

[9]  The 2004-2005 Enrollment Form states, "Enrollment forms with checks, please mail to:  Calsurance . . .."  (Docket Entry # 97-12).  The form set a different time period for "Newly Contracted Agents" of Indianapolis Life.  These individuals had to "Enroll within 45 Days of Contract date."  (Docket Entry # 97-12).

which the "Insured" shall become legally obligated to pay as "Damages" as a result of:

1.  Any "Claim" arising out of a negligent act, error or omission of the "Insured", or any person for whose acts the "Insured" is legally liable, in rendering or failing to render "Professional Services" for others in the conduct of the "Insured's" profession as a licensed Life, Accident and Health Insurance Agent, Broker, General Agent or Manager, Notary Public or Registered Representative, while there is in effect a contract between Named Insured and the insurance company named in Item 1 of the Declarations.

(Docket Entry ## 121-4 & 121-5, ¶¶ I(A)(1)).

The term "Claim" is defined in each policy. It "mean[s] a written demand received by the 'Insured' seeking monetary damages, including service of suit or the institution of arbitration proceedings against the 'Insured'." (Docket Entry ## 121-4 & 121-5, ¶¶ II(C)). The term "Damages" in each policy meant "monetary amounts for which an 'Insured' is legally liable, including sums paid as judgments, awards, or settlements." (Docket Entry ## 121-4 & 121-5, ¶¶ II(D)). The definition did not include "the return or withdrawal of fees, commissions, or brokerage charges" and it did not include "[n]on-pecuniary or injunctive relief."[10]  (Docket Entry ## 121-4 & 121-5, ¶¶ II(D)).

The E&O Policies define the term "Insured" to include contracted life insurance agents such as Caplitz.  The relevant and identical language in each policy states that:

---

[10]  Based on this language as well as other policy language, the November 2010 decision allowed summary judgment on Count II relative to the duty to defend and indemnify the counts in the Indianapolis complaint.  (Docket Entry # 72, pp. 22-28).

"Insured" shall mean:

1.  The Named Insured set forth in Item 1 of the Declarations, including:

> a.  All Agents or General Agents of the insurance company named in Item 1 of the Declarations provided they are party to an agent contract with the insurance company named in Item 1 of the Declarations . . ..

2.  Any corporation, partnership or other business entity which engages in "Professional Services" and which is either owned or controlled by the Named Insured and then only with respect to those operations of the business entity related to the "Professional Services" provided by the Named Insured.

3.  Any person acting on behalf of the Named Insured who was or is a partner, officer, director, stockholder or an employee of the Named Insured or Named Insured's business entity . . . and then only with respect to "Professional Services" provided by the Named Insured.

(Docket Entry ## 121-4 & 121-5, ¶¶ II(F)).  The policies define

"Professional Services" to include "[t]he sale or servicing of .

. . Life Insurance" and "'Financial Planning Activities.'"

(Docket Entry ## 121-4 & 121-5, ¶¶ II(J)).

The Plan Highlights for the 2003-2004 E&O Policy ("2003-2004

Plan Highlights") and the 2004-2005 E&O Policy ("2004-2005 Plan

Highlights") truncate this definition of "Insured" which, viewed

in isolation, gives a broader definition to paragraphs two and

three under the heading "Additional Insured."  More specifically,

the highlights define "Additional Insured" as the "Insured

Agent's Business Entity."  The terms "Officers," "Directors" and

other positions or categories appear immediately under the

language "Insured Agent's Business Entity."[11]   (Docket Entry #
97, Ex. D & QQ).   Although Caplitz was an employee of Financial
Resources, Herman deferred to his expertise in the area of
insurance.   (Docket Entry # 125, ¶ 15) (Docket Entry # 96, ¶ 4).
Herman authorized Financial Resources to pay insurance premiums.
As to the Meiselman life insurance policies, Caplitz prepared
projections which Meiselman reviewed.   Herman, as trustee of the
FRN Plan, wanted Meiselman's input but it was Herman who made the
decision to purchase the policies.   (Docket Entry # 125, ¶ 15)
(Docket Entry # 96, ¶¶ 4-7).

     As with previous policies, the 2003-2004 E&O policy year
ended on July 1, 2004.   (Docket Entry # 124, ¶ 4).   In prior
years, Caplitz paid the annual premium by credit card.   In 2004,
Calsurance changed its policy and required payment by check.   As
previously indicated, in order to effectively enroll, an agent
such as Caplitz had to submit an enrollment form and pay the

---

[11]   The March 2012 decision determined that neither Herman nor
Financial Resources was an "Insured" under the express E&O
Policies.   (Docket Entry # 107, pp. 48-52).   Plaintiffs presently
argue that Herman and Financial Resources each fall within the
definition of "Additional Insured" in the 2003-2004 and the 2004-
2005 Plan Highlights and are therefore covered under the oral and
the implied in fact contracts as well as the "contract by
estoppel."   Also relying on a conversation between Herman and
James Madsen ("Madsen"), plaintiffs submit that "Insured Agent's
Business Entity" includes the business at which Caplitz, the
"Named Insured," performed the professional services, i.e.,
Financial Resources, as well as the "Officers" and "Directors" of
the company, i.e., Herman.   (Docket Entry # 116, pp. 11-12)
(Docket Entry # 123).

premium within 30 days of July 1, 2004.  (Docket Entry # 124, ¶ 6).  "Calsurance delivered an enrollment form to all agents with expiring coverage, including Caplitz, so that the agents, if they chose to do so, could renew their errors and omissions coverage with American Guarantee for the 2004-2005 policy year."  (Docket Entry # 124, ¶ 7).  The 2004-2005 Enrollment Form allowed "Agents with Expiring Coverage" to "Enroll within 30 days of Expiration." (Docket Entry # 97-12).

On or about July 30, 2004, Caplitz completed and delivered a 2004-2005 Enrollment Form to Calsurance as well as a check dated July 29, 2004, in full payment of the premium in order to enroll in the 2004-2005 E&O Policy during the 30 day period.  (Docket Entry # 125, ¶ 5) (Docket Entry # 95, ¶ 9) (Docket Entry # 97, Ex. L).  Herman signed the premium check.  The printed address on the check is for a bank account under the name of Financial Designing Consultants Inc. as opposed to Financial Resources. (Docket Entry # 97-12).

On a routine basis, Calsurance "sent out notices of cancellation when a premium [was] not paid, but Caplitz never received one."  (Docket Entry # 125, ¶ 7).  Caplitz avers he had no knowledge that his coverage had not been renewed.  (Docket Entry # 125, ¶ 8) (Docket Entry # 95, ¶ 12).  He further attests that, "no defendant advised me at the end of the policy year ending July 1, 2004," of a nonrenewal.  (Docket Entry # 125, ¶ 8)

16

(Docket Entry # 95, ¶ 12).  Calsurance does not have a record of receiving the July 29, 2004 Enrollment Form or the July 30, 2004 premium check.  (Docket Entry # 121-3).

Escalating disagreements between Caplitz, Herman and Financial Resources on the one hand and Meiselman on the other hand led Caplitz to orally report the disagreements to Lancer by telephone on or about August 8, 2004.[12]  (Docket Entry # 125, ¶ 16) (Docket Entry # 95, ¶ 14).  Caplitz and Meiselman, a longtime client, had disagreed regularly in the past about a number of subjects including investment strategies.  (Docket Entry # 125, ¶ 16) (Docket Entry # 95, ¶ 14).  In this instance, Meiselman objected to the purchase of the Meiselman life insurance policies.  Although Meiselman originally supported the purchasing decision, he subsequently decided he no longer wanted the policies.  Seeking to cancel the policies after their issuance, Meiselman registered a complaint with the Massachusetts Office of Consumer Affairs and Business Regulation – Division of Insurance.  (Docket Entry # 125, ¶¶ 16 & 17).

Lancer's internal progress notes initially reveal a notation designating Caplitz as "Currently Enrolled" for the 2004-2005 E&O Policy as well as the existence of a "potential claim."[13]

---

[12]  Lancer's internal progress notes with the applicable claim number reflect a reporting date of August 12, 2004.  (Docket Entry # 98, Ex. LL).  The difference in the date is not material.
[13]  See footnote 17 and related text outlining the automatic Extended Reporting Provision and the Awareness Provision.

(Docket Entry # 125, ¶ 23) (Docket Entry # 98-11).  "Currently Enrolled" "should mean" that "the adjuster has attained information from Calsurance that the agent [Caplitz] is currently a participant in an[] in force policy."  (Docket Entry # 125, ¶ 26) (Docket Entry # 98-19, p. 153).  The same page of Lancer's internal progress states, "Coverage Questions relating to date: 'None'" as well as, "This is a potential claim for professional services against a properly enrolled agent, which was made and reported within the policy period," to wit, July 1, 2004 to July 1, 2005.  (Docket Entry # 98-11).  On another page, the internal progress notes show "REVISED COVERAGE" reflecting Caplitz as *not* currently enrolled because the insured "failed to renew in time for the 7/1/04 to 7/1/05 policy year."  (Docket Entry # 98-11).

On August 19, 2004, Stephen Casey ("Casey"), Director of Lancer, sent a letter to Caplitz.  Consistent with the initial, foregoing internal notations, the letter advised Caplitz that the E&O Policy "issued to Amerus[14] by American Guarantee" was "effective for the Policy Period of 07/01/2004 to 07/01/2005." (Docket Entry # 125, ¶ 20) (Docket Entry # 97, Ex. N).  The letter states the following with respect to coverage:

> this claim is subject to all other applicable terms and conditions of the policy.  A complete coverage evaluation will be completed on this matter within the next 30 days. If there are any coverage issues that need to be addressed,

---

[14]  AmerUs purchased Indianapolis Life.  (Docket Entry # 121-2, p. 24).

you will receive notice of those issues under separate
cover.  In the meantime, American Guarantee considers all
rights mutually reserved.

(Docket Entry # 97, Ex. N).  Caplitz did not receive notice of

coverage issues during the next 30 days.  In addition, after

reporting the Meiselman disagreement, Caplitz did not receive

advice from any defendant requiring him to provide written

notice.  (Docket Entry # 95, ¶ 26, 1st sentence).

Like its predecessors, the 2004-2005 E&O Policy was a claims

made and reported policy.[15]  The 2003-2004 E&O Policy and the

2004-2005 E&O Policy contain the following unambiguous language

establishing each as a claims made and reported policy:

This Policy applies to negligent acts, errors or omissions
provided further that:

1.  The "Claim" is first *made* against the "Insured" during
the "Policy Period" *and* is *reported* to the Company in
writing during the "Policy Period", or the Extended
Reporting Period (if applicable), in accordance with VII.
CONDITIONS A.

(Docket Entry # 121-5, ¶ ID(1)) (Docket Entry # 121-4, ¶ ID(1))

(emphasis added).  The 2003-2004 and the 2004-2005 Plan

Highlights likewise reflect the coverage as "Claims Made and

Reported Acts, errors or omissions."  (Docket Entry # 97-4)

(Docket Entry # 98-16).  The referenced conditions A contains the

two types of notice requirements commonly found in a claims made

---

[15]  The March 2012 decision provides an extended discussion of the
nature of a claims made and reported errors and omissions
insurance policy which need not be repeated.  (Docket Entry #
107, pp. 44-48).

and reported policy.[16]   Conditions A states:

> As a condition precedent to the right of insurance coverage
> afforded herein, the "Insured" . . . which seeks coverage
> shall:  (a) *As soon as practicable*, but *not more than (60)
> days after the termination of coverage*, give to the Company
> *written notice* of any "Claim" made against the "Insured" . .
> . during the "Policy Period" . . ..

(Docket Entry # 121-5, ¶ VIIA(1)) (Docket Entry # 121-4, ¶

VIIA(1)) (emphasis added).  Again, the 2003-2004 and the 2004-

2005 Plan Highlights substantially repeat this policy language.

In answer to the question, "How do I report a Claim," the

highlights state, "1.  As soon as practicable, give to the

Insurance Company written notice.  2.  Immediately forward every

demand, notice summons or other process received to" Lancer.

(Docket Entry # 97-4) (Docket Entry # 98-16).

Lancer's internal progress notes reflect a potential claim

reported under the automatic Extended Reporting Provision.  The

automatic Extended Reporting Provision in both policies provides

that:

> In the event insurance under this Policy is terminated, the
> "Insured" shall have a period of sixty (60) days after the
> date of termination to report to the Company any "Claim"
> which (1) is first made during said sixty (60) day period,
> and (2) arises out of a negligent act, error or omission
> which occurred before the date of termination . . ..

(Docket Entry # 121-4, ¶ IV(A)) (Docket Entry # 121-5, ¶

---

[16] The March 2012 decision explains the two kinds of notice
requirements in greater detail.  (Docket Entry # 107, p. 46).

IV(A)).[17]   The 2003-2004 Plan Highlights and the 2004-2005 Plan
Highlights do not contain this 60 day automatic Extended
Reporting Provision.

Both the 2003-2004 and the 2004-2005 E&O Policies contain
the following Awareness Provision:

> If, during the "Policy Period," the Company shall be given
> written notice of any negligent act, error or omission which
> could reasonably be expected to give rise to a "Claim"
> against an "Insured" under this Policy . . . then any
> "Claim" which subsequently arises out of such negligent act,
> error or omission shall be considered to be a "Claim" made
> during the "Policy Period" in which the written notice was
> received.

(Docket Entry # 121-4, ¶ V) (Docket Entry # 121-5, ¶ V).   The
term "Policy Period" is defined as "the period from the effective
date of this Policy to the expiration date or earlier termination
date, if any, of this Policy."   (Docket Entry # 121-4, ¶ II(I))
(Docket Entry # 121-5, ¶ II(I)).

The 2003-2004 and the 2004-2005 Plan Highlights reiterate
the substance of the Awareness Provision, stating:

> For your protection, the policy also includes an "Awareness
> Provision."   This allows you to provide written notice of
> circumstances that could reasonably be expected to give rise

---

[17]   The March 2012 decision rejected plaintiffs' argument of
coverage for Caplitz under the 2003-2004 E&O Policy.   As to
Caplitz, there was no "Claim" within the meaning of the policy
reported and first made during the 60 day automatic Extended
Reporting Provision or any notice of a potential claim made
*during* the policy period (July 1, 2003 to July 1, 2004) in
compliance with the Awareness Provision.   (Docket Entry # 107,
pp. 54-58).   The decision also held that Herman and Financial
Resources were not "Insureds" within the meaning of the express
E&O Policies.

> to a claim.  Then if a claim subsequently arises out of the
> described circumstances, it will be considered to be a claim
> during *the Policy Period in which the written notice was
> received*.

(Docket Entry # 97-4) (Docket Entry # 98-16) (emphasis added).

The 2003-2004 and the 2004-2005 Plan Highlights define the

"Policy Period" respectively as July 1, 2003 to July 1, 2004, and

July 1, 2004 to July 1, 2005.  (Docket Entry # 97-4) (Docket

Entry # 98-16).  The Awareness Provision in the 2003-2004 and the

2004-2005 Plan Highlights therefore provides coverage for the

policy period in which the written notice is received.  Here,

Caplitz did not give any written or oral notice to Lancer or

Calsurance during the July 1, 2003 to July 1, 2004 policy period

set out in the 2003-2004 Plan Highlights.

On September 28, 2004, Casey spoke by telephone to Caplitz.

Caplitz informed Casey that the Meiselman matter would likely be

settled and that he had forwarded a check and application for the

2004-2005 E&O Policy.  (Docket Entry # 125, ¶ 11).  On the same

day, Casey wrote a note for the Lancer claim file indicating that

he forwarded a copy of the enrollment application and the

check.[18]  The note includes "AmerUs" on a separate line.  (Docket

Entry # 98-19, pp. 162-163) (Docket Entry # 98-22, pp. 74-75)

---

[18]  The above finding is disputed and therefore made only when
viewing the record in plaintiffs' favor for purposes of resolving
defendants' summary judgment motion.  For purposes of resolving
plaintiffs' partial summary judgment motion and thus viewing the
record in defendants' favor, a different finding results.

(Docket Entry # 97-15).

On October 28, 2004, Meiselman filed the Meiselman I lawsuit against Financial Resources, the FRN Plan, Herman, as trustee of the FRN Plan, and Caplitz. (Docket Entry # 125, ¶ 28). By letter dated October 29, 2004, however, Cynthia Renner ("Renner"), Senior Director of Coverage for Lancer and on behalf of American Guarantee, informed Caplitz that Lancer and American Guarantee "have not been able to confirm your enrollment for the Policy period July 1, 2004 to July 1, 2005." (Docket Entry # 125, ¶ 29) (Docket Entry # 124, ¶ 12) (Docket Entry # 97-18). The letter invited Caplitz to provide proof of payment and a completed renewal form. Shortly thereafter, on November 5, 2004, Caplitz faxed a copy of the aforementioned Enrollment Form dated July 30, 2004, and a copy of the July 29, 2004 premium check noting that the check had not cleared the account. (Docket Entry # 125, ¶ 33).

On November 19, 2004, Meiselman I was settled by execution of a release and a settlement agreement. On November 18 or 19, 2004, Caplitz spoke to Stanley Robb ("Robb") of Calsurance to inform him of the settlement and that he had sent his Enrollment Form and premium check. (Docket Entry # 124, ¶ 13). Caplitz attests that he forwarded the settlement agreement to Lancer

around that same time.[19]   (Docket Entry # 95, ¶ 33).   According

to Lynn Johnson ("Johnson"), however, Lancer did not receive the

release and the settlement agreement until October 10, 2005.

(Docket Entry # 125, ¶ 36) (Docket Entry # 121-1, p. 188).

From August 8 to November 23, 2004, Caplitz believed he was

insured and covered under the 2004-2005 E&O Policy.   (Docket

Entry # 124, ¶ 14) (Docket Entry # 95, ¶ 49).   On November 23,

2004, Indianapolis Life filed the complaint in the Indianapolis

action against the FRN Plan, Herman, identified as trustee of the

FRN Plan, Caplitz and the Meiselmans seeking a return of the

$650,297.01 commission paid to Caplitz.[20]   (Docket Entry # 125, ¶

40, 1st and 2nd sentences).

By email dated November 29, 2004, Jeanette Younger

("Younger"), a Calsurance employee who processed coverage

confirmations and assisted in drafting enrollment forms,[21] sent

Caplitz an enrollment form for retroactive coverage for the 2004-

2005 E&O Policy year with an effective date of August 1, 2004,

---

[19]   This fact is disputed.   There is, however, no dispute that
Caplitz did not send the Meiselman crossclaim filed in February
2005 to Lancer.   Rather, Lancer first received notice of that
claim on August 31, 2004, in an email from Meiselman's attorney.

[20]   As previously noted, Indianapolis Life had rescinded the
policies.   The November 2010 decision allowed summary judgment in
favor of American Guarantee and Zurich on Count II to the extent
that the counts in the Indianapolis complaint did not impose a
duty to defend and indemnify Caplitz or any other plaintiff.
(Docket Entry # 72, pp. 22-28).
[21]   Younger did not interpret policies and was not responsible for
coverage issues.   (Docket Entry # 121-3).

along with an attached letter for his signature.  (Docket Entry # 124, ¶ 15) (Docket Entry # 97-12).  In order to enroll, Calsurance required Caplitz to sign the letter acknowledging that he was not currently enrolled in the 2004-2005 E&O Policy, he had a "potential gap in coverage" and he would have "no prior acts coverage."  (Docket Entry # 97-12).  In December of the previous year, Calsurance allowed Caplitz to backdate coverage to July 1, 2003, for the 2003-2004 E&O Policy simply by signing a letter that he had no knowledge of a claim or potential claim.  The December 2003 letter did not include an acknowledgment of a "potential gap in coverage."  (Docket Entry # 97-9).  Calsurance similarly allowed Caplitz to effectuate a late enrollment and backdate coverage for the 2002-2003 E&O Policy as long as he signed a warranty letter.  (Docket Entry # 97-2).  Caplitz refused to sign the letter attached to the November 2004 email. (Docket Entry # 121-1, p. 182) (Docket Entry # 95, ¶ 39).

On November 30, 2004, Caplitz spoke by telephone with Younger as well as John Jasinki ("Jasinki") of Calsurance. (Docket Entry # 124, ¶¶ 15-16).  Jasinki and Caplitz discussed Caplitz's ability to renew coverage for the 2004-2005 policy year and whether there would be a gap in coverage.  After the conversation, Caplitz wrote a letter to Jasinki reiterating Caplitz's intent not to create a gap in coverage.  (Docket Entry # 124, ¶ 16) (Docket Entry # 121-13).

25

Meanwhile, a series of internal emails between Robb, Younger, Jasinki, Anne Baker ("Baker") of Calsurance[22] and Harris Tsangaris ("Tsangaris") of Zurich took place during this time period.  Baker initially emailed Robb on December 1, 2004, about the potential for a problem with Caplitz's attempt to backdate coverage to July 1, 2004.  She noted that Robb previously allowed Caplitz to backdate coverage for both the 2002-2003 E&O Policy and the 2003-2004 E&O Policy notwithstanding late renewals.  She also noted that, "[N]ow he has a claim."  (Docket Entry # 121-12).  In a reply email, Robb did not favor backdating coverage. The following day, Tsangaris weighed in that he was not willing to backdate coverage if Caplitz had a potential claim.  Tsangaris noted that Zurich typically requires an agent to sign a warranty statement.  If the agent states he has knowledge of a claim, Zurich will not provide the coverage, according to Tsangaris.  In reply, Robb requested clarification and, if he understood the matter correctly, proposed "email[ing] the warranty statement to [Caplitz] and tell[ing] him that this needs to be completed and signed and faxed back to us."  Robb did not send Caplitz a warranty statement.[23]  (Docket Entry # 97-22) (Docket Entry #

---

[22]  Baker was a Calsursance senior account administrator working under Robb.  (Docket Entry # 121-8, pp. 34-35).
[23]  Plaintiffs take issue with the more onerous requirement in the letter attached to the November 29, 2004 email that Caplitz acknowledge a "potential gap in coverage" as opposed to the less onerous acknowledgment in years past of the absence of knowledge of a claim or a potential claim.

121-12) (Docket Entry # 125, ¶¶ 44-46 & 48) (Docket Entry # 98-19, pp. 195-196).

On December 2, 2004, Robb telephoned Caplitz. Robb informed him that the only way Zurich would backdate coverage was if Caplitz had no claims. Caplitz responded that he had no claims against him.[24]  (Docket Entry # 124, ¶ 18).

On December 2 and/or 3, 2004, Robb faxed Caplitz a letter explaining Zurich's inability to backdate coverage. In pertinent part, the letter reads:

> We have gone to the Zurich underwriter to see if we could back date your coverage to July 1, 2004 so that there would be no interruption in coverage. The underwriter has stated that he cannot backdate coverage at this time because of the pending claim.
>
> We did have to disclose to the underwriter that you enrolled late in the 7-1-2002 policy year. That year you enrolled in February, 2003, and we backdated coverage to 7-1-2002. You again late enrolled for the 7-1-2003 policy enrolling in January, 2004. You stated to me yesterday and also sent a fax to us representing that you sent us the enrollment form and check in July, 2004 for the July 1, 2004 policy year renewal. We have no record of having received either the enrollment form or your check.
>
> You also stated to me yesterday that you had no claim. I checked with Lancer Claim[s] Service and you did report a claim to them on August 10, 2004. It is Lancer Claim Number

---

[24]  As determined in the November 2010 decision, exclusion L in the 2004-2005 E&O Policy bars coverage for Caplitz for the claims in the Indianapolis complaint. (Docket Entry # 72, pp. 25-26). Citing this exclusion for commissions and a portion of Robb's deposition, plaintiffs now reason that the claim for the return of the commission in the Indianapolis complaint "is excepted from coverage." Hence, there were no covered claims against Caplitz on December 2, 2004, when he made the foregoing representation to Robb. (Docket Entry # 124, ¶ 18, p. 8).

61380.   It is because of this claim that the Zurich
underwriter has declined to backdate your coverage.

(Docket Entry # 124, ¶ 19) (Docket Entry # 121-14) (Docket Entry # 97, Ex. X) (Docket Entry # 125, ¶ 48, referencing Ex. X).

In another letter to Caplitz dated December 3, 2004, Younger repeated the inability to renew coverage for the July 1, 2004 to July 1, 2005 policy period.  (Docket Entry # 125, ¶ 51) (Docket Entry # 97-25) (Docket Entry # 98-19, pp. 201-202).  The letter notes the lack of coverage as of July 1, 2004.  (Docket Entry # 97-25).  Johnson of BBC testified that the termination would trigger the automatic extended reporting period of the 2003-2004 E&O Policy subject to the terms and conditions of that policy.  (Docket Entry # 125, ¶ 51) (Docket Entry # 98-19, pp. 201-202).  Caplitz attests that no one advised him that "my claim was covered under the automatic extended reporting period."  (Docket Entry # 95, ¶ 40).  On December 6, 2004, Caplitz was served with a summons and the complaint in the Indianapolis action.  (Docket Entry # 124, ¶ 18, p. 8) (Docket Entry # 98-24) (Docket Entry # 95, ¶ 38).

Caplitz attests that he immediately tried to obtain replacement coverage but was not successful.  (Docket Entry # 95, ¶ 45).  On December 9, 2004, he telephoned Robb and repeated his position that he does not have a claim against him.[25]  (Docket

_____

[25]   See the previous footnote.

28

Entry # 97-26) (Docket Entry # 121-8, p. 87).

On February 9, 2005, Meiselman filed the Meiselman crossclaim against Herman, Caplitz and Financial Resources. Caplitz did not report the claim to Lancer or Calsurance. (Docket Entry # 125, ¶¶ 54-55) (Docket Entry # 95, ¶ 47) (Docket Entry # 98-1).  On February 21, 2005, Lancer closed its file.[26] (Docket Entry # 125, ¶ 57, citing Docket Entry # 98-19, p. 217). Caplitz, Herman and Financial Resources retained the services of Attorney Wayne Murphy ("Attorney Murphy") to represent them. (Docket Entry # 125, ¶ 59).  Attorney Murphy did not file an answer to the crossclaim thereby resulting in the default judgment.  Indianapolis Life Ins. Co. v. Herman, 204 Fed.Appx. 908, 909 (1st Cir. 2006); (Docket Entry # 125, ¶ 60, citing Indianapolis Life Ins. Co. v. Herman, 204 Fed.Appx. at 909).

On January 27, 2006, the final judgment issued in favor of Indianapolis Life.  The judgment awarded Indianapolis Life

---

[26] Caplitz attests that he did not report the Meiselman crossclaim because defendants "informed him unequivocally that he was not covered." (Docket Entry # 125, ¶ 55) (Docket Entry # 95, ¶ 47).  The summary judgment record includes certain portions of Caplitz's affidavit that were not stricken, including paragraph 48. (Docket Entry # 121-10).  Paragraph 48 refers to a February 24, 2005 letter from Casey to Caplitz (Docket Entry # 98, Ex. EE) as does a page of Johnson's deposition cited by plaintiffs (Docket Entry # 98-19, p. 217) (Docket Entry # 125, ¶ 57) and a paragraph in plaintiffs' LR. 56.1 statement (Docket Entry # 125, ¶ 57, citing Ex. FF).  The letter asks Caplitz to immediately contact Lancer if he receives any communication about the claim or if suit is filed against him.  (Docket Entry # 98, Ex. EE).

$650,297.01 against Caplitz reflecting the amount of the
commission.  (Docket Entry # 60, citing Ex. KK) (Docket Entry #
98, Ex. KK).  The First Circuit affirmed the judgment in November
2006.  Indianapolis Life Ins. Co. v. Herman, 204 Fed.Appx. 908
(1st Cir. 2006).

Caplitz avers that, as a consequence of the judgment, he has
not been able to work as an insurance agent.  The inability to
work has caused him "a substantial loss of commission income."
(Docket Entry # 95, ¶ 84) (Docket Entry # 121-10, ¶ 84).  Herman
attests to experiencing losses resulting from defendants' failure
to properly procure insurance including attorneys' fees of
approximately $900,000.  (Docket Entry # 118).  In a state court
action Herman brought against Attorney Murphy, the court denied
the bulk of these fees.  (Docket Entry # 87, Ex. CC).

I.  DEFENDANTS' SUMMARY JUDGMENT MOTION

Defendants move for summary judgment on the remaining counts
against them in the first amended complaint.  (Docket Entry #
119).  In general, they submit there is no evidence of an oral or
an implied in fact contract nor a contract by estoppel that would
provide coverage that differs from the terms of the 2003-2004 E&O
Policy and the 2004-2005 E&O Policy.  (Docket Entry # 120).

A.  Counts III and IV

Counts III and IV respectively assert that American
Guarantee and Zurich breached an oral and an implied in fact

30

insurance contract.  Each count alleges a breach of the oral or the implied in fact contract "by failing to defend and indemnify them against Meiselman's claims, among other things."  (Docket Entry # 28, ¶¶ 60 & 64).

With respect to Count III, defendants initially argue there was no meeting of the minds on all of the essential elements of an oral contract for insurance irrespective of whether the contract was for the 2004-2005 E&O Policy or for a completely different policy.  (Docket Entry # 120, § I(A)).  In addition, they argue there was no breach of any such contract.  (Docket Entry # 120, § I(B)).

As to Count IV, defendants submit there are no Massachusetts cases involving an implied in fact contract for insurance. Alternatively, they argue that plaintiffs fail to establish the existence of an implied in fact contract.  Further, if a contract did exist through a course of dealing and the 2004-2005 Plan Highlights, it would not provide coverage because the highlights expressly incorporate the terms and conditions of the express 2004-2005 E&O Policy.  Finally, plaintiffs failed to confer any benefit on American Guarantee or Zurich and Herman's conversation with Madsen of Indianapolis Life does not bind American Guarantee and Zurich, according to defendants.[27]  (Docket Entry ## 120 &

---

[27]  Outside the insurance context, an implied in fact contract arises where the plaintiff confers measurable benefits upon another party, the defendant accepts the services with the

126).

Before addressing the arguments, it is worth noting that plaintiffs rely on similar if not identical evidence, including the 2003-2004 and the 2005-2005 Plan Highlights and the enrollment forms, to create the oral and the implied in fact contracts and to set out their terms.[28]  Massachusetts cases repeatedly refer to insurance contracts outside the context of an express contract as oral as opposed to implied in fact contracts. More importantly, so called "oral" insurance contracts still use documentary evidence to establish their creation and their terms. See Cunningham v. Connecticut Fire Ins. Co., 86 N.E. 787, 788 (Mass. 1909) (action on "parol" contracts of insurance which, although court found they were never made, court considered facts including the conduct that defendant's agent was to *write* the policies and plaintiff was to *receive* them);[29] Baldwin v.

_____

expectation of compensating the plaintiff and the plaintiff demonstrates that he provided the services with the reasonable expectation of receiving compensation.  General Electric Company v. Lyon, 894 F.Supp. 544, 554 (D.Mass. 1995); Bolen v. Paragon Plastics, Inc., 747 F.Supp. 103, 106-107 (D.Mass. 1990); see generally LiDonni, Inc. v. Hart, 246 N.E.2d 446, 449 (Mass. 1969) ("In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties"); Restatement (Second) of Contracts § 4, comments a & b (1981) (distinguishing express and implied contracts from quasi-contracts, also denominated contracts implied in law).

[28]  For example, plaintiffs argue that they "had an oral agreement and implied-in-fact agreement that they were enrolled because the Enrollment Form and Plan Highlights say so . . .."  (Docket Entry # 116).

[29]  Delivery of a policy is not ordinarily required unless, as indicated by the facts in Cunningham, the contract sets out a delivery requirement.  See Gargano v. Liberty International

<u>Connecticut Mutual Life Insurance Co.</u>, 65 N.E. 837, 838 (Mass. 1903) (action to recover on "oral" life insurance contract which, although never formed because of agent's lack of authority, was based on *signing* an application and an oral conversation); <u>London Clothes v. Maryland Casualty Co.</u>, 63 N.E.2d 577, 578-580 (Mass. 1945) (action on "oral" contract of insurance or oral agreement to renew policy based on conversations and *conduct* of charging full premium and paying commission was sufficient to create agreement to issue new policy in a form similar to previous policy); <u>see also</u> <u>Sanford v. Orient Insurance Co.</u>, 54 N.E. 883, 884 (Mass. 1899) (claim of "oral" agreement to make insurance policy based on same terms as prior *written* policy).  Similarly, as explained by one commentator, the essential terms of an oral contract for insurance may be implied if not expressly stated based upon the parties' "prior dealings and contracts between the parties" or industry custom and practice.  1 Jeffrey Thomas and Francis Mootz, III, <u>New Appleman on Insurance Law</u> § 3:02 (2009). Thus, in determining the existence of an oral contract, this court does not limit itself to conversations but rather considers all of the relevant, non-verbal evidence.  The creation and the terms of an oral contract therefore include all of the evidence

---

<u>Underwriters, Inc.</u>, 575 F.Supp.2d 300, 306 (D.Mass. 2008) ("'neither delivery nor actual possession by the insured is essential to the making of an insurance contract unless the contract expressly sets out a requirement of delivery'").

considered to create and to enforce any implied in fact insurance contract.

It is well settled that Massachusetts courts recognize oral contracts for insurance. See Cunningham v. Connecticut Fire Ins. Co., 86 N.E. at 788 ("nor can it be argued that there may not be a valid contract of insurance resting only in parol"). The oral contract may take the form of a contract to renew an existing policy or a contract for a new or a renewed policy with different terms. See 3D Steven Plitt, Daniel Maldonado and Joshua Rogers, Couch on Insurance § 29:24 (3d ed. 2005) ("right to make a renewal by oral agreement exists" and it is "permissible for an oral agreement for renewal" to contain new terms); 1 Jeffrey Thomas and Francis Mootz, III, New Appleman on Insurance Law § 3:02 (2009) ("[o]ral contracts of insurance are enforceable . . . '[e]ven "permanent" contracts of insurance can be oral'"); see, e.g., London Clothes v. Maryland Casualty Co., 63 N.E.2d 577 (Mass. 1945) (addressing whether parties entered into oral contract to renew original theft policy or a revised oral policy that added requirement of watchman at insured property).

In order to form an oral contract for insurance, there must be a meeting of the minds between the parties on the essential elements of the contract. See Cunningham v. Connecticut Fire Ins. Co., 86 N.E. at 788-790 (rejecting formation of oral insurance contract because facts did not sufficiently show

34

"meeting of minds" as to all "essential elements"); <u>London Clothes v. Maryland Casualty Co.</u>, 63 N.E.2d at 580 ("oral contract of insurance which contains all the essential elements of the transaction is valid"); 1 Jeffrey Thomas and Francis Mootz, III, <u>New Appleman on Insurance Law</u> § 3:07 (2009) ("[r]enewal contracts have the same requirements of mutual assent, offer and acceptance and new consideration as other contracts").  The parties likewise agree there must be a meeting of the minds on the essential elements of an oral contract. (Docket Entry # 123, p. 2) (Docket Entry # 120, p. 6).  These essential elements include the identity of the insuring company, "the time the policies should run," the amount of the insurance assumed and the amount of the premium.  <u>Cunningham v. Connecticut Fire Ins. Co.</u>, 86 N.E. at 788.  Like an express insurance contract, an oral insurance contract "must specify the subject matter to be insured, the scope of the risk to be insured, the duration of the risk, the amount of indemnity and the amount of the premium."  1 Jeffrey Thomas and Francis Mootz, III, <u>New Appleman on Insurance Law</u> § 3:02 (2009).

The parties' prior course of dealing, enrollment forms and prior express policies uniformly establish that the policies ran for a period of one year beginning on July 1 and ending on July 1 of the following year.  Plaintiffs primarily, albeit not exclusively, focus on the 2004-2005 policy period.  It is also

undisputed that Caplitz was enrolled in the 2003-2004 E&O Policy. Accordingly, this court initially turns to the formation, if any, of an oral or an implied in fact contract for the 2004-2005 policy period and, if made, whether it was breached.

With American Guarantee and Zurich having pointed to the absence of evidence to form an oral or an implied contract, it is incumbent upon plaintiffs, as the summary judgment targets with the underlying burden of proof, to show facts sufficient to create a trialworthy dispute. Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012) ("'summary judgment target'" who "'bears the ultimate burden of proof . . . cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute'"). Plaintiffs rely and point to the 2004-2005 Plan Highlights and the 2004-2005 Enrollment Form as the basis for the formation of the oral and the implied contracts and their terms.

Plaintiffs also identify Caplitz's "conversations with the defendants' representatives" as containing the essential terms of the oral or the implied agreement. (Docket Entry # 123, pp. 1-2) (Docket Entry # 124, ¶¶ 11-17). The referenced paragraphs set out the following, aforementioned conversations and documents: (1) the September 28, 2004 conversation Caplitz had with Casey advising him that he had forwarded the check and the application to enroll in the 2004-2005 E&O Policy (Docket Entry # 124, ¶ 11);

(2) Casey's internal notes the same day evidencing that he forwarded the check and the application thereby evidencing receipt (Docket Entry # 124, ¶ 12);[30] (3) the November 5, 2004 facsimile by Caplitz of copies of the July 29, 2004 check and the July 30, 2004 Enrollment Form to Renner of Lancer (Docket Entry # 124, ¶ 15) (Docket Entry # 125, ¶ 33) (Docket Entry # 97-16); (4) the November 18 or 19, 2004 conversation Caplitz had with Robb of Calsurance advising him that he had sent in the check and the 2004-2005 Enrollment Form and that Meiselman I had settled (Docket Entry # 124, ¶ 13); (5) the November 30, 2004 conversations Caplitz had with Younger of Lancer and thereafter Jasinki of Calsurance with Jasinki discussing the ability to renew coverage for the 2004-2005 policy period and the possibility of a gap in coverage (Docket Entry # 124, ¶ 16); (6) the November 30, 2004 letter from Caplitz to Jasinki wherein Caplitz denies any intent on his part to create a gap in coverage (Docket Entry # 124, ¶ 16) (Docket Entry # 121-13); and (7) the December 2, 2004 conversation Caplitz had with Robb of Calsurance reiterating his timely sending of the check and the enrollment form, the absence of any claim against him and the settlement of Meiselman I (Docket Entry # 124, ¶ 17) (Docket Entry # 121-1, pp. 182-185) (Docket Entry # 121-8, p. 36).[31]  All of these

---

[30] See footnote 18 and related text.

[31]  In addition to the above evidence and the terms of the enrollment form, Caplitz attests to sending the check and the

conversations pertain to the enrollment dispute and the formation, if any, of a contract and the breach thereof. They do not, for example, address the reporting or notice requirement of the alleged claims made and reported oral or implied insurance contracts.

Turning to formation of an oral contract, plaintiffs rely on the 2004-2005 Plan Highlights as containing the subject matter of the risk, the amount of insurance, the duration of the insurance and the identity of the parties. (Docket Entry # 123, p. 3). As plaintiffs point out, the 2004-2005 Plan Highlights contain: (1) the subject matter of the risk, to wit, "Claims Made and Reported Acts, errors or omissions arising out of the rendering of or failure to render Professional Services"; (2) the amount of the insurance, to wit, a policy aggregate of $100,000,000 with three choices of an annual aggregate and per claim limit with designated deductibles;[32] (3) the duration of the insurance, to wit, the "Policy Period" of "July 1, 2004 to July 1, 2005"; and (4) the identity of the parties, to wit, American Guarantee[33] on the one hand and the "Named Insured," defined as agents of AmerUs

---

2004-2005 Enrollment Form on or about July 30, 2004. (Docket Entry # 95, ¶ 9).

[32] The 2004-2005 Enrollment Form provides a space to check the option chosen. Here, Caplitz checked the highest limit of $3,250,000 per claim and annual aggregate. (Docket Entry # 97-12).

[33] The 2004-2005 Plan Highlights identify "American Guarantee and Liability Insurance Company[,] A Zurich North American Company" as the insurance provider. (Docket Entry # 98-16).

Life, and the "Additional Insured," defined as "Insured Agent's Business Entity[,]" "Officers" and "Partners."[34]  As to the premium, the 2004-2005 Plan Highlights sets out a premium table. The 2004-2005 Enrollment Form contains a box to set out the amount of the premium from the table.  Here, Caplitz stated $2,916, an amount that corresponds to the coverage option he chose.  (Docket Entry # 97-12).  The terms of the enrollment form require "Agents with Expiring Coverage," such as Capltiz, to "Enroll within 30 days of Expiration" of the prior policy and to mail the "Enrollment forms with check" to Calsurance.  (Docket Entry # 97-12).

Excluding the Madsen conversation, the foregoing conversations, documents and Caplitz's affidavit provide sufficient evidence for a jury to find that Caplitz sent in the signed 2004-2005 Enrollment Form and the check for the $2,916 premium in a timely manner on or before July 30, 2004.  The

---

[34]  Plaintiffs argue that Herman and Financial Resources are each an "Additional Insured" based on the language in the 2004-2005 Plan Highlights (Docket Entry # 98-16) and a conversation Herman had with Madsen of Indianapolis Life that she and Financial Resources were covered because of the statements in the Plan Highlights (Docket Entry # 96, ¶ 2).  See fn. 11.  The latter basis is not part of the summary judgment record because this court struck the affidavit statement (Docket Entry # 96, ¶ 2) (Docket Entry # 107, pp. 27-28) and plaintiffs fail to provide any justification for reconsideration.  Nonetheless, this court will accept for purposes of the two pending summary judgment motions that, as urged by plaintiffs, Herman and Financial Resources are "Additional Insured[s]."  Accepting this fact does not alter, effect or change the denial of defendants' summary judgment motion on Count V as to the 2004-2005 policy period and on Count VI.

record also provides adequate support for a jury to find that
Calsurance and/or American Guarantee received the check and the
enrollment.  Again, viewing the record in plaintiffs' favor, it
is a genuine issue of material fact as to whether the parties
agreed upon all of the essential terms of the oral or the implied
contract of insurance for the 2004-2005 policy period based on
the 2004-2005 Plan Highlights, the 2004-2005 Enrollment Form and
the foregoing conversations, documents and affidavit.[35]  Caplitz
is a "Named Insured" as an agent of Indianapolis Life.  (Docket
Entry # 72, p. 26).  Summary judgment in favor of American
Guarantee and Zurich on the basis of the absence of an oral or an
implied in fact contract is not warranted.

American Guarantee and Zurich next submit that the statute
of frauds, Massachusetts General Laws chapter 259, section one,
bars enforcement of the oral insurance contract.  (Docket Entry #
120, § I(C)).  "When a party seeks to enforce an alleged oral

---

[35] The finding is not based on Lancer's uncommunicated, internal
progress notes.  See Louis Stoico, Inc. v. Colonial Development
Corporation, 343 N.E.2d 872, 875 (Mass. 1976) ("circumstances
surrounding the making of an agreement must be examined to
determine the objective intent of the parties"); Brewster
Wallcovering Company v. Blue Mountain Wallcoverings, Inc., 864
N.E.2d 518, 532 n.35 (Mass.App.Ct. 2007) (binding contract arises
when "the parties manifested the intent, viewed objectively, to
be bound at the time of contract formation, notwithstanding
either party's subjective intent"); see also T.F. v. B.L., 813
N.E.2d 1244, 1249 (Mass. 2004); Donoghue v. IBC USA
(Publications), Inc., 70 F.3d 206, 212 (1st Cir. 1995); In re
Newport Plaza, Associates, L.P., 985 F.2d 640, 646 (1st Cir.
1993) (contracts depend upon "objective indicia of consent, not
on a party's subjective expectations").

40

contract that is within the statute of frauds, he must not only prove the existence of the oral contract itself but he must go one step further and prove a memorandum in writing containing the terms of that same oral contract in so far as he seeks to enforce them." <u>Fichera v. City of Lawrence</u>, 44 N.E.2d 779, 780 (Mass. 1942) (citation to statute of frauds omitted).  In order to satisfy the statute, the written memorandum must "correctly state[] the oral undertaking of the party sought to be charged." <u>Epdee Corp. v. Richmond</u>, 75 N.E.2d 238, 239 (Mass. 1947); <u>see Harrington v. Fall River Housing Authority</u>, 538 N.E.2d 24, 29 (Mass.App.Ct. 1989) (memorandum "must contain all the provisions of the oral contract with which the plaintiff is seeking to charge the defendant"); <u>see also</u> <u>Simon v. Simon</u>, 625 N.E.2d 564, 567 (Mass.App.Ct. 1994) (writing must set out the essential provisions of the oral agreement).  Ordinarily, the written memorandum must therefore:  "(1) reasonably identify the subject matter of the contract, (2) indicate that a contract with respect to this subject matter has been made between the parties, (3) state with reasonable certainty the essential terms of the unperformed promises in the contract, and (4) be signed by or on behalf of the party to be charged." <u>Trenwick America Reinsurance Corp. v. IRC, Inc.</u>, 764 F.Supp.2d 274, 298-299 (D.Mass. 2011) (citing Massachusetts cases).  Finally, "under Massachusetts law, multiple documents pertinent to a transaction may be read

41

together in determining whether the statute of frauds has been satisfied." Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 198 n.4 (1st Cir. 2001); see In re Rolfe, 710 F.2d 1, 3 (1st Cir. 1983) ("written memorandum 'may consist of several writings' as long as they 'clearly indicate that they relate to the same transaction'").

Here, plaintiffs identify the 2004-2005 Plan Highlights, the 2004-2005 Enrollment Form and the August 19, 2004 letter signed by Casey "on behalf of American Guarantee" (Docket Entry # 97-14) to satisfy the statute.  Assuming for purposes of argument that the oral liability insurance contract falls within the reach of the statute of frauds, the foregoing documents provide the necessary writings to satisfy the statute of frauds.

Turning to the terms of the oral or the implied in fact contract and any breach, American Guarantee and Zurich submit that such terms are no different than the terms of the express 2004-2005 E&O Policy.  Because this court found there was no coverage under the 2004-2005 E&O Policy, American Guarantee and Zurich argue there should be no coverage under the oral or the implied in fact contract for insurance.  Briefly stated, the March 2012 decision found that Caplitz did not comply with the conditions precedent to coverage requiring the "Insured" to provide "written notice of any 'Claim' made . . . during the

'Policy Period'" and requiring the "Insured," Caplitz,[36] to
"Immediately forward . . . every 'Claim', notice, summons or
other process" received by the Insured to Lancer. (Docket Entry
# 121-5, ¶ VII(A)) (Docket Entry # 107, pp. 58-66). The March
2012 decision also found that the Awareness Provision
unambiguously applied to reporting a potential claim as opposed
to an actual claim. (Docket Entry # 107, pp. 55 & 59-62).

     With respect to the terms of the oral and the implied
contract, plaintiffs rely on the 2004-2005 Plan Highlights. They
submit that the terms of the 2004-2005 oral contract allowed
Caplitz to orally report "the claim." (Docket Entry # 116, ¶
III(D)). In particular, they argue that, "Caplitz properly
reported plaintiffs' claim as required by the plain language of
the Plan Highlights and that claim was received and accepted by
Calsurance even though the claim was reported orally." (Docket
Entry # 116, p. 14). According to plaintiffs, Lancer accepted
the oral report of the claim and no one advised Caplitz of a
requirement to send a written notice. They also note that
Lancer's internal progress notes state, at least initially, that
"this is a potential claim . . . made and reported within the
policy period." (Docket Entry # 98-11, p. 00290). American

---

[36] Assuming arguendo, as previously noted, that Herman and
Financial Resources qualify as "Additional Insured[s]," there is
no evidence that they provided oral or written notice to Lancer
of the Meiselman crossclaim.

Guarantee and Zurich thereafter breached the oral and the implied insurance contracts by refusing coverage and failing to defend and identify plaintiffs, according to plaintiffs.

In addition to properly reporting "the claim," plaintiffs submit they properly reported a potential claim "under the 'awareness provision' of the Plan Highlights." (Docket Entry # 116, p. 5). Here too, however, plaintiffs rely on the 2004-2005 Plan Highlights for coverage during that policy period.

Plaintiffs' reliance on the 2004-2005 Plan Highlights as a basis to properly report the Meiselman crossclaim by orally reporting the disagreements in early August 2004 is misguided. In no uncertain terms, the 2004-2005 Plan Highlights state that:

> This document is a summary of the coverage provided. All statements contained herein are subject to all of the terms, Conditions and Exclusions of the actual policy. Call (800) 745-7189 to receive a copy of the policy.

(Docket Entry # 98-16). For reasons explained in the March 2012 decision, Caplitz did not provide proper notice during the July 1, 2004 to July 1, 2005 policy period and he did not immediately forward the February 2005 Meiselman crossclaim to Lancer. (Docket Entry # 107, 44-48 & 58-66). Furthermore, reporting a potential claim under the Awareness Provision in early August 2004 does not satisfy the 2004-2005 E&O Policy's notice provisions to report a claim in the designated manner. (Docket Entry # 107, 44-48 & 58-66). Because Caplitz did not comply with the reporting and notice provisions, the express 2004-2005 E&O

44

Policy did not afford him coverage.  (Docket Entry # 107, 44-48 &
58-66).  Because the reporting and notice provisions apply to
"Additional Insured[s]," neither Herman nor Financial Resources
are covered under the 2004-2005 E&O Policy even if, for purposes
of argument, they qualify as "Additional Insured[s]."  The
incorporation of the terms of the 2004-2005 E&O Policy into the
2004-2005 Plan Highlights therefore eviscerates plaintiffs'
breach of contract argument both with respect to the oral
contract and the implied in fact contract.  See generally Mt.
Airy Insurance. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir. 1997)
(there is "no duty to defend a claim that is specifically
excluded from coverage") (applying Massachusetts law).

   Even without the incorporation language, the 2004-2005 Plan
Highlights do not afford coverage under the oral or the implied
in fact contract.  The 2004-2005 Plan Highlights, like the 2003-
2004 Plan Highlights, state that:

> a Claim is "reported" by giving written notice of it to
> Lancer Claims Services.  A Claim must be "made and reported"
> during the policy period.  The policy requires that written
> notice of claims be provided as soon as practicable during
> the Policy Period . . ..
>
> How do I report a Claim?
>
> The agent has the following duties in the event of a claim
> or suit:
>
> 1.  As soon as practicable, give to the Insurance Company
> written notice.
>
> 2.  Immediately forward every demand, notice, summons or
> other process to [Lancer].

(Docket Entry # 98-16).[37]  This language sets out the substance of the two condition precedents that formed the basis to deny coverage under the express 2004-2005 E&O Policy in the March 2012 decision.  For reasons stated therein, Caplitz did not comply with these requirements and, accordingly, there is no duty to defend or indemnify.

Turning to the existence of an oral or an implied in fact contract for the 2003-2004 policy period, plaintiffs contend that the 60 day automatic Extended Reporting Provision provides coverage.[38]  (Docket Entry # 116, p. 7) (Docket Entry # 125, ¶ 41).  The March 2012 decision rejected this argument with respect to the express 2003-2004 E&O Policy.  (Docket Entry # 107, pp. 54-58).  Here too, the same reasons apply.  The Awareness Provision of the 2003-2004 Plan Highlights affords coverage for

---

[37]  The language does not disclose the 60 day automatic Extended Reporting Provision.  There is, however, no coverage for the 2004-2005 policy period under this provision based on the August 31, 2005 email from Meiselman's counsel.  (Docket Entry # 107, pp. 60-62).  Plaintiffs do not identify any other communication during the July 1 to August 31, 2005, 60 day period.

[38]  The argument reads as follows:

> The defendants were, in any event, well aware that, even if Caplitz was not enrolled in the 2004-05 policy, he was nevertheless covered under the Automatic Extended Reporting Period for the prior year policy which allowed him to report claims within 60 days of the termination of the prior year's policy for claims made during the prior year policy period.  Meiselman's claim arose out of the purchase of insurance during that policy period.  SOF, par. 41.

(Docket Entry # 116, p. 7).

"the Policy Period *in which* the written notice" of the potential claim "*was received*." (Docket Entry # 97-4) (emphasis added). Caplitz did not report or notify Lancer of the Meiselman matter until August 8, 2004. Because the notice "was received" in the 2004-2005 policy period, any coverage is supplied by the July 1, 2004 to July 1, 2005 oral or implied in fact contract.

Even irrespective of the Awareness Provision, the 60 day automatic Extended Reporting Provision in the 2003-2004 E&O Policy does not afford coverage. By its term, it applies to any Claim that "(1) is first made during said sixty (60) day period, and (2) arises out of a negligent act, error or omission which occurred before the date of termination." (Docket Entry # 121-4, ¶ IV(A)). Plaintiff's argument that "Meiselman's claim arose out of the purchase" of the Meiselman life insurance policies does not satisfy the first requirement. The Meiselman claim was "first made" at the time of the February 2005 Meiselman crossclaim.

Plaintiffs further note that, "No one advised Caplitz that his claim was covered under the Automatic Extended Reporting Period and nothing in the Plan Highlights provided to Caplitz disclosed the existence of this extended reporting period." (Docket Entry # 116, p. 7). Because the claim was not encompassed under this reporting provision, the argument does not provide a basis for relief. In light of the lack of defense and

47

indemnity coverage under the terms of the oral or the implied in
fact contracts, it is not necessary to address American Guarantee
and Zurich's argument that they are not bound by the actions of
Calsurance as to Count IV.  (Docket Entry # 126, § III(B)).

B.  <u>Count VI</u>

Count VI sets out the breach of the covenant of good faith
and fair dealing claim against defendants.  In seeking summary
judgment, defendants first submit that if no insurance is in
effect, there is no contract to which the implied covenant can
attach.

"'In order to establish a breach of the covenant of good
faith and fair dealing, a plaintiff must prove that there existed
an enforceable contract between the two parties.'"  <u>Blake v.
Professional Coin Grading Service</u>, 2012 WL 4903334, *16 (D.Mass.
Oct. 16, 2012) (quoting <u>Boyle v. Douglas Dynamics, LLC</u>, 292
F.Supp.2d 198, 209-10 (D.Mass. 2003)).  A "failure to demonstrate
the existence of an enforceable contract" is "fatal" to a
plaintiff's "contention that [the defendant] violated that
contract's implied covenant of good faith and fair dealing."
<u>O'Connor v. Merrimack Mutual Fire Insurance Co.</u>, 897 N.E.2d 593,
600 (Mass.App.Ct. 2008).  As previously explained, however,
sufficient evidence exists that the parties agreed upon the
essential terms of an oral contract thereby giving rise to an
oral contract for insurance based on the 2004-2005 Plan

Highlights, the 2004-2005 Enrollment Form and the previously identified conversations, documents and Caplitz's affidavit. Viewing the record in plaintiffs' favor, there is also sufficient evidence that Caplitz timely enrolled in the policy and that Calsurance received the enrollment form and the check. Defendants first argument therefore does not provide a basis for summary judgment as to the 2004-2005 policy period.[39]

Next, defendants contend that if the E&O Polices were in effect, there is no breach of the covenant because, as determined by this court, there was no breach of the duty to defend and indemnify in the 2003-2004 E&O Policy and in the 2004-2005 E&O Policy.  As a result, purportedly "there can be no breach of the covenant of good faith and fair dealing based on the Defendants' refusal to defend and indemnify the Plaintiffs." (Docket Entry # 120, § IV) (citing Chokel v. Genzyme Corp., 867 N.E.2d 325, 329-331 (Mass. 2007)).  In other words, because they acted in a manner authorized by the E&O Policies, defendants submit they did not breach the covenant.  (Docket Entry # 126, § III(D)). Plaintiffs, in turn, argue that defendants breached the covenant because their agent, Calsurance, received the check and the 2004-2005 Enrollment Form and initially issued coverage in accordance with the oral or the implied in fact insurance contract but, when

---

[39]  Defendants do not present a separate argument specific to the 2003-2004 policy period during which Caplitz was enrolled in the express 2003-2004 E&O Policy.

the claim materialized to a greater degree, disavowed such coverage in late October 2004.[40]  It is therefore the performance of the enrollment provisions and the representation of coverage, if any, that provide the basis for the covenant and its breach. (Docket Entry # 116, § III(F)) (Docket Entry # 123, § III(E)).

Massachusetts law implies a covenant of good faith and fair dealing into every contract.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009).  "The purpose of the covenant 'is to guarantee that the parties remain faithful to the intended and agreed expectations' of the contract."  Liss v. Studeny, 879 N.E.2d 676, 680 (Mass. 2008).  In essence, the covenant requires that the parties not "'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000); see Liss v. Studeny, 879 N.E.2d at 680 (covenant ensures "that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'"); Uno Restaurants v. Boston Kenmore Realty, 805 N.E.2d 957, 964 (Mass. 2004) (covenant "preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract").  "It is implicit in [the foregoing] definition,

---

[40]  The argument parallels this court's reasoning for denying American Guarantee and Zurich's first summary judgment motion. (Docket Entry # 72, pp. 48-49).

and made explicit [under First Circuit] precedent, that the
prohibition contained in the covenant applies only to conduct
during performance of the contract, not to conduct occurring
prior to the contract's existence . . .." AccuSoft Corp. v.
Palo, 237 F.3d 31, 45 (1st Cir. 2001).

"Equally clear from this definition is that the requirement
of good-faith performance ultimately is circumscribed by the
obligations-the contractual 'fruits'-actually contained in the
agreement." Id.; see Liss v. Studeny, 879 N.E.2d at 680 ("'scope
of the covenant is only as broad as the contract that governs the
particular relationship'"). Consequently, "[t]he covenant does
not supply terms that the parties were free to negotiate, but did
not" and it does not "'create rights and duties not otherwise
provided' for in the contract." Chokel v. Genzyme Corp., 867
N.E.2d at 329 (citation omitted). A successful claim for breach
of the covenant does not, however, require a separate breach of
the express terms of the contract or the agreement. See, e.g.,
Larson v. Larson, 636 N.E.2d 1365 (Mass.App.Ct. 1994).

The facts viewed in plaintiffs' favor establish that Caplitz
completed the 2004-2005 Enrollment Form (Docket Entry # 97-12)
and mailed the form and the premium check to Calsurance within
the requisite 30 days in accordance with the instructions in the
form. In early August 2004, Caplitz orally reported the
Meiselman dispute. Lancer initially represented that the policy

"is effective" but it remained subject to the terms of the policy. (Docket Entry # 97-14). The August 19, 2004 letter also explained that a "complete coverage evaluation will be completed" in the next 30 days and, if there are any coverage issues, Caplitz "will receive notice of those issues." (Docket Entry # 97-14). Caplitz did not receive any such notice during the next 30 days. When the Meiselman disagreements or claim materialized to a greater degree, American Guarantee and Zurich disavowed the policy and Calsurance's receipt of the enrollment form and check. Thus, their performance of initially honoring and thereafter dishonoring Caplitz's timely enrollment provides sufficient evidence of a breach of the covenant as circumscribed by the enrollment obligations. Those obligations required the Indianapolis contracted agent to complete the enrollment form and send the check to Calsurance. Then, if everything was in order, the contracted agent would be a Named Insured under the policy. It is the *performance* of the *enrollment provisions* that provide the scope of the covenant.

Defendants however argue that they acted in conformity with the terms of the policy when they refused to defend and indemnify plaintiffs. Even assuming that their adherence to the terms of the Awareness Provision and the automatic Extended Reporting Provision in denying coverage does not violate the covenant, their conduct relative to their performance of the enrollment

provisions of the oral insurance contract may nonetheless violate
the covenant.  Defendants brevis assertion in a footnote that if
plaintiffs could prove a breach of the duty to defend and
indemnify then the breach of the covenant of good faith adds
nothing fails because of the absence of any legal authority, see
LR. 7.1(b)(1), and the absence of the initial premise, to wit,
breach of the duty to defend and indemnify.

Thus, given the arguments presented,[41] they do not provide a
sufficient basis to allow summary judgment on Count VI.

C.   Counts I and V

In seeking summary judgment, defendants apply the same
arguments to each of the two estoppel counts with respect to the
2004-2005 policy period.  Count I presents an estoppel claim
against B&B, BBC and Calsurance for failure to procure or provide
a policy of insurance.  Plaintiffs purportedly relied on the
promise to procure insurance by refraining from purchasing
coverage through another carrier.  (Docket Entry # 28, ¶¶ 50-53)
(Docket Entry # 116, § III(C)) (Docket Entry # 123, § III(D)).
Count V is an estoppel claim against American Guarantee and
Zurich based on their failure to defend and indemnify plaintiffs
notwithstanding their alleged representations of coverage.  In
reliance on those coverage representations, plaintiffs did not

---

[41]   Defendants do not expressly refer to the absence of "damages"
caused by the covenant's breach or otherwise raise such an
argument.

seek coverage elsewhere.  (Docket Entry # 28, ¶¶ 66-69) (Docket Entry # 116, § III(E)) (Docket Entry # 123, § III(D)).

Massachusetts insurance law adheres to "the rule that a liability insurer," such as American Guarantee and Zurich, "'having led the assured to rely exclusively on its protection during the period when he might have protected himself . . . cannot, in fairness, thereafter withdraw that protection.'" Specialty National Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 735 (1st Cir. 2007) (quoting Salonen v. Paananen, 71 N.E.2d 227, 230 (Mass. 1947)).  To establish such an estoppel "under a liability insurance policy, an insurer must say or do something intended to induce conduct on the part of its insured; the insured must act or refrain from acting in reasonable reliance on the insurer's representation; and the insured must suffer some detriment as a result."  Id. (citing Salonen v. Paananen, 71 N.E.2d at 230); Safety Insurance Co. v. Day, 836 N.E.2d 339, 346 (Mass.App.Ct. 2005) (setting out same elements).  Detrimental reliance is a required element.  Specialty National Insurance Co. v. OneBeacon Insurance Co., 486 F.3d at 737; see also Rotundi v. Arbella Mutual Insurance Co., 763 N.E.2d 563, 564 (Mass.App.Ct. 2002).  Moreover, as noted in the context of the "special circumstances" in Jet Line, when an insurance company makes a representation that "misleads an insured reasonably to believe that there is coverage" for a type of loss, "the insured may

satisfy its burden of proof of detrimental reliance (that is, that the insurer's conduct caused a loss to the insured) simply by demonstrating that the loss occurred." Jet Line Services, Inc. v. American Employers Insurance Co., 537 N.E.2d 107, 113 (Mass. 1989).  The insurance company then has the burden of "showing that, if the insured had not had the coverage as represented by the insurer, the insured would have sustained the same loss in any event." Id.

For purposes of their summary judgment motion, defendants assume that, "Plaintiffs reasonably relied on the Defendants' representation that the 2004-2005 [E&O] Policy was in effect and that, as a result, the Plaintiffs refrained from buying other insurance." (Docket Entry # 120, § III).  They then point out, correctly, that plaintiffs have no defense and indemnity coverage under the express 2004-2005 E&O Policy as determined in the November 2010 and the March 2012 decisions.  Thus, even if successful in establishing that defendants are estopped to deny the policy's timely renewal, plaintiffs are not entitled to any relief, according to defendants.  (Docket Entry # 120, § III) (Docket Entry # 126, § III(C)).  Defendants also emphasize that plaintiffs did not comply with the terms of the express 2004-2005 E&O Policy.  (Docket Entry # 120, § III).

Without more, defendants' argument that the express policy does not provide coverage precludes the estoppel claim in Count V

does not warrant summary judgment.  As explained by the court in
Jet Line, "Although the [general liability insurance] policy did
not provide coverage for the damage to the Air Force tank caused
by the Newington explosion, the jury [was] warranted in finding
that [the insurance company] was estopped to deny coverage for
that damage."  Jet Line Services, Inc. v. American Employers
Insurance Co., 537 N.E.2d at 112.

Defendants' argument also misperceives the relevant inquiry
and the nature of the estoppel claim that plaintiffs present in
Count V.  After Caplitz's notice in early August 2004, plaintiffs
assert they "were led to believe they had coverage" and their
"reliance created a detriment in the form of an inability to
obtain replacement coverage after the August notice from
Caplitz."[42]  (Docket Entry # 116, § III(E)).  A reasonable fact
finder could find that Lancer did not simply make a
representation that the policy was in effect in the August 19,
2004 letter.  (Docket Entry # 97-13) ("we would like to advise
you that your Policy . . . is effective").  In addition to noting
that the Meiselman matter or "claim is subject to all other
applicable terms and conditions," the letter states that, "A
complete coverage evaluation will be completed on this matter

_____

[42]  Plaintiffs also base the claim on representations in the
2004-2005 Plan Highlights that Herman and Financial Resources
were covered as Additional Insureds.  (Docket Entry # 116, §
III(E)).

56

within the next 30 days.  If there are any coverage issues that
need to be addressed, you will receive notice of those issues
under separate cover." (Docket Entry # 97-13).  Consequently, a
reasonable fact finder could find that Lancer made a
representation about coverage for the Meiselman matter absent
notice of a coverage issue in the next 30 days.  Caplitz did not
receive a coverage determination in the next 30 days.  See id. at
112 (evidence "that insurance companies usually disclaim coverage
within sixty days of notice of a claim" gave support to estoppel
claim).

Viewing the record in plaintiffs' favor, plaintiffs
demonstrated that the loss took place inasmuch as they incurred
the liability to Meiselman.  On summary judgment, it is incumbent
upon defendants and, in particular, American Guarantee and Zurich
as to Count V, to provide a sufficient showing that plaintiffs
would have sustained the same (or greater) loss if they had known
that Caplitz did not have the coverage as represented.  See id.
at 113.  Defendants fail to provide the requisite showing with
respect to the 2004-2005 policy period.  Defendants additionally
argue that, "'[A]n action based on reliance is equivalent to a
contract action, and the party bringing such an action must prove
all the necessary elements of a contract other than
consideration.'" (Docket Entry # 120, § III) (quoting Rhode
Island Hospital Trust National Bank v. Varadian, 647 N.E.2d 1174,

1179 (Mass. 1995)).  In <u>Varadian</u>, "the necessary elements of a contract" consisted of the offer and acceptance.  <u>Rhode Island Hospital Trust National Bank v. Varadian</u>, 647 N.E.2d at 1179. Assuming for purposes of argument that <u>Varadian</u> applies in the context of a liability insurance dispute, a fact finder could conclude that all of the elements of an oral contract of insurance exist.  As previously explained, there is sufficient evidence to establish all of the essential elements of an oral insurance contract, including offer and acceptance.  Defendants' argument based on <u>Varadian</u> therefore does not provide a basis to enter summary judgment on Count V.

Raising a similar premise and citing <u>Massachusetts Municipal Wholesale Electric Co. v. Town of Danvers</u>, 577 N.E.2d 283, 288 (Mass. 1991), defendants assert that proving all of the elements of a contract entails and requires plaintiffs to prove compliance with conditions precedent.  (Docket Entry # 120, § III).  First, although <u>Massachusetts Municipal</u> sets out the well established principle that if a condition precedent "is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced," the case is a breach of contract case that does not involve an estoppel claim.  <u>Massachusetts Municipal Wholesale Electric Co. v. Town of Danvers</u>, 577 N.E.2d at 288 (breach of electric power sales agreements).  Second, as explained therein, "A condition precedent defines an event which must occur before a

contract becomes effective or before an obligation to perform arises under the contract." Id. Here, sufficient evidence exists of an oral insurance contract.  The circumstances do not involve events that must occur before the oral insurance contract becomes effective.  As such, plaintiffs' compliance with the conditions precedent at issue in this case (such as reporting) is not a necessary element to form the oral insurance contract. Third, defendants do not identify the conditions precedent plaintiffs must fulfill to succeed on the estoppel claim. Defendants single sentence argument based on the Massachusetts Municipal decision does not provide a basis to enter summary judgment on either estoppel claim.  In sum, based on the arguments defendants present,[43] they are not entitled to summary judgment on the estoppel claim in Count V as to the 2004-2005 policy period.

Turning to the 2003-2004 policy period, defendants address the estoppel claim, if any, out of an abundance of caution.  In addition to presenting the same arguments, they add an agency argument.  In particular, they submit that the representatives of the insured lack the authority to bind them. (Docket Entry # 120, § III, n.4) (citing Providence Washington Indemnity Co. v. Varella, 112 F.Supp. 732, 733-734 (D.Mass. 1953)).  They also

---

[43]  Defendants do not make an insurable loss or an agency argument with respect to the estoppel claim in Count V based on the 2004-2005 policy period.

assume that the claim, if any, is premised on the 2003-2004 E&O
Policy's automatic Extended Reporting Provision.  The August 2004
notice by Caplitz to Lancer falls within the 60 day time frame of
the 2003-2004 E&O Policy's automatic Extended Reporting
Provision.  Although the 2003-2004 Plan Highlights and the 2003-
2004 Enrollment Form do not refer to this 60 day automatic
Extended Reporting Provision, plaintiffs do not identify any
other representation that supports an estoppel claim in Count V
for the 2003-2004 policy period.  See generally Kenney v. Floyd,
700 F.3d at 608 ("'summary judgment target'" with underlying
burden of proof "'must affirmatively point to specific facts that
demonstrate the existence of an authentic dispute'").

Even if the oral or the implied in fact insurance contracts
do not include this provision, it remains incumbent upon
plaintiffs to provide facts sufficient to withstand summary
judgment that Lancer, or whoever else made the representation
supporting the estoppel in Count V, had the authority to make a
representation that would alter the terms of the oral or the
implied insurance contract and bind American Guarantee and
Zurich.  See Smith Beverages, Inc. v. Metropolitan Casualty
Insurance Co., 149 N.E.2d 146, 148 (Mass. 1958) (allowing
directed verdict inasmuch as "the plaintiff made no affirmative
preliminary showing that McDonald had the authority from the
defendant" and there was also "no showing of the scope of

Meehan's authority"); <u>Belbas v. New York Life Insurance Co.</u>, 15 N.E.2d 806, 808 (Mass. 1938); <u>see also</u> <u>Providence Washington Indemnity Co. v. Varella</u>, 112 F.Supp. at 733-734.  In response to defendants' agency argument, plaintiffs fail to provide such facts thus requiring summary judgment on the estoppel claim in Count V based on the 2003-2004 policy period.

With respect to Count I, defendants argue that, "Plaintiffs' alleged reliance on B&B to procure coverage under the 2004-2005 [E&O] Policy and refrain from purchasing other insurance during that time does not expand the scope of coverage available to the Plaintiffs under the policy."  (Docket Entry # 126, § III(C)). Defendants submit that the terms of the 2004-2005 E&O Policy did not provide defense and indemnity coverage.  Consequently, an estoppel based on plaintiffs' reliance on Calsurance to procure the 2004-2005 E&O Policy does not expand or alter the lack of coverage available under the 2004-2005 E&O Policy.  Therefore, even if plaintiffs established that B&B, BBC and/or Calsurance are estopped to deny the renewal of the 2004-2005 E&O Policy, they would not be entitled to any relief.  In other words, defendants maintain there was no detriment as a consequence of the failure to procure the policy.  (Docket Entry # 126, § III(C)) (Docket Entry # 120, § III).

Plaintiffs point out that the 2004-2005 Plan Highlights and the 2004-2005 Enrollment Form as opposed to the express 2004-2005

E&O Policy constitute the basis for the "contract by estoppel."
(Docket Entry # 123, § III(D)).  As previously explained, the
highlights and the enrollment form do not provide defense and
indemnity coverage.  Thus, the terms of these contracts, like the
terms of the express 2004-2005 E&O Policy, do not entitle
plaintiffs to relief.  The absence of any detriment as a
consequence of the failure of B&B, BBC or Calsurance to procure
such "coverage" thus remains a viable argument.

    As previously noted, detrimental reliance is required to
succeed on an estoppel claim.  Lumbermens Mutual Casualty Co. v.
Office Unlimited, 645 N.E.2d 1165, 1169 (Mass. 1995); Specialty
National Insurance Co. v. OneBeacon Insurance Co., 486 F.3d at
737.  To succeed on an estoppel claim, "it must be shown that one
has been induced by the conduct of another to do something
different from what otherwise would have been done and that harm
has resulted."  Lumbermens Mutual Casualty Co. v. Office
Unlimited, 645 N.E.2d at 1169; see Rotundi v. Arbella Mutual
Insurance Co., 763 N.E.2d at 564 (estoppel requires showing
"'that one has been induced by the conduct of another to do
something different from what otherwise would have been done and
which has resulted to his harm'") (quoting Royal-Globe Insurance
Co. v. Craven, 585 N.E.2d 315, 319 (Mass. 1992)).  Plaintiffs
bear the underlying burden of showing their detrimental reliance.
See Specialty National Insurance Co. v. OneBeacon Insurance Co.,

486 F.3d at 737.   The burden shifting framework in <u>Jet Line</u> does not apply to the estoppel claim in Count I because it is based on a failure to procure the insurance policy covering Caplitz, Herman and Financial Resources as opposed to a misrepresentation of coverage for the Meiselman matter.   <u>See</u> <u>Dahlstedt v. State Farm Insurance Co.</u>, 1998 WL 324197, *5 (Mass.Super. June 8, 1998) (rejecting burden shifting under <u>Jet Line</u> in context of estoppel claim in part because insurer's delay in denying coverage was not "a misrepresentation that requires the burden of proof of loss to shift to the insurer").

Here, plaintiffs assert that they refrained from purchasing other insurance coverage covering Herman and Financial Resources as well as Caplitz as a result of a representation made by Calsurance (or B&B or BBC) to procure insurance.   (Docket Entry # 116, § III(C)) (Docket Entry # 28, ¶ 51).   The evidence in the record to support the assertion consists of Caplitz's averment that he tried without success "through his broker" to "obtain replacement coverage" after the December 2, 2004 fax from Robb. (Docket Entry # 125, ¶ 53) (Docket Entry # 95, ¶ 45).   The broker, now deceased, "took a telephone application" for "an E&O policy" with AIG.   AIG denied Caplitz "E&O coverage" because of the claim history as to the Meiselman claim.   (Docket Entry # 125, ¶ 53) (Docket Entry # 87, pp. 54-57).   There is no evidence about the terms of the AIG policy and whether the errors and

omissions coverage would have included defense and indemnity for
the Meiselman crossclaim.  In other words, there is no showing
that the AIG replacement policy (or another unidentified errors
and omissions policy Caplitz refrained from purchasing in
reliance on the representation to procure insurance) was better
than the oral insurance contract or the express 2004-2005 E&O
Policy Calsurance (or B&B or BBC) failed to obtain.  Herman's
averment that she did not purchase additional or other insurance
"[i]n reliance on the language in the <u>Plan Highlights</u>" (Docket
Entry # 125, ¶ 14) (Docket Entry # 96, ¶ 3) does not provide
detrimental reliance because there is no indication that the
additional insurance would have provided more favorable coverage
for the Meiselman matter.  <u>See generally</u> <u>Specialty National</u>
<u>Insurance Co. v. OneBeacon Insurance Co.</u>, 486 F.3d at 735-736;[44]

---

[44]  As explained in <u>Speciality</u>:

> [T]here is no evidence that McMillan did, or refrained from
> doing, anything in response to Specialty's actions, either
> before or after it hired him an attorney.  Nor is there any
> evidence that whatever McMillan did, or failed to do, worked
> to his detriment.  OneBeacon suggests that McMillan could
> have retained his own counsel had he known that Specialty
> would disclaim coverage, but there is nothing to suggest
> that, had he done so, the claim would have been resolved
> more favorably to him . . ..
>
> [OneBeacon also] postulates that it might have hired counsel
> for McMillan to seek a declaratory judgment that he was not
> liable to the Rhodeses, or even to intervene in their
> lawsuit, rather than waiting to get brought in on a
> third-party complaint.  But OneBeacon does not explain how
> these tactics would have improved McMillan's settlement
> position, and the point is far from obvious.  Speculation as

<u>Transamerica Insurance Group v. Turner Construction Co.</u>, 601
N.E.2d 473, 477 (Mass.App.Ct. 1992) ("action based on estoppel .
. . presupposes a change of position by the plaintiff to that
plaintiff's detriment").

Simply stated, plaintiffs do not provide sufficient facts of
the harm they experienced as a consequence of relying on the
representation to procure insurance.  Accordingly, the estoppel
claim in Count I against B&B, BBC and Calsurance based upon
plaintiffs' alleged reliance on the representation to procure or
provide insurance does not withstand summary judgment.

II.  <u>PLAINTIFFS' PARTIAL SUMMARY JUDGMENT MOTION</u>

Plaintiffs seek partial summary judgment on liability for
counts I, III, IV, V and VI.  They also seek to establish certain
facts under Rule 56(g).

As to counts III and IV and viewing the facts in plaintiffs'
favor, they are not entitled to summary judgment on the oral and
the implied in fact contract claims against American Guarantee
and Zurich because of plaintiffs' failure to establish as a
matter of law that these contracts provide defense and indemnity
coverage for the Meiselman crossclaim.  Genuine issues of
material fact also preclude a finding that Caplitz sent the

---

        to the insured's detrimental reliance cannot sustain an
        estoppel claim.

<u>Id.</u>

enrollment form and the premium check to Calsurance in a timely manner as required in the 2004-2005 Enrollment Form.  Summary judgment on Count I in plaintiffs' favor is inappropriate because of plaintiffs' failure to provide sufficient facts to establish detrimental reliance as a matter of law.  Plaintiffs also fail to establish as a matter of law that B&B, BBC or Calsurance made a contract to procure an insurance policy with plaintiffs.

Genuine issues of material fact also prevent summary judgment on Count VI.  At a minimum, plaintiffs fail to establish that defendants breached the covenant as a matter of law.  They also fail to establish as a matter of law that Caplitz sent the enrollment form and the premium check to Calsurance in a timely manner.

Genuine issues of material fact likewise preclude summary judgment on Count V.  Plaintiffs fail to establish as a matter of law that Lancer or anyone else made a promise or representation of coverage for the Meiselman matter or claim.

Finally, plaintiffs seek to establish certain facts under Rule 56(g).  Under Rule 56(g), if a court does not grant all of the relief requested in a summary judgment motion, "the court can determine if there are material facts which are genuinely not in dispute, and establish those facts as undisputed for trial."
Pariseau v. Captain John Boats, 2011 WL 1560975, *2 (D.Mass. April 25, 2011).  All of the proposed facts plaintiffs seek to

establish are genuinely disputed.  In addition, facts assumed by defendants for purposes of their summary judgment motion are not appropriate facts to deem established under Rule 56(g).  <u>See</u> Advisory Committee Notes, 2010 Amendment, Rule 56(g), Fed. R. Civ. P.; <u>Triple H Debris Removal, Inc. v. Companion Property and Casualty Insurance Co.</u>, 647 F.3d 780, 785-786 (8th Cir. 2011).

CONCLUSION

In accordance with the foregoing discussion, the motion for summary judgment filed by defendants (Docket Entry # 119) is **ALLOWED** except for Count V with respect to the 2004-2005 policy period and for Count VI.  Plaintiff's motion for partial summary judgment (Docket Entry # 115) under Rules 56(a) and Rule 56(g) is **DENIED**.  The parties shall appear for a status conference on April 2, 2013, at 2:30 p.m. to set a trial date.

     /s/ Marianne B. Bowler     
**MARIANNE B. BOWLER**
United States Magistrate Judge